**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTRO DE TRABAJADORES UNIDOS,
   9805 S. Ewing Ave,
   Chicago, IL 60617,

and

IMMIGRANT SOLIDARITY DUPAGE,
   311 S. Naperville Rd,
   Wheaton, IL 60187,

      Plaintiffs,

     v.

SCOTT BESSENT,
in his official capacity as Secretary of the Treasury,
   1500 Pennsylvania Ave., NW
   Washington, DC 20220,

INTERNAL REVENUE SERVICE,
   1111 Constitution Ave., NW
   Washington, DC 20224,

and

MELANIE KRAUSE,
in her official capacity as acting Commissioner of Internal Revenue,
   1111 Constitution Ave., NW
   Washington, DC 20224,

      Defendants.

Civil Action No. 25-677

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.     Plaintiffs Centro de Trabajadores Unidos and Immigrant Solidarity DuPage file this action seeking declaratory and injunctive relief against Defendants Scott Bessent, in his official capacity as Secretary of the Treasury; the Internal Revenue Service (IRS); and Melanie Krause, in her official capacity as acting Commissioner of Internal Revenue. Defendants are the agency and agency officials with control over records submitted by taxpayers to the IRS in connection with the payment of federal taxes. Plaintiffs seek a declaration that Defendants are forbidden by law,

26 U.S.C. § 6103, from disclosing the names and addresses of taxpayers with Individual Taxpayer Identification Numbers (ITINs), as well as other information filed with the IRS by those taxpayers, to the Department of Homeland Security (DHS) or to any other federal or state agency or person for purposes of aiding in the enforcement of immigration laws, and, if necessary, an injunction implementing the declaration.

## JURISDICTION

2. This Court has jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law.

## PARTIES

3. Plaintiff Centro de Trabajadores Unidos (CTU) is a not-for-profit corporation located in Chicago, Illinois and serving Chicago's southeast side and south suburbs. As a member-led community organization and worker center, CTU strives to build immigrant and worker power by working to advance systemic change that promotes racial, gender and economic justice and stabilizes low-income immigrant communities and communities of color. Founded in 2008, CTU's programming and initiatives reflect its vision to build neighborhood institutions that represent the interests of working people. CTU represents and serves hundreds of members and their surrounding communities through programs supporting workers' rights, organizing and civic education in immigrant communities, assistance for members seeking to establish business cooperatives, and through parent-mentor programs intended to increase member engagement with local schools.

4. Plaintiff Immigrant Solidarity DuPage (ISD) is a not-for-profit corporation located in Wheaton, Illinois and serving DuPage County, Illinois and the western suburbs of Chicago. Founded in 2007, ISD's mission is to educate, organize, and mobilize DuPage County around the

rights, culture and collective struggles of the Latino community. ISD organizes with members in campaigns to advance the dignity of workers by conducting know-your-rights presentations and offering technical assistance to worker-led efforts to highlight employer abuses. ISD also operates a community center offering a variety classes, cultural events, meeting space, and workshops on community rights.

5. Scott Bessent is the Secretary of the Treasury. In that capacity, he is responsible for administration and enforcement of the Internal Revenue Code. 26 U.S.C. § 7801(a)(1).

6. Defendant IRS is a federal agency headquartered in Washington, D.C. and is responsible for implementation of the internal revenue laws.

7. Defendant Melanie Krause is the acting Commissioner for Internal Revenue. In that capacity, she is responsible for execution and application of the internal revenue laws. 26 U.S.C. § 7803(a)(2). She is also responsible for ensuring that IRS employees "are familiar with and act in accord with taxpayer rights," including "the right to privacy" and "the right to confidentiality." *Id*. § 7803(a)(3)(G), (H).

## FACTUAL BACKGROUND

**The administration's immigration enforcement agenda**

8. President Donald J. Trump, during his campaign for President, promised voters that he would deport millions of people who are not authorized to be present in the United States. Since the election in November, and now as President, he has frequently restated his intention to honor that promise.

9. On the first day of his term, President Trump issued an executive order establishing the federal government's policy of "[r]emoving promptly all aliens who enter or remain in violation of Federal law." Exec. Order 14165, § 2(d), 90 Fed. Reg. 8467, 8467 (Jan. 30, 2025).

10.     In a second executive order issued on the same day, President Trump declared a federal policy of "execut[ing] the immigration laws against all inadmissible and removable aliens." Exec. Order 14159, § 2, 90 Fed. Reg. 8443, 8443 (Jan. 29, 2025).

