## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Centro de Trabajadores Unidos, et al.,

     Plaintiffs,

     v.

Scott Bessent, in his official capacity as
Secretary of the Treasury, et al.,

     Defendants.

Civil Action No. 25-677 (DLF)

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

Kevin L. Herrera
    (Motion for *pro hac vice* forthcoming)
Mark H. Birhanu
    (Motion for *pro hac vice* forthcoming)
Raise the Floor Alliance
1 N. LaSalle Street, Suit 1275
Chicago, Illinois 60602
(312) 795-9115
kherrera@raisetheflooralliance.org

Nandan M. Joshi
    (DC Bar. No. 456750)
Michael T. Kirkpatrick
    (DC Bar. No. 486293)
Public Citizen Litigation Group
1600 20th Street, NW
Washington, DC 20009
(202) 588-7733
njoshi@citizen.org

Alan B. Morrison
    (DC Bar. No. 073114)
George Washington Law School,
2000 H Street, NW
Washington, DC 20052
(202) 994-7120
abmorrison@law.gwu.edu

*Counsel for Plaintiffs*

March 14, 2025

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

    Statutory Framework ................................................................................................ 2

    The Administration's Immigration Enforcement Agenda .................................... 6

    This Action................................................................................................................ 9

LEGAL STANDARD................................................................................................... 10

ARGUMENT ............................................................................................................... 10

    I.  Plaintiffs are likely to succeed on the merits.............................................. 10

    II.  Plaintiffs will suffer irreparable harm absent a TRO. ................................ 13

    III. The balance of equities and the public interest support grant of a TRO...................... 16

CONCLUSION............................................................................................................. 18

i

## TABLE OF AUTHORITIES

**CASES**

*C.G.B. v. Wolf*,
  464 F. Supp. 3d 174 (D.D.C. 2020) ................................................................. 17

*Center for Biological Diversity v. Trump*,
  453 F. Supp. 3d 11 (D.D.C. 2020) ................................................................. 10

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ................................................................. 10

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) ................................................................. 10

*Church of Scientology of California v. IRS*,
  484 U.S. 9 (1987) ................................................................. 11, 12

*D.A.M. v. Barr*,
  474 F. Supp. 3d 45 (D.D.C. 2020) ................................................................. 10

*Electronic Privacy Information Center v. IRS*,
  910 F.3d 1232 (D.C. Cir. 2018). ................................................................. 3, 4

*Hall v. Johnson*,
  559 F. Supp. 2d 1 (D.D.C. 2009) ................................................................. 10

*Hospitality Staffing Solutions, LLC v. Reyes*,
  736 F. Supp. 2d 192 (D.D.C. 2010) ................................................................. 15

*League of Women Voters of United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ................................................................. 17

*Medical Imaging & Technology Alliance v. Library of Congress*,
  103 F.4th 830 (D.C. Cir. 2024) ................................................................. 10

*National Treasury Employees Union v. U.S. Department of Treasury*,
  838 F. Supp. 631 (D.D.C. 1993) ................................................................. 15

*Pursuing America's Greatness v. FEC*,
  831 F.3d 500 (D.C. Cir. 2016) ................................................................. 10

*Open Communities Alliance v. Carson*,
  286 F. Supp. 3d 148 (D.D.C. 2017) ................................................................. 17, 18

*Rodriguez v. United States*,
  480 U.S. 522 (1987) ................................................................. 1

## STATUTES AND REGULATIONS

26 U.S.C. § 1 ................................................................................................................. 2

26 U.S.C. § 2(d) ........................................................................................................... 2

26 U.S.C. § 871 ............................................................................................................ 2

26 U.S.C. § 4481 ........................................................................................................ 13

26 U.S.C. § 6103 .......................................................................................................... 1

26 U.S.C. § 6103(a) ...................................................................................................... 5

26 U.S.C. § 6103(b)(1) ................................................................................................. 5

26 U.S.C. § 6103(b)(2)(A) ........................................................................................... 5

26 U.S.C. § 6103(b)(6) ................................................................................................. 5

26 U.S.C. § 6103(b)(8) ............................................................................................ 5, 12

26 U.S.C. § 6103(c) ...................................................................................................... 5

26 U.S.C. § 6103(d) ................................................................................................ 5, 12

26 U.S.C. § 6103(f) ...................................................................................................... 5

26 U.S.C. § 6103(g) ...................................................................................................... 5

26 U.S.C. § 6103(g)(1) ............................................................................................... 13

26 U.S.C. § 6103(g)(1)(A) ........................................................................................ 5, 6

26 U.S.C. § 6103(g)(3)–(5) .......................................................................................... 6

26 U.S.C. § 6103(g)(4) ............................................................................................... 13

26 U.S.C. § 6103(g)(5) ............................................................................................... 13

26 U.S.C. § 6103(h) ...................................................................................................... 5

26 U.S.C. § 6103(i) ................................................................................................. 6, 12

26 U.S.C. § 6103(i)(1)–(5) ........................................................................................... 6

26 U.S.C. § 6103(j) ...................................................................................................... 5