11.     DHS, through its subagency U.S. Immigration and Customs Enforcement (ICE), is responsible for enforcing federal immigration laws. Specifically, ICE manages all aspects of the immigration enforcement process, including the identification, arrest, detention, and removal of aliens who are subject to removal or are unlawfully present in the United States. Executive Order 14159 charged DHS with ensuring "the successful enforcement of final orders of removal" and stated "that the primary mission of [ICE] is the enforcement of the provisions of the [Immigration and Nationality Act] and other Federal laws related to the illegal entry and unlawful presence of aliens in the United States and the enforcement of the purposes of this order." § 4, 90 Fed. Reg. at 8444.

12.     President Trump has imposed quotas on ICE to increase arrests from a few hundred per day to between 1200 to 1500 per day.[1] The White House deputy chief of staff for policy Stephen Miller has described these quotas as a "floor, not a ceiling."[2]

13.     In early February, top officials at ICE were removed from their positions for failing to arrest and deport individuals at a pace desired by the administration.[3] At about the same time, DHS asked Secretary Bessent to deputize IRS agents to engage in immigration enforcement

---

[1] Nick Miroff & Maria Sacchetti, *Trump officials issue quotas to ICE officers to ramp up arrests*, Wash. Post, Jan. 26, 2025.

[2] Priscilla Alvarez, *White House pressures ICE to pick up pace of migrant arrests, sources say*, CNN, Feb. 7, 2025.

[3] Nick Miroff, *Top ICE officials reassigned amid strain to meet Trump deportation goals*, Wash. Post, Feb. 11, 2025.

4

activities.[4] On or about February 21, the acting director of ICE was removed from his post due to ICE's inability to accelerate deportations.[5]

14.     President Trump and DHS have taken action to enlist the aid of state authorities in the enforcement of immigration laws. President Trump has directed DHS to enter into agreements with states to "ensure State and local law enforcement agencies across the United States can assist with the protection of the American people" by authorizing "State and local law enforcement officials … to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary of Homeland Security." Exec. Order 14159, § 11, 90 Fed. Reg. at 8445.

15.     On January 23, 2025, DHS made a finding of a "Mass Influx of Aliens," 90 Fed. Reg. 8399 (Jan. 29, 2025), which triggers a regulatory provision permitting DHS to request assistance from state and local government in the administration of immigration laws. 28 C.F.R. § 65.83.

16.     The Trump administration has begun taking steps to collect information about individuals for potential immigration enforcement.

17.     President Trump has issued an executive order to facilitate the sharing of data between agencies. He has directed the U.S. DOGE Service (USDS) to "work with Agency Heads to promote inter-operability between agency networks and systems" and "facilitate responsible data collection and synchronization." He has also directed agency heads to assure that "USDS has full and prompt access to all unclassified agency records, software systems, and IT systems." Exec.

---

[4] Hamed Aleaziz & Andrew Duehren, *I.R.S. Agents Are Asked to Help With Immigration Crackdown*, N.Y. Times, Feb. 10, 2025.

[5] Michelle Hackman, *Trump Administration to Replace Acting ICE Director*, Wall St. J., Feb. 21, 2025.

Order 14158, § 4, 90 Fed. Reg. 8441 (Jan. 29, 2025). He has also issued an executive order directing DHS to share information with states for immigration enforcement purposes. Exec. Order 14159, § 18, 90 Fed. Reg. at 8446.

18. The administration has incorrectly characterized every individual not authorized to be present in the United States as a criminal. In a January 29, 2025, briefing, White House Press Secretary Karoline Leavitt stated that a foreign national "who illegally enters the United States" is "by definition, a criminal." In response to a specific question asking how many recent ICE arrestees "have a criminal record versus those who are just in the country illegally," Ms. Leavett responded: "All of them, because they illegally broke our nation's laws, and, therefore, they are criminals, as far as this administration goes. I know the last administration didn't see it that way, so it's a big culture shift in our nation to view someone who breaks our immigration laws as a criminal."

19. In fact, unauthorized physical presence in the United States and accepting employment in the United States while present without authorization are not, standing alone, violations of federal criminal law.

20. More than thirteen million individuals are potentially subject to the President's mass deportation plans.[6] To carry out the deportation policies articulated by President Trump, DHS and ICE must first identify and locate individuals who are subject to removal.