26 U.S.C. § 6103(*l*) ................................................................................... 5, 12

26 U.S.C. § 6103(o) ......................................................................................... 5

26 U.S.C. § 6103(o)(3) ............................................................................... 5, 13

26 U.S.C. § 6109 ............................................................................................. 3

26 U.S.C. § 6109(i) ......................................................................................... 3

26 U.S.C. § 6651 ............................................................................................. 3

26 U.S.C. § 7201 ............................................................................................. 3

26 U.S.C. § 7701(b)(1) ................................................................................... 2

Act of July 1, 1862, 12 Stat. 432 .................................................................... 4

Revenue Act of 1918, 40 Stat. 1057 ............................................................... 4

Revenue Act of 1924, 43 Stat. 253 ................................................................. 4

Supporting America's Children and Families Act, Pub. L. 118-258, title II,
    § 202(a)(2), 138 Stat. 2947 .................................................................... 12

Tax Reform Act of 1976, Pub. L. No. 94-455, tit. XII, § 1202, 90 Stat. 1520 ............................. 4

20 C.F.R. § 422.104 ........................................................................................ 3

28 C.F.R. § 65.83 ............................................................................................ 8

## FEDERAL REGISTER

Executive Order 14158, 90 Fed. Reg. 8441 (Jan. 29, 2025) .......................... 8

Executive Order 14159, 90 Fed. Reg. 8443 (Jan. 29, 2025) .................... 6, 7, 8

Executive Order 14165, 90 Fed. Reg. 8467 (Jan. 30, 2025) .......................... 6

Mass Influx of Aliens, 90 Fed. Reg. 8399 (Jan. 29, 2025) ........................... 7

## OTHER

@jacobbogage.bsky.social, Bluesky (Feb. 28, 2025, 11:14 pm),
    https://bsky.app/profile/jacobbogage.bsky.social/post/3ljc2oduenc25 ...................... 9

Hamed Aleaziz & Andrew Duehren, *I.R.S. Agents Are Asked to Help with
Immigration Crackdown*, N.Y. Times, Feb. 10, 2025 ................................ 7

Priscilla Alvarez, *White House pressures ICE to pick up pace of migrant arrests,*
*sources say*, CNN, Feb. 7, 2025 ............................................................................... 7

American Immigration Council, Mass Deportation,
https://www.americanimmigrationcouncil.org/research/mass-deportation .............................. 7

Jacob Bogage & Jeff Stein, *DOGE presses to check federal benefits payments against*
*IRS tax records*, Wash. Post, Mar. 1, 2025 .............................................................. 15

Jacob Bogage et al., *DHS asks IRS for addresses of people believed to be in U.S.*
*illegally*, Wash. Post., Feb. 28, 2025 .......................................................................... 9

Adrian Carrasquillo, *Trump Wants to Use the IRS to Track Down Immigrants. They*
*May Stop Paying Taxes*, The Bulwark, Mar. 5, 2025 ............................................... 17

Andrew Duehren, *Homeland Security Officials Push I.R.S. for 700,000 Immigrants'*
*Addresses*, N.Y. Times, Feb. 25, 2025 ....................................................................... 9

Debu Ghandhi et al., *Trump's Rash Immigration Actions Place Cruelty and Spectacle*
*Above Security*, Ctr. for Am. Progress, Feb. 27, 2025,
https://www.americanprogress.org/article/trumps-rash-immigration-actions-place-
cruelty-and-spectacle-above-security/ .................................................................. 3

Michelle Hackman, *Trump Administration to Replace Acting ICE Director*, Wall St.
J., Feb. 21, 2025 ...................................................................................................... 7

The Heritage Foundation, *Mandate for Leadership: The Conservative Promise* 167
(2023), https://static.project2025.org/2025_MandateForLeadership_FULL.pdf ..................... 8

H.R. Conf. Rep. No. 94-1515 (1976) ............................................................................ 11

Internal Revenue Service, Introduction to residency under U.S. tax law,
https://www.irs.gov/individuals/international-taxpayers/introduction-to-residency-
under-us-tax-law ...................................................................................................... 3

IRS Publication 1, https://www.irs.gov/pub/irs-pdf/p1.pdf ............................................... 11

IRS Publication 1075, Tax Information Security Guidelines for Federal, State, and
Local Agencies, https://www.irs.gov/pub/irs-pdf/p1075.pdf ....................................... 14

IRS Publication 4369, Disclosure & Privacy Law Reference Guide (rev. 2012),
https://www.irs.gov/pub/irs-pdf/p4639.pdf ............................................................. 15

Lauren Lorichhio et al., *Mass Deportation Plans Prompt Unease for ITIN Filers*,
TaxNotes, Mar. 7, 2025 ......................................................................................... 17

National Immigration Law Center, *FAQ: Individual Taxpayer Identification Number (ITIN): A Powerful Tool for Immigrant Taxpayers*, https://www.nilc.org/resources/itinfaq/ ...................................................................... 14

Nick Miroff, *Top ICE officials reassigned amid strain to meet Trump deportation goals*, Wash. Post, Feb. 11, 2025 .......................................................................... 7

Nick Miroff & Maria Sacchetti, *Trump administration seeking access to database of immigrant minors*, Wash. Post, Jan. 31, 2025 ............................................. 8

Nick Miroff & Maria Sacchetti, *Trump officials issue quotas to ICE officers to ramp up arrests*, Wash. Post, Jan. 26, 2025 ....................................................... 7