**Confidentiality of taxpayer records**

21. Under the Internal Revenue Code (IRC), all income earned in the United States is subject to federal income tax, regardless of whether the taxpayer has been lawfully admitted. 26 U.S.C. §§ 1, 2(d), 871, 7701(b)(1). Any taxpayer who fails to file federal income tax returns

---

[6] https://www.americanimmigrationcouncil.org/research/mass-deportation.

required by law and to pay taxes on their income is subject to civil liability and penalties, and, in cases of willful attempts to evade taxes, criminal liability, including a fine of up to $100,000 and five years in prison. 26 U.S.C. §§ 6651, 7201.

22. United States citizens are entitled to obtain a Social Security number (SSN), which is used for filing their federal income and other tax returns and in making tax payments.

23. Individuals who are not lawfully present in the United States are not entitled to obtain an SSN. Instead, exercising authority conferred by Congress in 26 U.S.C. § 6109, in 1996, the IRS developed a process through which individuals who are not eligible for an SSN can apply for and obtain an ITIN to enable them to file tax returns and pay federal income taxes as required by law. Obtaining an ITIN requires applicants to provide their full name and address, as well as other identifying information about themselves in the IRS Form W-7.[7]

24. Millions of individuals in the U.S. have filed ITIN applications.[8] Those applications, the returns of taxpayers who file using ITINs, and other tax records contain personal information—including names, current addresses, and, in many cases, information about dependents—that would greatly facilitate DHS and ICE in identifying and locating millions of individuals who are potentially subject to removal. Access to this sensitive data by DHS and ICE would thereby expose millions of taxpayers to the administration's aggressive immigration enforcement tactics.

25. Internal Revenue Code section 6103 forbids Defendants from complying with requests—whether from the President, DHS, ICE, or a state—to share return or return information for purposes of immigration enforcement. Section 6103(a) declares that "[r]eturns and return

---

[7] https://www.irs.gov/pub/irs-pdf/fw7.pdf.

[8] https://itep.org/itin-filer-data-gap-how-changing-laws-lack-of-data-disaggregation-limit-inclusive-tax-policy/.

information shall be confidential" and may not be disclosed except as "authorized" by the IRC. Subsections (c)–(o) contain specific exceptions to the prohibition on disclosure of return and return information in subsection (a). Most of these subsections contain further specific exceptions. None of these exceptions authorize Defendants to disclose taxpayer returns and return information—including ITIN records—to DHS, ICE, or any state to facilitate enforcement of the federal immigration laws.

26. Subsection (g) of section 6103 authorizes the President of the United States or his office to obtain return and return information if the President makes a "written request," "signed by him personally," that identifies the taxpayer's "name and address." Because this exception requires the President to identify by name the taxpayer whose return or return information is requested, it does not authorize the President to obtain returns or return information in bulk for purposes of identifying targets for immigration enforcement.

27. Although section 6103 includes no language authorizing disclosure of return and return information for immigration enforcement, section 6103(i) does authorize such disclosure for certain criminal investigations.

28. The administration has incorrectly characterized all individuals not authorized to remain in the U.S. as criminals. Obtaining access to return and return information by falsely characterizing civil immigration enforcement as enforcement of criminal laws would circumvent section 6103's carefully crafted and narrowly tailored exceptions to confidential treatment of tax records.

29. Despite the prohibitions in section 6103, DHS, ICE, and/or other components of the administration are currently seeking access to ITIN information for purposes of immigration enforcement because ITIN information is the largest source of the names and current addresses of

non-citizens within the federal government. Indeed, according to media reporting, immigration enforcement officials have already requested that the IRS "divulge the home addresses," as well as phone numbers and email addresses, "of 700,000 people suspected of being in the country illegally."[9] DHS reportedly has sought this information for weeks.

30. The IRS, under prior leadership, refused to provide the requested information. On February 28, 2025, current acting administrator Defendant Melanie Krause replaced the prior acting commissioner, who had rebuffed DHS's request. She is reportedly reexamining DHS's request for access to taxpayer information.

31. In addition, as set forth in paragraph 17 above, there is reason to believe that the administration will seek to transmit ITIN information to state enforcement authorities for purposes of aiding the administration in the enforcement of immigration laws.

32. No statute authorizes Defendants to disclose return and return information of Plaintiffs' members to the President, DHS, ICE, a state or local government, or any other person for the purpose of identifying targets for immigration enforcement.