Maria Sacchetti, *Undocumented and paying taxes, they seek a foothold in the American Dream*, Wash. Post, Mar. 11, 2017 ........................................... 11, 14, 17

S. Rep. No. 94-938 pt. 1 (1976) ............................................................................... 4

Treasury Inspector General for Tax Administration, Administration of the Individual Taxpayer Identification Number Program, Rep. No. 2024-400-012 (Dec. 19, 2023), https://www.tigta.gov/sites/default/files/reports/2024-11/2024400012fr.pdf ......................... 16

## INTRODUCTION

President Trump has made clear that he wants immigration authorities to remove "all" undocumented individuals from the United States. This lawsuit does not question the President's authority to set the immigration enforcement priorities for his administration. Rather, this lawsuit is about whether the administration may access confidential taxpayer information to pursue its enforcement objectives.

"Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice." *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (per curiam). Nearly 50 years ago, Congress made the legislative choice that the information that taxpayers submit to the Internal Revenue Service (IRS) should be kept confidential—including from the law enforcement agencies of the federal government—and may be disclosed only if Congress has authorized disclosure and, then, only under the terms and conditions that Congress has specified. *See* 26 U.S.C. § 6103. Congress has actively responded to the "competing values" at stake, *Rodriguez*, 480 U.S. at 526, by amending section 6103 multiple times to address new situations, including an amendment enacted just two months ago. Congress has never amended section 6103 to permit the IRS to disclose taxpayer information to federal or state authorities for the purpose of facilitating immigration enforcement.

Like U.S. citizens and lawfully admitted immigrants, taxpayers who are not authorized under the immigration laws to be present or work in the United States are subject to the duty to pay taxes. They are also entitled by law to the privacy protections that section 6103 affords their sensitive tax information. Accordingly, the IRS lacks the statutory authority to apply a different set of confidentiality rules to protected tax data, no matter how much they believe it believes the different set of rules will advance a particular administration's policy objectives. The current administration, however, has signaled its intent to breach section 6103's protections to locate

taxpayers and their families who are subject to arrest and removal under the immigration laws. Such a breach, once it occurs, cannot be undone and would work irreparable harm on the hundreds of thousands, if not millions, of people who would be subject to the threat of removal actions simply because they faithfully complied with their legal obligation to pay their federal taxes.

Plaintiffs Centro de Trabajadores Unidos and Immigrant Solidarity DuPage are membership organizations that serve immigrant communities in the Chicago area. They have members who work, earn income, and pay income taxes as required by law, but who are not authorized to be present or be employed in the United States and thus are at risk of arrest and removal as a result of the administration's immigration enforcement agenda. On behalf of their members, Plaintiffs seek to prevent the IRS from disclosing their members' tax information to immigration enforcement authorities and thereby violating its statutory obligation to protect the confidentiality of that information. Plaintiffs seek emergency relief to ensure that the information remains protected until this Court can adjudicate the merits of Plaintiffs' claims.

## BACKGROUND

**Statutory Framework**

The Internal Revenue Code (IRC) imposes taxes on individuals who work in the United States. 26 U.S.C. § 1. The duty to pay federal taxes applies to individuals who are not lawfully admitted and are subject to removal. *Id.* §§ 2(d), 871, 7701(b)(1). As the IRS explains it, "[a]lthough the immigration laws of the United States refer to individuals who are not U.S. citizens as immigrants, nonimmigrants, and undocumented individuals, the tax laws of the United States refer only to residents and nonresidents" and taxes both based on income from "sources within the United States."[1] A taxpayer who fails to file federal income tax returns required by law and to pay

---

[1] IRS, Introduction to residency under U.S. tax law, https://www.irs.gov/individuals/international-taxpayers/introduction-to-residency-under-us-tax-law. An "undocumented

taxes on their income is subject to civil liability and penalties, 26 U.S.C. § 6651, and, in cases of willful attempts to evade taxes, criminal liability including a fine of up to $100,000 and five years in prison, *id.* § 7201.

The IRC requires taxpayers to use an identification number to identify themselves and others, such as dependents, listed in a tax return. 26 U.S.C. § 6109. For citizens, permanent residents, and other individuals who are eligible for a Social Security number, the taxpayer identification number is the taxpayer's Social Security number. *Id.* § 6109(a), (d). Undocumented workers, however, are not eligible to receive a Social Security number. 20 C.F.R. § 422.104. To ensure that such workers can file returns necessary to comply with their obligation to file returns and pay taxes, the IRC authorizes the IRS to issue individual taxpayer identification numbers (ITINs) to them for use on their tax returns. 26 U.S.C. § 6109(i). The use of an ITIN on a tax return, thus, signals that the taxpayer or other individuals identified on a tax return are not U.S. citizens or permanent residents. In 2022, undocumented workers used the ITIN program to pay $59.4 billion in federal income taxes. Undocumented workers also pay $25.7 billion in Social Security taxes and $6.4 billion in Medicare taxes, programs for which they are statutorily ineligible to receive benefits.[2]

In connection with its role in collecting federal taxes, the IRS "acquires and maintains a reservoir of sensitive information about taxpayers." *Elec. Priv. Info. Ctr. v. IRS*, 910 F.3d 1232, 1235 (D.C. Cir. 2018). For much of history, taxpayer information received little privacy protection. For instance, at one time Congress thought it beneficial to make taxpayers' names, addresses, and