**Harm to Plaintiffs**

33. Individual members of both CTU and ISD stand to suffer material, irreparable harms in the absence of intervention by this Court, if personally identifiable information contained in ITIN applications, returns, and other tax records held by Defendants is disclosed to DHS or ICE.

34. The statements and activities of the Trump Administration have made clear their intention to use mass collection of taxpayer information to advance civil immigration enforcement, in contravention of the plain language of the tax code.

---

[9] Jacob Bogage et al., *DHS asks IRS for addresses of people believed to be in U.S. illegally*, Wash. Post., Feb. 28, 2025.

35. Release of such information would subject individual members of CTU and ISD to privacy harm and harm in the form of the arrest, detention, or other deprivations of liberty associated with the Trump Administration's stated intention to engage in mass actions against immigrants in the United States.

36. Relief from such harm would not be practicable following release of legally protected tax information given the virtual impossibility fashioning an order limiting its use or further dissemination.

## CLAIMS FOR RELIEF

### First Cause of Action

37. Under the Administrative Procedure Act, a court shall "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

38. Disclosure of the return and return information of Plaintiffs' members to the President, DHS, ICE, a state or local government, or any other person for the purpose of identifying targets for immigration enforcement would be final agency action for which there is no adequate remedy.

39. Disclosure of the return and return information of Plaintiffs' members to the President, DHS, ICE, a state or local government, or any other person for the purpose of identifying targets for immigration enforcement would violate IRC § 6103, and would be contrary to law.

40. Unless this Court enters a declaratory judgment stating that Defendants are forbidden from providing DHS, the President, or any other agency or person the ITIN applications and any other taxpayer return information for targeting individuals for immigration enforcement action, Defendants are likely to provide such information to DHS, the President, or others not authorized by state to receive it.

41. Injunctive relief is necessary because, if such information is disseminated outside of the IRS for purposes of immigration enforcement, it will be impossible after the fact to prevent the harm caused by the unlawful dissemination.

## Second Cause of Action

42. Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

43. Defendants lack authority to disclose of the return and return information of Plaintiffs' members to the President, DHS, ICE, a state or local government, or any other person for the purpose of identifying targets for immigration enforcement.

44. Unless this Court enters a declaratory judgment stating that Defendants are forbidden from providing DHS, the President, or any other agency or person the ITIN applications and any other taxpayer return information for individuals for immigration enforcement action, Defendants are likely to provide such information to DHS, the President, or others not authorized by state to receive it.

45. Injunctive relief is necessary because, if such information is disseminated outside of the IRS for purposes of immigration enforcement, it will be impossible after the fact to prevent the harm caused by the unlawful dissemination.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a) Enter a judgment declaring that 26 U.S.C. § 6103 forbids Defendants from providing the Department of Homeland Security, the U.S. Immigration and Customs Enforcement, the President of the United States, state or local authorities, or any other agency or person, the ITIN applications, income tax returns, or any other record, for any taxpayer, unless disclosure of such information is specifically permitted by an exception to the prohibition of section 6103(a);

(b) Enjoin Defendants from providing the Department of Homeland Security, the U.S. Immigration and Customs Enforcement, the President of the United States, state or local authorities, or any other agency or person, the ITIN applications, income tax returns, or any other record, for any taxpayer, unless disclosure of such information is specifically permitted by an exception to the prohibition of section 6103(a); and

(c) Grant any other relief, including other injunctive relief, if needed, that this Court concludes is appropriate to protect the confidentiality of ITIN information for all taxpayers.

Dated: March 7, 2025

Kevin L. Herrera
   (Motion for pro hac vice forthcoming)
Mark H. Birhanu
   (Motion for pro hac vice forthcoming)
Raise the Floor Alliance
1 N. LaSalle St. Ste 1275
Chicago, Illinois 60602
(312) 795-9115
kherrera@raisethefloor alliance.org

Respectfully submitted,

/s/ Nandan M. Joshi
Nandan M. Joshi
   (DC Bar. No. 456750)
Michael T. Kirkpatrick
   (DC Bar. No. 486293)
Public Citizen Litigation Group
1600 20th Street, NW
Washington, DC 20009
(202) 588-7733
njoshi@citizen.org

Alan B. Morrison
   (DC Bar No. 073114)
George Washington Law School,
2000 H Street NW
Washington D.C. 20052
(202) 994-7120
abmorrison@law.gwu.edu