---

individual" who is substantially present in the U.S. will be regarded as a U.S. resident for tax purposes. *Id.*

[2] Debu Ghandhi et al., *Trump's Rash Immigration Actions Place Cruelty and Spectacle Above Security*, Ctr. for Am. Progress, Feb. 27, 2025, https://www.americanprogress.org/article/trumps-rash-immigration-actions-place-cruelty-and-spectacle-above-security/.

tax owed or paid broadly available. *See, e.g.*, Act of July 1, 1862, § 15, 12 Stat. 432, 437; Revenue Act of 1918, § 257, 40 Stat. 1057, 1086–87; Revenue Act of 1924, § 257, 43 Stat. 253, 293. Under that regime, "the President could—for any reason or no reason at all—order the IRS to make that sensitive information public." *Elec. Priv. Info. Ctr.*, 910 F.3d at 1235. "Then the Nixon administration compiled a list of political enemies and ordered the IRS to harass them," resulting in a scandal that "prompted the Congress to enact sweeping legislation to protect taxpayer privacy." *Id.*

That legislation was the Tax Reform Act of 1976, Pub. L. No. 94-455, tit. XII, § 1202, 90 Stat. 1520, 1667. The 1976 law revised section 6103 to "mandate[] that tax '[r]eturns and return information shall be confidential' unless they fall within one of the statute's narrowly drawn exceptions." *Elec. Priv. Info. Ctr.*, 910 F.3d at 1135 (quoting 26 U.S.C. § 6103(a)). In strengthening the IRC's confidentiality provisions, Congress recognized that "the IRS probably has more information about more people than any other agency in this country," but that "in many cases the Congress has not specifically considered whether the agencies which have access to tax information should have that access." S. Rep. No. 94-938 pt. 1, at 316–17 (1976). As revised by the 1976 law, the new section 6103 addressed that concern by establishing the "General rule" that tax information "shall be confidential" unless a statutory exception applies. Those confidentiality protections protect everyone who pays federal taxes—"the ordinary taxpayer and the President alike." *Elec. Priv. Info. Ctr.*, 910 F.3d at 1135.

To that end, IRC § 6103 expressly bars any "officer or employee of the United States" from "disclos[ing] any return or return information obtained by him in any manner in connection with his service as such an officer or employee or otherwise or under the provisions of" section 6103. 26 U.S.C. § 6103(a). A "return" includes "any tax or information return" or "claim for refund." *Id.*

§ 6103(b)(1). "Return information" includes "a taxpayer's identity" and "any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense." *Id*. § 6103(b)(2)(A). A taxpayer's identity is defined to include not just the taxpayer's name but also mailing address and taxpayer identifying number. *Id*. § 6103(b)(6). A "disclosure" occurs by "making known to any person in any manner whatever a return or return information." *Id.* § 6103(b)(8).

Section 6103, at subsections (c) through (o), sets out a detailed list of exceptions to section 6103(a)'s confidentiality requirement. Several of these exceptions cover disclosures of return and return information to other federal agencies or to state and local authorities. For instance, section 6103(d) authorizes disclosure of taxpayer information to state and local taxing authorities. Section 6103(f) authorizes disclosure to congressional committees. Section 6103(h) permits disclosure of information to officers and employees of the Treasury Department, the Justice Department, and the courts for purposes of tax administration. Section 6103(j) provides for disclosure for statistical purposes. Section 6103(*l*) sets out several other exceptions that permit the IRS to disclose return and return information to various federal agencies.

Section 6103(g) authorizes the disclosure of returns or return information to the President "[u]pon written request signed by him personally," if the request includes the "name and address of the taxpayer" and "the specific reason why the inspection or disclosure is requested." *Id*. § 6103(g)(1)(A). Disclosures under this provision are subject to strict limits on redisclosure and to reporting requirements. *Id.* § 6103(g)(3)–(5).

5

Subsection (i) permits disclosure of return and return information to federal agencies for enforcement of laws not related to tax administration. The disclosures authorized by this provision may be used for undertaking criminal investigations and proceedings, locating fugitives from justice pursuant to a federal arrest warrant relating to a felony, and responding to or investigating terrorist activities. 26 U.S.C. § 6103(i)(1)–(5). This provision also permits disclosure of returns and return information to the Government Accountability Office for purposes of conducting audits. *Id.* § 6103(i)(8).

None of the exceptions in section 6103 authorize disclosure of returns or return information to federal or state authorities for purposes of enforcement of immigration laws. Although section 6103 includes exceptions for many federal agencies, the Department of Homeland Security (DHS) is mentioned only once, and then in regard to a law unrelated to immigration enforcement. Most significantly, the exceptions are all narrow in scope and are generally limited to use for a particular taxpayer, not the kind of wholesale transfer of taxpayer information sought by DHS.

**The Administration's Immigration Enforcement Agenda**

President Trump has made the removal of non-citizens a central object of his presidency. On the first day of his term, President Trump issued an executive order establishing the federal government's policy of "[r]emoving promptly *all* aliens who enter or remain in violation of Federal law." Exec. Order 14165, § 2(d), 90 Fed. Reg. 8467, 8467 (Jan. 30, 2025) (emphasis added). In a second executive order issued on the same day, President Trump declared a federal policy of "execut[ing] the immigration laws against *all* inadmissible and removable aliens." Exec. Order

14159, § 2, 90 Fed. Reg. 8443, 8443 (Jan. 29, 2025) (emphasis added). More than thirteen million individuals have that status.[3]

The President has taken a number of steps to accelerate the removal process. He has imposed quotas on Immigration and Customs Enforcement (ICE), a component of the Department of Homeland Security (DHS), to increase arrests from a few hundred per day to between 1200 to 1500 per day.[4] The White House deputy chief of staff for policy Stephen Miller has described these quotas as a "floor, not a ceiling."[5] In early February, top officials at ICE were removed from their positions for failing to arrest and deport individuals at a pace desired by the administration.[6] At about the same time, DHS asked the Secretary of the Treasury, defendant Scott Bessent, to deputize IRS agents to engage in immigration enforcement activities.[7] On or about February 21, the acting director of ICE was removed from his post due to ICE's inability to accelerate deportations.[8]

To aid in their enforcement efforts, President Trump and DHS have enlisted state authorities in these efforts. On January 23, 2025, DHS made a finding of a "Mass Influx of Aliens," 90 Fed. Reg. 8399 (Jan. 29, 2025), which triggers a regulatory provision permitting DHS to request

---

[3] Am. Immigration Council, Mass Deportation, https://www.americanimmigrationcouncil.org/research/mass-deportation.

[4] Nick Miroff & Maria Sacchetti, *Trump officials issue quotas to ICE officers to ramp up arrests*, Wash. Post, Jan. 26, 2025.

[5] Priscilla Alvarez, *White House pressures ICE to pick up pace of migrant arrests, sources say*, CNN, Feb. 7, 2025.

[6] Nick Miroff, *Top ICE officials reassigned amid strain to meet Trump deportation goals*, Wash. Post, Feb. 11, 2025.

[7] Hamed Aleaziz & Andrew Duehren, *I.R.S. Agents Are Asked to Help with Immigration Crackdown*, N.Y. Times, Feb. 10, 2025.

[8] Michelle Hackman, *Trump Administration to Replace Acting ICE Director*, Wall St. J., Feb. 21, 2025.

assistance from state and local government in the administration of immigration laws. 28 C.F.R. § 65.83. The President has directed DHS to enter into agreements with states to "ensure State and local law enforcement agencies across the United States can assist with the protection of the American people" by authorizing "State and local law enforcement officials … to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary of Homeland Security." Exec. Order 14159, § 11, 90 Fed. Reg. at 8445. The President has also directed DHS to share information with states for immigration enforcement purposes. *Id*. § 18, 90 Fed. Reg. at 8446.

Indeed, collecting and sharing information about individuals is an important component of the administration's efforts to achieve their immigration enforcement agenda. As far back as 2023, the report *Mandate for Leadership*, commonly known as Project 2025, proposed that the Treasury Department "[i]mplement all necessary regulations … to provide DHS with all tax information of illegal aliens as expeditiously as possible."[9] President Trump has accelerated efforts to facilitate the sharing of data between agencies by directing the U.S. DOGE Service (USDS) to "work with Agency Heads to promote inter-operability between agency networks and systems" and "facilitate responsible data collection and synchronization." Exec. Order 14158, § 4, 90 Fed. Reg. 8441 (Jan. 29, 2025). And at the end of January, immigration officers sought access to databases of the Office of Refugee Resettlement at the Department of Health and Human Services that contain

---

[9] The Heritage Foundation, *Mandate for Leadership: The Conservative Promise* 167 (2023), https://static.project2025.org/2025_MandateForLeadership_FULL.pdf.

"information on hundreds of thousands of immigrant teens and children" who entered the country unaccompanied by their parents.[10]

The IRS's records on taxpayers—in particular, personal information associated with individuals who use ITINs—would provide a trove of information on individuals subject to immigration enforcement, including their identities, current location, place of employment, and dependents. Access to this information would advance the administration's aggressive immigration enforcement agenda. Indeed, DHS has requested that the IRS turn over identifying information concerning 700,000 individuals for immigration enforcement.[11] Although that request was denied by the then-acting IRS commissioner, he has since been replaced by a new acting commissioner, defendant Melanie Krause, who is reportedly planning to comply with the request for access.[12]

**This Action**

In light of media reports that the IRS may share confidential taxpayer data imminently with DHS, Plaintiffs filed their complaint on March 7, 2025, seeking declaratory and injunctive relief to prevent such sharing.

Pursuant to this Court's instruction, Plaintiffs approached the Department of Justice that same day seeking to confer about Plaintiffs' request for emergency relief. Between March 10, when counsel for Defendants was identified to Plaintiffs, and March 13, Plaintiffs attempted to

---

[10] Nick Miroff & Maria Sacchetti, *Trump administration seeking access to database of immigrant minors*, Wash. Post, Jan. 31, 2025.

[11] Andrew Duehren, *Homeland Security Officials Push I.R.S. for 700,000 Immigrants' Addresses*, N.Y. Times, Feb. 25, 2025.

[12] Jacob Bogage et al., *DHS asks IRS for addresses of people believed to be in U.S. illegally*, Wash. Post., Feb. 28, 2025; @jacobbogage.bsky.social, Bluesky (Feb. 28, 2025, 11:14 pm), https://bsky.app/profile/jacobbogage.bsky.social/post/3ljc2oduenc25.

reach an agreement with Defendants on a consent order that would preserve the status quo until this Court could resolve the merits of Plaintiffs' claims. Because the parties were unable to reach such an agreement, Plaintiffs now seek emergency relief from this Court.

## LEGAL STANDARD

To obtain a temporary restraining order, "the moving party must show: (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the [temporary restraining order] were not granted; (3) that [such an order] would not substantially injure other interested parties; and (4) that the public interest would be furthered" by the order. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations omitted); *see also Hall v. Johnson*, 559 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("[T]he same standard applies to both temporary restraining orders and to preliminary injunctions." (citation omitted)). "When the movant seeks to enjoin the government, the final two TRO factors—balancing the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020) (citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

## ARGUMENT

### I. Plaintiffs are likely to succeed on the merits.

"Agencies must operate within the legal authority conferred by Congress," and "courts have the responsibility to determine whether individual rights have been infringed by the exertion of unauthorized administrative power." *Med. Imaging & Tech. All. v. Libr. of Cong.*, 103 F.4th 830, 838 (D.C. Cir. 2024) (cleaned up). Under the Administrative Procedure Act (APA), when an agency's action is "not in accordance with law," courts have a duty to set it aside. 5 U.S.C. § 706(2)(A). Even apart from the APA, courts may enjoin *ultra vires* actions by an agency that are in excess of its statutory authority. *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 50 (D.D.C. 2020). An agency's decision to disclose information in violation of law is the type of

10

agency action for which the courts can provide redress. *Chrysler Corp. v. Brown*, 441 U.S. 281, 318–19 (1979) (discussing reverse-FOIA actions).

During the first Trump administration, "immigrants [were] so rattled by Trump's pledge to accelerate deportations that some are afraid to file returns, worried that addresses and other personal information on their returns could end up with federal agencies administering the crackdown."[13] In response to that fear, the IRS reassured taxpayers that "tax information cannot be shared with another government agency unless authorized by law":

> The IRS has strong processes in place to protect the confidentiality of taxpayer information, and this includes information related to tax returns filed using ITINs,' a statement from the agency said. 'There is no authorization under this provision to share tax data with ICE.[14]

The IRS's conclusion was correct then, and it is correct now. As the IRS today makes clear in its Taxpayer Bill of Rights, "[t]axpayers have the right to expect that any information they provide to the IRS will not be disclosed unless authorized by the taxpayer or by law."[15]

This confidentiality rule embodies the core paradigm change that Congress made in the Tax Reform Act of 1976. Before that enactment, tax records were considered "public records" and were "open to inspection" if authorized by statute, regulations, or executive order. H.R. Conf. Rep. No. 94-1515, at 475 (1976). The Tax Reform Act jettisoned that framework and replaced it with one in which "returns and return information are to be confidential and not subject to disclosure except as specifically provided by statute." *Id.* As a result of the 1976 law, only Congress may authorize the IRS to disclose taxpayer information to another agency—the President and his administration do not have that authority. *See Church of Scientology of Cal. v. IRS*, 484 U.S. 9, 16

---

[13] Maria Sacchetti, *Undocumented and paying taxes, they seek a foothold in the American Dream*, Wash. Post, Mar. 11, 2017 (Sacchetti Article).

[14] *Id.*

[15] IRS Pub. 1, https://www.irs.gov/pub/irs-pdf/p1.pdf.

(1987) ("One of the major purposes in revising § 6103 was to tighten the restrictions on the use of return information by entities other than [the IRS].").

Since enacting the Tax Reform Act of 1976, Congress has amended section 6103 more than 75 times when it has determined that new legislation is needed to address a policy concern—approximately one and a half amendments per year. The most recent amendment was enacted on January 4, 2025, just two months ago. *See* Supporting America's Children and Families Act, Pub. L. 118-258, title II, § 202(a)(2), 138 Stat. 2947, 2970. Thus, Congress not only retains the authority to adjust the taxpayer confidentiality protections of section 6103 to respond to new policy concerns, it has demonstrated a willingness to exercise that authority time and again.

Congress, however, has never authorized the IRS to disclose return or return information to DHS, ICE, or any other federal or state authority for purposes of immigration enforcement. That is no oversight. Section 6103's 13 subsections (§ 6103(c)–(o)) set out in detail the purposes for which tax return information may be disclosed outside of the IRS and the conditions on which they must be disclosed. For instance, subsection (d) addresses disclosures to states for administration of state tax laws. Subsection (i) concerns disclosure of tax information for use in criminal or terrorism investigations and to locate fugitives from justice. Subsection (*l*) contains 22 paragraphs that detail when tax return information can be disclosed to other governmental agencies for purposes of implementing various non-tax statutes, such as Medicare or the Higher Education Act. *None* of the exceptions to the rule that tax information must be confidential authorize disclosure of that information for immigration enforcement. Indeed, none of those exceptions mentions ICE as an agency authorized to receive IRS taxpayer data, and DHS is mentioned only once—in connection with its authority under 26 U.S.C. § 4481 to administer use taxes on highway motor

12

vehicles. 26 U.S.C. § 6103(o)(3). And the exception applies to the Customs and Border Patrol component of DHS—not ICE, which is responsible for immigration matters.

Section 6103(g)(1) authorizes the President or an employee of the White House Office to obtain return or return information for any purpose. But the procedural requirements imposed by subsection (g) foreclose the use of that subsection for immigration enforcement. To obtain tax information under subsection (g), the President must make a written request that is "signed by him personally" and that includes the "name and address" of the taxpayer and "the specific reason why the inspection or disclosure is requested." Since obtaining address information is a primary reason for immigration authorities to seek taxpayer data, the President could not use subsection (g) because he would have to have the names and addresses of each individual before he could use subsection (g).

In short, section 6103 guarantees the confidentiality of returns and return information, including those submitted by undocumented taxpayers using ITINs, and none of the statutory exceptions to confidentiality permit the disclosure of returns and return information to any federal or state agency for purposes of immigration enforcement. The IRS got it right during the first Trump administration when it said that "[t]here is no authorization under this provision to share tax data with ICE." Plaintiffs are likely to succeed on their claims that sharing of tax information for immigration enforcement purposes is contrary to law and exceeds the IRS's statutory authority.

**II.    Plaintiffs will suffer irreparable harm absent a TRO.**

Emergency relief is needed to prevent irreparable harm to Plaintiffs' members. Plaintiffs are membership organizations who operate in the Chicago area and advocate for the interests of their immigrant members. Although some of Plaintiffs' members are eligible to obtain social security numbers and use those numbers to file their tax returns and pay their federal taxes, many of Plaintiffs' members require ITINs in order to comply with their tax obligations. Both Centro de

13

Trabajadores Unidos and Immigrant Solidarity DuPage encourage their members who lack social security numbers to obtain ITINs and pay the federal taxes that they owe. *See* Guajardo Decl. ¶ 4; Cavozos Decl. ¶ 4. Plaintiffs do so, both because the IRC requires workers to pay federal taxes even if they are not authorized to be present or work in the United States, and because faithful compliance with tax obligations furthers workers' hopes of normalizing their immigration status. *See* Guajardo Decl. ¶ 4; Cavozos Decl. ¶ 4; *see also* 2017 Sacchetti Article, supra note 13 ("For immigrants from Guatemala, El Salvador and other nations who are in this country illegally, filing tax returns is an act of faith they hope will benefit them if Congress lets them apply for legal residency in the United States."). Plaintiffs advise their members that tax information is protected from disclosure, *see* Guajardo Decl. ¶ 5; Cavozos Decl. ¶ 5—assurances that other organizations serving immigrant communities have also provided.[16]

Undocumented workers like Plaintiffs' members who rely on ITINs are understandably concerned that the information they provide to the IRS will be shared with immigration authorities. *See* Guajardo Decl. ¶ 5; Cavozos Decl. ¶ 5. Indeed, to alleviate this concern and encourage the filing of income taxes, the IRS during the first Trump administration reassured ITIN users that it lacked "authorization … to share tax data with ICE." *See* 2017 Sacchetti Article, supra note 13. The IRS understands that "[t]o foster a tax system based on voluntary compliance, the public must maintain a high degree of confidence that the personal and financial information furnished to the [IRS] is protected against unauthorized use, inspection, or disclosure."[17] As the IRS has explained,

---

[16] *See, e.g.*, Nat'l Immigration Law Center, FAQ: Individual Taxpayer Identification Number (ITIN): A Powerful Tool for Immigrant Taxpayers ("Is it safe to use an ITIN? Generally, yes. The IRS has strong privacy protections in place to ensure that immigrants who report their income and file their taxes are not at risk of having their information shared."), https://www.nilc.org/resources/itinfaq/.

[17] IRS Pub. 1075, Tax Info. Sec. Guidelines for Fed., State, and Local Agencies 23, https://www.irs.gov/pub/irs-pdf/p1075.pdf.

"[i]f the IRS abused [taxpayers'] reasonable expectation of privacy, the resulting loss of public confidence could seriously impair the tax system."[18]

Contradicting the IRS's longstanding position, President Trump's administration has both openly and behind the scenes taken action to break down the firewalls that exist among information databases of different agencies—including the IRS.[19] "Obviously, once … highly personal information is disclosed …, the revelation cannot be undone." *Nat'l Treasury Emps. Union v. U.S. Dep't of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993); *see also Hospitality Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010) ("This Court has recognized that the disclosure of confidential information can constitute an irreparable harm because such information, once disclosed, loses its confidential nature."). That is especially the case here, where a breach of taxpayer confidentiality would potentially be disseminated to thousands of immigration enforcement officers across multiple agencies. In these circumstances, Plaintiffs' members face the reasonable "fear" that the mere act of complying with their duty to file tax returns and pay taxes could subject them to consequences such as "separation from their families and communities, and forced removal from the country where they have made their lives." Cavazos Decl. ¶ 6. Absent emergency relief, those members will face a Hobson's choice—in the middle of tax-filing season—between either paying their taxes and risking unlawful sharing of their tax information on the one hand, or declining to pay their taxes in an effort to protect themselves from arrest and removal.

---

[18] IRS Pub. 4369, Disclosure & Privacy Law Reference Guide 1-9 (rev. 2012), https://www.irs.gov/pub/irs-pdf/p4639.pdf.

[19] *See*, *e.g.*, Jacob Bogage & Jeff Stein, *DOGE presses to check federal benefits payments against IRS tax records*, Wash. Post, Mar. 1, 2025.

Moreover, given the amount of information that individuals must provide to the IRS even to obtain an ITIN, Plaintiffs' members "without SSNs who do not already have ITIN numbers will be much less likely to obtain them and pay federal income taxes if the IRS is permitted to provide DHS with ITIN related information, despite the express protections in the Tax Code." Guajardo Decl. ¶¶ 3, 6, & Attachment. This consequence imposes additional harms, extending beyond both the tax and immigration enforcement contexts. Like a Social Security number, "an ITIN has become widely accepted by third parties outside of the IRS for use as a valid identification number for many nontax purposes"; these include obtaining loans and credit cards, opening businesses and bank accounts, getting driver's licenses, and establishing a credit history.[20] Absent emergency relief to prevent the IRS from sharing confidential data with immigration authorities, many of Plaintiffs' members will be unable to access these other services necessary to carry on their daily lives.

### III.    The balance of equities and the public interest support grant of a TRO.

As against the certain and irreparable injury that innumerable members of the public—including Plaintiffs' members—would experience if the IRS failed to protect the confidentiality of taxpayer information and unlawfully disclosed that information to immigration enforcement authorities, Defendants would suffer no cognizable harm if enjoined to maintain the status quo until this Court has resolved this litigation. The balance of equities and public interest both support the requested relief.

To begin, "[i]t is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice,'" or, in this case, prevents one from beginning.

---

[20] Treasury Inspector Gen. for Tax Admin., Admin. of the Individual Taxpayer Identification Number Program, Rep. No. 2024-400-012, at 1 (Dec. 19, 2023), https://www.tigta.gov/sites/default/files/reports/2024-11/2024400012fr.pdf.

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Cmties. Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)). Thus, Plaintiffs' "extremely high likelihood of success on the merits is a strong indicator that [injunctive relief] would serve the public interest." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (discussing preliminary injunction standard). Moreover, Defendants would suffer no injury from remaining bound by the confidentiality restrictions that they have previously recognized applies to them, *see* 2017 Sacchetti Article, supra note 13, and that they have operated under since the Tax Reform Act of 1976. As to DHS, it has been more than 50 days since the Inauguration and there is no evidence that DHS needs ITIN information on perhaps as many as three million individuals before this Court holds a hearing on Plaintiffs' claims. The balance of equities thus weighs decisively in favor of granting temporary relief here.

The broader impact further tilts the equities in favor of temporary relief. Media reports indicate that the fear that Plaintiffs' members experience is widespread among the immigrant community. Tax professionals serving those communities have reported that "even longtime customers have disappeared or said they won't be filing taxes this year" because "they're too scared."[21] Organizations focused on assisting immigrant taxpayers have reported "increasing concerns among workshop members about the safety and confidentiality of their data."[22] These taxpayers are "in a desperate bind: fearful that they could be tracked down and deported if they file their taxes, but also mindful that they could get in trouble for not paying their taxes." Carrasquillo Article, supra note 21.

---

[21] Adrian Carrasquillo, *Trump Wants to Use the IRS to Track Down Immigrants. They May Stop Paying Taxes*, The Bulwark, Mar. 5, 2025 (Carrasquillo Article).

[22] Lauren Lorichhio et al., *Mass Deportation Plans Prompt Unease for ITIN Filers*, TaxNotes, Mar. 7, 2025.

A temporary restraining order would also serve the public interest. "There is generally no public interest in the perpetuation of an unlawful agency action." *Open Cmties. Alliance*, 286 F. Supp. 3d at 179 (citation omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws." *Id.* (citation omitted).

## CONCLUSION

For the foregoing reasons, this Court should enter a temporary restraining order enjoining Defendants from disclosing tax return information to the U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, the President of the United States, or any other component of the federal government or of a state government seeking such information for purposes of the enforcement of immigration laws, and enjoining Defendants to retrieve and safeguard any such information that has already been disclosed for that purpose.

Dated: March 14, 2025                                        Respectfully submitted,

                                                            /s/ Nandan M. Joshi
Kevin L. Herrera                                            Nandan M. Joshi
    (Motion for *pro hac vice* forthcoming)                    (DC Bar. No. 456750)
Mark H. Birhanu                                            Michael T. Kirkpatrick
    (Motion for *pro hac vice* forthcoming)                    (DC Bar. No. 486293)
Raise the Floor Alliance                                   Public Citizen Litigation Group
1 N. LaSalle Street, Suite 1275                            1600 20th Street, NW
Chicago, Illinois 60602                                    Washington, DC 20009
 (312) 795-9115                                            (202) 588-7733
kherrera@raisethefflooralliance.org                        njoshi@citizen.org

                                                           Alan B. Morrison
                                                               (DC Bar No. 073114)
                                                           George Washington Law School,
                                                           2000 H Street, NW
                                                           Washington, DC 20052
                                                           (202) 994-7120
                                                           abmorrison@law.gwu.edu