# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Centro de Trabajadores Unidos, et al.,

       Plaintiffs,

       v.

Scott Bessent, in his official capacity as
Secretary of the Treasury, et al.,

       Defendants.

Civil Action No. 25-677 (DLF)

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Kevin L. Herrera
   (Motion for *pro hac vice* forthcoming)
Mark H. Birhanu
   (Motion for *pro hac vice* forthcoming)
Raise the Floor Alliance
1 N. LaSalle Street, Suite 1275
Chicago, Illinois 60602
(312) 795-9115
kherrera@raisetheflooralliance.org

Nandan M. Joshi
   (DC Bar No. 456750)
Michael T. Kirkpatrick
   (DC Bar No. 486293)
Public Citizen Litigation Group
1600 20th Street, NW
Washington, DC 20009
(202) 588-7733
njoshi@citizen.org

Alan B. Morrison
   (DC Bar No. 073114)
George Washington Law School,
2000 H Street, NW
Washington, DC 20052
(202) 994-7120
abmorrison@law.gwu.edu

*Counsel for Plaintiffs*

March 31, 2025

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ....................................................................................................................... 2

    Statutory Framework ......................................................................................................... 2

    The Imminent IRS/DHS Information-Sharing Agreement ................................................ 7

LEGAL STANDARD................................................................................................................. 9

ARGUMENT ............................................................................................................................. 9

I.      Plaintiffs are likely to succeed on the merits. .................................................... 9

    A.     Plaintiffs have shown a likelihood of standing. ......................................... 9

    B.     Plaintiffs are likely to succeed on their claims.......................................... 12

II.     Plaintiffs will suffer irreparable harm absent a preliminary injunction. ........................... 18

III.    The balance of equities and the public interest support grant of a preliminary
       injunction. ......................................................................................................... 21

CONCLUSION.......................................................................................................................... 23

# TABLE OF AUTHORITIES

**CASES**

*Advocates for Highway & Auto Safety v. FMCSA*,
41 F.4th 586 (D.C. Cir. 2022) ................................................................................ 10

*American Ass'n of Cosmetology School v. Devos*,
258 F. Supp. 3d 50 (D.D.C. 2017) ........................................................................... 9

*American Bar Ass'n v. U.S. Department of Education*,
370 F. Supp. 3d 1 (D.D.C. 2019) ........................................................................... 17

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015) ............................................................................................... 12

*C.G.B. v. Wolf*,
464 F. Supp. 3d 174 (D.D.C. 2020) ....................................................................... 21

*Center for Biological Diversity v. EPA*,
56 F.4th 55 (D.C. Cir. 2022) .................................................................................... 9

*Center for Biological Diversity v. Regan*,
734 F. Supp. 3d 1 (D.D.C. 2024) ............................................................................. 9

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ................................................................................. 9

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979) ............................................................................................... 13

*Church of Scientology of California v. IRS*,
484 U.S. 9 (1987) ................................................................................................... 14

*Department of Homeland Security v. Regents of the University of California*,
591 U.S. 1 (2020) ................................................................................................... 17

*Electronic Privacy Information Center v. IRS*,
910 F.3d 1232 (D.C. Cir. 2018) ........................................................................... 3, 4

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ............................................................................................... 17

*Hospitality Staffing Solutions, LLC v. Reyes*,
736 F. Supp. 2d 192 (D.D.C. 2010) ....................................................................... 20

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ................................................................................... 21

*Medical Imaging & Technology Alliance v. Library of Congress,*
    103 F.4th 830 (D.C. Cir. 2024) ............................................................ 12

*Michigan v. EPA,*
    576 U.S. 743 (2015) .......................................................................... 17

*National Treasury Employees Union v. U.S. Department of Treasury,*
    838 F. Supp. 631 (D.D.C. 1993) ........................................................ 20

*NAACP v. Trump,*
    298 F. Supp. 3d 209 (D.D.C. 2018) ................................................... 10

*NB ex rel. Peacock v. District of Columbia,*
    682 F.3d 77 (D.C. Cir. 2012) ............................................................ 10

*Pursuing America's Greatness v. FEC,*
    831 F.3d 500 (D.C. Cir. 2016) ............................................................ 9

*Open Communities Alliance v. Carson,*
    286 F. Supp. 3d 148 (D.D.C. 2017) ............................................... 21, 22

*Rodriguez v. United States,*
    480 U.S. 522 (1987) ............................................................................ 1

**STATUTES AND REGULATIONS**

5 U.S.C. § 706(2)(A) ........................................................................... 12

26 U.S.C. § 1 ........................................................................................ 2

26 U.S.C. § 2(d) ................................................................................... 2

26 U.S.C. § 871 .................................................................................... 2

26 U.S.C. § 6103 ............................................................................. 1, 23

26 U.S.C. § 6103(a) ......................................................................... 4, 5

26 U.S.C. § 6103(b)(1) ......................................................................... 5

26 U.S.C. § 6103(b)(2)(A) ..................................................................... 5

26 U.S.C. § 6103(b)(6) ......................................................................... 5

26 U.S.C. § 6103(b)(8) ..................................................................... 5, 12

26 U.S.C. § 6103(i) .............................................................................. 5

26 U.S.C. § 6103(i)(1)(A) ................................................................... 5, 6

26 U.S.C. § 6103(i)(2) ........................................................................................... 6, 15

26 U.S.C. § 6103(i)(2)(A) ................................................................................ 6, 15, 16

26 U.S.C. § 6103(i)(2)(B) .......................................................................................... 6

26 U.S.C. § 6103(i)(2)(B)(i) ............................................................................... 14, 15

26 U.S.C. § 6103(i)(2)(B)(ii) .................................................................................... 16

26 U.S.C. § 6103(i)(2)(B)(iii) ................................................................................... 15

26 U.S.C. § 6103(i)(2)(B)(iv) ................................................................................... 15

26 U.S.C. § 6103(i)(4) .............................................................................................. 5

26 U.S.C. § 6103(i)(5) ........................................................................................... 5, 14

26 U.S.C. § 6103(i)(5)(A) .......................................................................................... 6

26 U.S.C. § 6103(i)(5)(B) .......................................................................................... 6

26 U.S.C. § 6109 ....................................................................................................... 3

26 U.S.C. § 6109(a) ................................................................................................... 3

26 U.S.C. § 6109(d) ................................................................................................... 3

26 U.S.C. § 6109(i) .................................................................................................... 3

26 U.S.C. § 6651 ....................................................................................................... 3

26 U.S.C. § 7201 ....................................................................................................... 3

26 U.S.C. § 7213 ....................................................................................................... 5

26 U.S.C. § 7213A ..................................................................................................... 5

26 U.S.C. § 7701(b)(1) .............................................................................................. 2

Act of July 1, 1862, 12 Stat. 432 ............................................................................... 4

Revenue Act of 1918, 40 Stat. 1057 .......................................................................... 4

Revenue Act of 1924, 43 Stat. 253 ............................................................................ 4

Supporting America's Children and Families Act, Pub. L. 118-258, title II,
    § 202(a)(2), 138 Stat. 2947 .................................................................................. 14

Tax Reform Act of 1976, Pub. L. No. 94-455, tit. XII, § 1202, 90 Stat. 1520 ............................................ 4

20 C.F.R. § 422.104 .................................................................................................. 3

**FEDERAL REGISTER**

Mass Influx of Aliens, 90 Fed. Reg. 13622 (Mar. 25, 2025)........................................ 16

**OTHER**

@jacobbogage.bsky.social, Bluesky (Feb. 28, 2025, 11:14 pm),
    https://bsky.app/profile/jacobbogage.bsky.social/post/3ljc2oduenc25....................... 7

Bernie Becker & Myah Ward, *IRS upheaval cracks agency resistance to data sharing
    with immigration officials*, Politico Pro, Mar. 28, 2025 ........................................... 8, 9, 15, 21

Jacob Bogage et al., *DHS asks IRS for addresses of people believed to be in U.S.
    illegally*, Wash. Post., Feb. 28, 2025 ...................................................................... 7

Jacob Bogage & Jeff Stein, *IRS nears deal with ICE to share addresses of suspected
    undocumented immigrants*, Wash. Post, Mar. 22, 2025 ....................................... 7, 8

Adrian Carrasquillo, *Trump Wants to Use the IRS to Track Down Immigrants. They
    May Stop Paying Taxes*, The Bulwark, Mar. 5, 2025 ............................................ 22

American Immigration Council, The Facts About the Individual Taxpayer
    Identification Number (ITIN),
    https://www.*americanimmigrationcouncil*.org/research/facts-about-individual-
    taxpayer-identification-number-itin........................................................................ 18

Andrew Duehren, *Homeland Security Officials Push I.R.S. for 700,000 Immigrants'
    Addresses*, N.Y. Times, Feb. 25, 2025 .................................................................. 7

Andrew Duehren & Eileen Sullivan, *I.R.S. Prepares to Help Find Immigrants
    Targeted for Deportation*, N.Y. Times, Mar. 22, 2025 .......................................... 7

Debu Ghandhi et al., *Trump's Rash Immigration Actions Place Cruelty and Spectacle
    Above Security*, Ctr. for Am. Progress, Feb. 27, 2025,
    https://www.americanprogress.org/article/trumps-rash-immigration-actions-place-
    cruelty-and-spectacle-above-security/ .................................................................... 3

H.R. Conf. Rep. No. 94-1515 (1976)................................................................... 13, 14

Internal Revenue Manual 11.3.28.2 ........................................................................ 15

Internal Revenue Manual 11.3.28.5 ............................................................... 7, 15, 17

Internal Revenue Manual Exhibit 11.3.28-2 ............................................................ 15

IRS, Disclosure Report for Public Inspection Pursuant to Internal Rev. Code Sect. 6103(p)(3)(C) for Calendar Year 2023, JCX-14-24 (Apr. 25, 2024), https://www.jct.gov/publications/2024/jcx-14-24/. ................................................................ 16

Internal Revenue Service, Introduction to residency under U.S. tax law, https://www.irs.gov/individuals/international-taxpayers/introduction-to-residency-under-us-tax-law ............................................................................................................... 3

IRS Publication 1, https://www.irs.gov/pub/irs-pdf/p1.pdf ........................................... 13

IRS Publication 1075, Tax Information Security Guidelines for Federal, State, and Local Agencies (Rev. Nov. 2021), https://web.archive.org/web/20250310231947/ https://www.irs.gov/pub/irs-pdf/p1075.pdf .............................................................. 20

IRS Publication 4369, Disclosure & Privacy Law Reference Guide (rev. 2012), https://www.irs.gov/pub/irs-pdf/p4639.pdf ............................................. 7, 15, 17, 19

Lauren Lorichhio et al., *Mass Deportation Plans Prompt Unease for ITIN Filers*, TaxNotes, Mar. 7, 2025 ........................................................................................... 22

National Immigration Law Center, *FAQ: Individual Taxpayer Identification Number (ITIN): A Powerful Tool for Immigrant Taxpayers*, https://www.nilc.org/resources/itinfaq/ ................................................................. 18

Richard Rubin & Michelle Hackman, *IRS Nears Deal to Share Data for Immigration Enforcement*, Wall St. J., Mar. 22, 2025.................................................................. 7

Maria Sacchetti, *Undocumented and paying taxes, they seek a foothold in the American Dream*, Wash. Post, Mar. 11, 2017 ................................................. 13, 18

S. Rep. No. 94-938 pt. 1 (1976)...................................................................................... 4

Treasury Inspector General for Tax Administration, Administration of the Individual Taxpayer Identification Number Program, Rep. No. 2024-400-012 (Dec. 19, 2023), https://www.tigta.gov/sites/default/files/reports/2024-11/2024400012fr.pdf ......................... 19

## INTRODUCTION

"Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice." *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (per curiam). Nearly 50 years ago, Congress made the legislative choice that, with limited and specific exceptions, the information that taxpayers submit to the Internal Revenue Service (IRS) should be kept confidential—including from the law enforcement agencies of the federal government—and that the information could be disclosed only if Congress authorized disclosure and, even then, only under the terms and conditions that Congress specified. *See* 26 U.S.C. § 6103. Congress has actively responded to the "competing values" at stake by amending section 6103 multiple times to address new situations, including an amendment enacted just two months ago. Congress has never included in section 6103 an exception permitting the IRS to disclose taxpayer information to federal or state authorities for the purpose of facilitating immigration enforcement.

Plaintiffs Centro de Trabajadores Unidos (CTU) and Immigrant Solidarity DuPage (ISD) initially brought this action against the IRS and Treasury Department officials based on information that, despite statutory protections for taxpayer information, the IRS was planning on sharing taxpayer information with the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), or others, to advance the administration's immigration enforcement agenda. This Court denied Plaintiffs' request for a temporary restraining order, finding that, at that time, Plaintiffs lacked sufficient evidence of imminent harm based on the possibility that the IRS might violate the confidentiality restrictions of the Internal Revenue Code (IRC).

Since then, multiple media outlets have reported that a deal between the IRS and DHS is imminent, and that, under that deal, the IRS will provide taxpayer address information to ICE for

the ostensible purpose of enforcing criminal immigration laws. On March 26, 2025, Plaintiffs filed an amended complaint describing the reported agreement, adding additional plaintiffs Somos Un Pueblo Unidos (Somos) and Inclusive Action for the City (IAC), and adding DHS, ICE, and the agency heads as defendants.

In light of the new information about the imminent agreement, Plaintiffs sought an agreement from Defendants that no taxpayer information would be shared until this Court had an opportunity to further address Plaintiffs' claims. Defendants refused to make such an agreement.

Plaintiffs therefore file this motion for a preliminary injunction in light of reports that defendants will imminently agree to share taxpayer data. A breach of taxpayer confidentiality, once it occurs, cannot be undone and would work irreparable harm on immigrants, as well as the businesses and communities in which they live and work, by undermining the reliance they placed on the IRS's assurances that it would keep their information secure from access by immigration authorities. A preliminary injunction would preserve the status quo by barring the IRS from disclosing, and DHS and ICE from inspecting and using, taxpayer address information pursuant to their reported agreement until this Court can fully address the merits of Plaintiffs' claims.

Plaintiffs reserve the right to seek emergency relief to prevent such a disclosure, inspection, or use before this Court decides this motion for a preliminary injunction. Plaintiffs' proposed preliminary injunction would not bar the disclosure of return information authorized by court order or otherwise consistent with 26 U.S.C. § 6103.

## BACKGROUND

**Statutory Framework**

The IRC imposes taxes on individuals who work in the United States. 26 U.S.C. § 1. The duty to pay federal taxes applies to individuals who are not lawfully admitted and are subject to removal. *Id.* §§ 2(d), 871, 7701(b)(1). As the IRS explains, "[a]lthough the immigration laws of

2

the United States refer to individuals who are not U.S. citizens as immigrants, nonimmigrants, and undocumented individuals, the tax laws of the United States refer only to residents and nonresidents" and tax both based on income from "sources within the United States."[1] A taxpayer who fails to file federal income tax returns required by law and to pay taxes on their income is subject to civil liability and penalties, *id*. § 6651, and, in cases of willful attempts to evade taxes, criminal liability including a fine of up to $100,000 and five years in prison, *id.* § 7201.

The IRC requires taxpayers to use an identification number to identify themselves and others, such as dependents, listed in a tax return. *id*. § 6109. For citizens, permanent residents, and other individuals who are eligible for a Social Security number (SSN), the taxpayer identification number is the taxpayer's SSN. *Id*. § 6109(a), (d). Undocumented workers, however, are not eligible to receive an SSN. 20 C.F.R. § 422.104. To ensure that such workers can file returns necessary to comply with their obligation to file returns and pay taxes, the IRC authorizes the IRS to issue individual taxpayer identification numbers (ITINs) to them for use on their tax returns. 26 U.S.C. § 6109(i). In 2022, undocumented workers used the ITIN program to pay $59.4 billion in federal income taxes. Undocumented workers also pay $25.7 billion in Social Security taxes and $6.4 billion in Medicare taxes, programs for which they are statutorily ineligible to receive benefits.[2]

In connection with its role in collecting federal taxes, the IRS "acquires and maintains a reservoir of sensitive information about taxpayers." *Elec. Priv. Info. Ctr. v. IRS*, 910 F.3d 1232, 1235 (D.C. Cir. 2018). For much of history, taxpayer information received little privacy protection.

---

[1] IRS, Introduction to residency under U.S. tax law, https://www.irs.gov/individuals/international-taxpayers/introduction-to-residency-under-us-tax-law. An "undocumented individual" who is substantially present in the U.S. will be regarded as a U.S. resident for tax purposes. *Id.*

[2] Debu Ghandhi et al., *Trump's Rash Immigration Actions Place Cruelty and Spectacle Above Security*, Ctr. for Am. Progress, Feb. 27, 2025, https://www.americanprogress.org/article/trumps-rash-immigration-actions-place-cruelty-and-spectacle-above-security/.

For instance, at one time Congress thought it beneficial to make taxpayers' names, addresses, and tax owed or paid broadly available. *See, e.g.*, Act of July 1, 1862, § 15, 12 Stat. 432, 437; Revenue Act of 1918, § 257, 40 Stat. 1057, 1086–87; Revenue Act of 1924, § 257, 43 Stat. 253, 293. Under that regime, "the President could—for any reason or no reason at all—order the IRS to make that sensitive information public." *Elec. Priv. Info. Ctr.*, 910 F.3d at 1235. "Then the Nixon administration compiled a list of political enemies and ordered the IRS to harass them," resulting in a scandal that "prompted the Congress to enact sweeping legislation to protect taxpayer privacy." *Id.*

That legislation was the Tax Reform Act of 1976, Pub. L. No. 94-455, tit. XII, § 1202, 90 Stat. 1520, 1667. The 1976 law revised section 6103 to "mandate[] that tax '[r]eturns and return information shall be confidential' unless they fall within one of the statute's narrowly drawn exceptions." *Elec. Priv. Info. Ctr.*, 910 F.3d at 1135 (quoting 26 U.S.C. § 6103(a)). In strengthening the IRC's confidentiality provisions, Congress recognized that "the IRS probably has more information about more people than any other agency in this country," but that "in many cases the Congress has not specifically considered whether the agencies which have access to tax information should have that access." S. Rep. No. 94-938 pt. 1, at 316–17 (1976). As revised by the 1976 law, the new section 6103 addressed that concern by establishing the "General rule" that tax information "shall be confidential" unless a statutory exception applies. Those confidentiality protections protect everyone who pays federal taxes— "the ordinary taxpayer and the President alike." *Elec. Priv. Info. Ctr.*, 910 F.3d at 1135.

To that end, IRC § 6103 expressly bars any "officer or employee of the United States" from "disclos[ing] any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of" section 6103.

26 U.S.C. § 6103(a). A "return" includes "any tax or information return" or "claim for refund." *Id*. § 6103(b)(1). "Return information" includes "a taxpayer's identity" and "any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense." *Id*. § 6103(b)(2)(A). A taxpayer's identity is defined to include not just the taxpayer's name but also mailing address and taxpayer identifying number. *Id*. § 6103(b)(6). A "disclosure" occurs by "making known to any person in any manner whatever a return or return information." *Id*. § 6103(b)(8). The IRC makes it unlawful for federal officers and employees to engage in the unauthorized disclosure or inspection of confidential taxpayer information. 26 U.S.C. §§ 7213, 7213A.

Subsections (c)–(o) of section 6103 contain specific exceptions to the prohibitions on disclosure and inspection of return and return information in subsection (a). None of these exceptions authorizes Treasury Defendants to disclose taxpayer returns and return information to DHS Defendants to facilitate civil enforcement of immigration laws.

Section 6103(i) authorizes such disclosure for certain criminal investigations and proceedings. Several provisions of section 6103(i) permit disclosure of tax information in criminal matters only pursuant to a court order. *See* 26 U.S.C. § 6103(i)(1)(A), (i)(4), (i)(5). As relevant here, section 6103(i)(5) specifically addresses disclosure and inspection of taxpayer information for purposes of locating an individual, but only if that individual is a fugitive as defined therein. Under that provision, Department of Justice (DOJ) officials may submit an application to a district court judge or magistrate judge for an ex parte order for "the return of an individual or return information with respect to such individual" to be used "exclusively for use in locating such

individual." 26 U.S.C. § 6103(i)(5)(A). This process applies when "(i) a Federal arrest warrant relating to the commission of a Federal felony offense has been issued for an individual who is a fugitive from justice, (ii) the return of such individual or return information with respect to such individual is sought exclusively for use in locating such individual, and (iii) there is reasonable cause to believe that such return or return information may be relevant in determining the location of such individual." *Id*. § 6103(i)(5)(B). The IRC does not authorize the disclosure or inspection of taxpayer information to locate individuals potentially subject to criminal liability in any other circumstance.

Section 6103(i)(2) permits the disclosure of taxpayer information for criminal matters without a court order. This provision requires the IRS to disclose return information (but not returns or taxpayer return information other than the taxpayer's identity) upon request by the "head of any Federal agency." 26 U.S.C. § 6103(i)(2)(A). The return information may be disclosed only to "officers and employees of such agency who are personally and directly engaged in" preparing for a judicial or administrative proceeding to enforce a specifically designated Federal criminal statute, an investigation which may result in such a proceeding, or a grand jury proceeding. *Id.* (cross-referencing *id.* § 6103(i)(1)(A)). Any return information disclosed under section 6103(i)(2) must be "solely for the use of such officers and employees" in carrying out those activities. *Id.*

To obtain taxpayer information under section 6103(i)(2), the head of an agency must provide a request in writing that includes "(i) the name and address of the taxpayer with respect to whom the requested return information relates; (ii) the taxable period or periods to which such return information relates; (iii) the statutory authority under which the proceeding or investigation described in subparagraph (A) is being conducted; and (iv) the specific reason or reasons why such disclosure is, or may be, relevant to such proceeding or investigation." *Id.* § 6103(i)(2)(B).

6

Because a request under section 6103(i)(2) requires the requesting agency to provide the address of the taxpayer, it cannot be used to obtain address information from the IRS. As the Internal Revenue Manual states: "Requests for addresses only cannot be honored because IRC 6103(i)(2) requires that the requester provide an address." IRM 11.3.28.5. The IRS's Disclosure and Privacy Law Reference likewise states: "Requests under section 6103(i)(2) seeking only taxpayers' addresses do not comply with the section."[3]

**The Imminent IRS/DHS Information-Sharing Agreement**

The IRS's records on taxpayers would provide information on individuals that would facilitate immigration enforcement, including the address that those taxpayers included in their IRS filings. To that end, DHS has requested that the IRS turn over identifying information concerning 700,000 individuals for immigration enforcement.[4] Although the request was initially denied by the then-acting IRS commissioner, the new acting commissioner, defendant Melanie Krause, has not rejected the request.[5]

Instead, on March 22, 2025, several independent media outlets reported that the IRS and DHS were close to reaching an agreement on sharing taxpayer information to aid immigration enforcement authorities.[6] Under the terms of the agreement DHS or ICE would provide the IRS

---

[3] IRS Pub. 4369, Disclosure & Privacy Law Reference Guide 5-4 (rev. 2012), https://www.irs.gov/pub/irs-pdf/p4639.pdf.

[4] Andrew Duehren, *Homeland Security Officials Push I.R.S. for 700,000 Immigrants' Addresses*, N.Y. Times, Feb. 25, 2025.

[5] Jacob Bogage et al., *DHS asks IRS for addresses of people believed to be in U.S. illegally*, Wash. Post., Feb. 28, 2025; @jacobbogage.bsky.social, Bluesky (Feb. 28, 2025, 11:14 pm), https://bsky.app/profile/jacobbogage.bsky.social/post/3ljc2oduenc25.

[6] *See* Jacob Bogage & Jeff Stein, *IRS nears deal with ICE to share addresses of suspected undocumented immigrants*, Wash. Post, Mar. 22, 2025 (Ex. A); Richard Rubin & Michelle Hackman, *IRS Nears Deal to Share Data for Immigration Enforcement*, Wall St. J., Mar. 22, 2025 (Ex. B); Andrew Duehren & Eileen Sullivan, *I.R.S. Prepares to Help Find Immigrants Targeted for Deportation*, N.Y. Times, Mar. 22, 2025 (Ex. C).

with names and addresses of individuals who they assert are subject to criminal investigation for immigration-related infractions, in particular, the willful failure to depart within 90 days of a removal order. *See* 8 U.S.C. § 1253. The IRS would then review taxpayer information and confirm whether the address matches the address for that person reflected in the IRS's records. The agreement would allow DHS and ICE to use this process to obtain "data verification for people 'subject to criminal investigation' for violating immigration laws."[7]

Because DOJ does not appear to be a party to the anticipated agreement, the information-sharing agreement would not use the section 6103(i)(5) process under which DOJ would obtain a court order for disclosure of taxpayer information for locating fugitives from justice. Instead, the agreement apparently will seek to avoid the need for a court order by invoking the section 6102(i)(2)'s process for obtaining information about taxpayers identified by name and address if the information is relevant to a criminal investigation that "is being conducted." 26 U.S.C. § 6103(i)(2)(B)(iii).

On the morning of March 28, 2025, Politico Pro reported that "[a]fter weeks of discussion, Trump administration officials are finalizing a data-sharing agreement between the IRS and [ICE], allowing immigration officials to use taxpayer databases to confirm the names and addresses of people who are in the country illegally."[8] The article quotes an ICE official as stating that "the data would likely improve efficiency by helping ICE confirm addresses, streamlining time-consuming work that agents often have to do manually."[9]

---

[7] Bogage & Stein, supra note 6.

[8] Bernie Becker & Myah Ward, *IRS upheaval cracks agency resistance to data sharing with immigration officials*, Politico Pro, Mar. 28, 2025 (Ex. D).

[9] *Id.*

**LEGAL STANDARD**

To obtain a preliminary injunction, "the moving party must show: (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the preliminary injunction were not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations omitted). In actions to enjoin the government, the final two preliminary-injunction factors—balancing the equities and the public interest—merge. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

**ARGUMENT**

**I.      Plaintiffs are likely to succeed on the merits.**

**A.      Plaintiffs have shown a likelihood of standing.**

Plaintiffs CTU, ISD, and Somos bring this suit on behalf of their immigrant members. A membership organization may assert associational standing if "'(1) at least one member of the association has standing to sue in her own right (based on a showing of harm, causation, and redressability), (2) the interests the association seeks to protect by suing on its members' behalf are germane to its purpose, and (3) neither the asserted claim nor the relief requested requires individual members to participate in the litigation.'" *Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1, 32 (D.D.C. 2024) (quoting *Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 66 (D.C. Cir. 2022)); *see Am. Ass'n of Cosmetology Sch. v. Devos*, 258 F. Supp. 3d 50, 67 (D.D.C. 2017) (stating that, when "an association seeks prospective relief on behalf of its members, actual participation by individual members is generally not required."). CTU, ISD, and Somos satisfy those requirements here.

Each of these Plaintiffs has an interest in advancing the rights and interests of immigrant workers, including with respect to the responsibility of workers to file tax returns and pay federal

income taxes. Guajardo Decl. ¶¶ 1, 4 (Ex. E); Cavazos Decl. ¶ 1, 4 (Ex. F); Diaz Decl. ¶¶ 1, 4 (Ex. G). Moreover, these organizations have individual members who are not authorized to be present or work in the United States but earn income on which they pay federal taxes. These Plaintiffs' members are subject to immigration enforcement if DHS or ICE is permitted to obtain their current location from the IRS's tax records.

CTU, for instance, has members who are not eligible for SSNs due to their immigration status. Guajardo Decl. ¶ 2. CTU encourages its members in that situation to pay federal taxes, despite fears of immigration enforcement, because the law protects the confidentiality of that information. *Id.* ¶¶ 5–6. CTU members follow that advice. *Id.* CTU member Jane Doe, for instance, has obtained an ITIN in order to pay her taxes, and has paid her taxes for several years. Jane Doe Decl. ¶¶ 3, 5 (Ex. H).[10] In filing her taxes, she has provided the IRS with her current address, information about her sources of income, and information about her dependents. *Id.* ¶ 5. If the IRS were to reveal her personal information to DHS or ICE, immigration enforcement authorities would be able to locate her and place her in removal proceedings, separating her from her family and her life in the United States. *Id.* ¶ 6.

ISD also has members who rely on ITINs to file their federal taxes. Cavazos Decl. ¶¶ 2–4. Yet they fear immigration raids and detentions, separation from their families and communities, and forced removal from the country. *Id.* ¶ 6. ISD members John Doe and James Doe, for instance, have been paying federal taxes for several years and, in doing so, have provided the IRS with their

---

[10] Members of CTU and ISD submit their declarations pseudonymously given their concerns that publicly identifying themselves would place them at risk of being subjected to removal proceedings. *See Advocs. for Highway & Auto Safety v. FMCSA*, 41 F.4th 586, 594 (D.C. Cir. 2022) ("anonymity is no barrier to standing on this record" (citing *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 86 (D.C. Cir. 2012)); *NAACP v. Trump*, 298 F. Supp. 3d 209, 225 (D.D.C. 2018) (finding associational standing based on anonymous affidavits from organization's members).

current address and sources of income. John Doe Decl. ¶¶ 5 (Ex. I); James Doe Decl. ¶¶ 3–6 (Ex. J). They have relied on the confidentiality protections afforded by section 6103 and are at risk of being subject to immigration enforcement if the IRS breaches those protections by sharing information with DHS or ICE. John Doe Decl. ¶¶ 6–7; James Doe Decl. ¶¶ 7–8.

Somos works on behalf of its immigrant members in New Mexico. Many of its members rely on ITINs to pay federal and state taxes. Diaz Decl. ¶ 2. Somos is aware that several members who do not yet have ITINs will forgo obtaining one, and those that do will decline to file taxes, based on the fear that they will be subject to immigration enforcement action as a result of the information they would provide the IRS. *Id.* ¶ 7. Somos also has members who have outstanding deportation orders and are at particular risk of being targeted by ICE. *Id.* ¶ 9. The harm to Somos's members, moreover, extends beyond threatened immigration enforcement. New Mexico relies on ITINs for immigrants who want to obtain driver's licenses, pay state taxes, receive certain tax credits, and obtain higher education benefits. *Id.* ¶¶ 10–12. These benefits will be lost to Somos's members who avoid participating in the federal tax system to protect their personal information from disclosure to DHS or ICE. *Id.* ¶ 14.

Finally, IAC will suffer harm directly if the IRS fails to protect the confidentiality of taxpayer records. IAC is a certified Community Development Financial Institution that serves underinvested communities in the Los Angeles area. Espinoza Decl. ¶¶ 1–2 (Ex. K). Since 2020, it has "deployed nearly $5 million in microloans and grants to Los Angeles street vendors, brick-and-mortar retail, food, art, and service entrepreneurs."[11] IAC's prospective clients include immigrants that are not eligible for an SSN and, therefore, rely on ITINs to pay federal taxes. Espinoza Decl. ¶ 3. Moreover, IAC's small-business clients rely on ITINs to engage in other

---

[11] https://www.inclusiveaction.org/capital-strategy.

financial transactions, such as applying for business permits, obtaining a mortgage or other loans, and opening a bank account. *Id.* ¶¶ 4–5. The IRS's failure to provide reassurance that it will protect taxpayer information from disclosure to immigration authorities discourages IAC's client base from relying on ITINs and paying their federal taxes. *Id.* ¶ 6–7. That, in turn, will have an adverse financial effect on IAC's business and its ability to fulfill its mission. In Los Angeles, half of small businesses are immigrant-owned, and these businesses are a major market for IAC's services. Many of these businesses will fail if their immigrant owners decline to obtain or use ITINs to prevent disclosure of their personal information to immigration authorities, which in turn will reduce demand for IAC's services and potentially increase default rates from existing businesses. *Id.* ¶ 8. Moreover, a potential borrower's decision not to file tax returns makes it more difficult for IAC to analyze the borrower's financial situation. *Id.* ¶ 9. As a result, IAC will either have to forgo lending opportunities or expend greater time and resources to analyze the individual's credit-worthiness. *Id.*

### B.    Plaintiffs are likely to succeed on their claims.

"Agencies must operate within the legal authority conferred by Congress," and "courts have the responsibility to determine whether individual rights have been infringed by the exertion of unauthorized administrative power." *Med. Imaging & Tech. All. v. Libr. of Cong.*, 103 F.4th 830, 838 (D.C. Cir. 2024) (cleaned up). Under the Administrative Procedure Act (APA), a court may set aside final agency action when that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Even apart from the APA, federal courts have inherent authority to "grant injunctive relief" against federal officers "who are violating, or planning to violate, federal law." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). An agency's decision to disclose information in violation of law is the type

of agency action for which the courts can provide redress. *Chrysler Corp. v. Brown*, 441 U.S. 281, 318–19 (1979) (discussing reverse-FOIA actions).

During the first Trump administration, "immigrants [were] so rattled by Trump's pledge to accelerate deportations that some [were] afraid to file returns, worried that addresses and other personal information on their returns could end up with federal agencies administering the crackdown."[12] In response to that fear, the IRS reassured taxpayers that "tax information cannot be shared with another government agency unless authorized by law":

> "The IRS has strong processes in place to protect the confidentiality of taxpayer information, and this includes information related to tax returns filed using ITINs," a statement from the agency said. "There is no authorization under this provision to share tax data with ICE."[13]

The IRS's conclusion was and is correct. As the IRS today makes clear in its Taxpayer Bill of Rights, "[t]axpayers have the right to expect that any information they provide to the IRS will not be disclosed unless authorized by the taxpayer or by law."[14]

This confidentiality rule embodies the core paradigm change that Congress made in the Tax Reform Act of 1976. Before that enactment, tax records were considered "public records" and were "open to inspection" if authorized by statute, regulations, or executive order. H.R. Conf. Rep. No. 94-1515, at 475 (1976). The Tax Reform Act jettisoned that framework and replaced it with one in which "returns and return information are to be confidential and not subject to disclosure except as specifically provided by statute." *Id.* As a result of the 1976 law, only Congress may authorize the IRS to disclose taxpayer information to another agency—the President and his

---

[12] Maria Sacchetti, *Undocumented and paying taxes, they seek a foothold in the American Dream*, Wash. Post, Mar. 11, 2017.

[13] *Id.*

[14] IRS Pub. 1, https://www.irs.gov/pub/irs-pdf/p1.pdf.

administration do not have that authority. *See Church of Scientology of Cal. v. IRS*, 484 U.S. 9, 16 (1987) ("One of the major purposes in revising § 6103 was to tighten the restrictions on the use of return information by entities other than [the IRS].").

Since enacting the Tax Reform Act of 1976, Congress has amended section 6103 *more than 75 times* to address a policy concern. The most recent amendment was enacted just two months ago, on January 4, 2025. *See* Supporting America's Children and Families Act, Pub. L. 118-258, title II, § 202(a)(2), 138 Stat. 2947, 2970. Thus, Congress both has the authority to adjust the taxpayer confidentiality protections of section 6103 to respond to new policy concerns, and has demonstrated a willingness to exercise that authority time and again.

Congress, however, has never authorized the IRS to disclose returns or return information to facilitate the civil enforcement of immigration laws. With respect to criminal matters, Congress has authorized the IRS to disclose taxpayer information to locate an individual in only one circumstance: When senior DOJ officials seek and obtain a court order authorizing the disclosure for purposes of locating a fugitive from justice. 26 U.S.C. § 6103(i)(5). The agreement between DHS and the IRS—but apparently not DOJ—reportedly would require disclosure of address information about immigrant taxpayers without satisfying the conditions that Congress established for obtaining location information about individuals accused of committing a crime. Put another way, in paragraph (i)(5), the law specifically provides a way for other agencies to obtain IRS return information to locate a taxpayer subject to criminal prosecution. The DHS request does not fit within that provision.

Section 6103(i)(2) likewise does not authorize DHS to seek or the IRS to disclose address information in these circumstances. First, section 6103(i)(2) requires the requesting agency to already have the address of the taxpayer for whom information is sought. 26 U.S.C.

§ 6103(i)(2)(B)(i). The IRS's anticipated agreement with DHS, however, would be for the purpose of *obtaining* or *confirming* address information to streamline ICE's enforcement efforts.[15] As the IRS itself has recognized, that is not a permissible use of the section 6103(i)(2) process. *See* IRM 11.3.28.5 ("Requests for addresses only cannot be honored because IRC 6103(i)(2) requires that the requester provide an address."); IRS Publication 4369, at 5-4 ("Requests under section 6103(i)(2) seeking only taxpayers' addresses do not comply with the section."). That limitation is required to avoid undermining section 6103(i)'s structure—law enforcement would have little reason to comply with section 6103(i)(5)'s requirement of a court order if section 6103(i)(2) could be invoked to obtain information about the location of a taxpayer.

Second, DHS reportedly seeks to use section 6103(i)(2) to obtain information on a mass scale—reportedly for approximately 700,000 individuals. Indeed, providing for the processing of requests on a mass scale must be the purpose of a new agreement, because the IRS already has a process for responding to individualized requests for taxpayer information under section 6103(i)(2). *See* IRM 11.3.28.2, .5 & Ex. 11.3.28-2. Section 6103(i)(2) provides for disclosure "solely for use of" those "officers and employees" of an agency "who are personally and directly engaged in" a criminal investigation or proceeding. 26 U.S.C. § 6103(i)(2)(A). Moreover, a section 6103(i)(2) request must state "the statutory authority under which the proceeding or investigation … *is being* [*i.e.*, not might be] *conducted*" and "*the specific reason or reasons* why such disclosure is, or may be, *relevant to* such proceeding or investigation" being conducted. *Id.* § 6103(i)(2)(B)(iii), (iv) (emphasis added). Section 6103(i)(2) is premised on the existence of an active criminal investigation or proceeding actually being conducted by officers or employees who

---

[15] *See* Becker & Ward, supra note 8.

need information relevant to the matter. A mass transfer of address information does not satisfy those requirements.

Moreover, it is implausible that DHS or ICE has opened criminal investigations on all of the 700,000 individuals whose address information it seeks. To get a sense of the scale of this request, the IRS in 2023 processed only 30,538 requests under section 6103(i)(2), all of which were made by U.S. Attorneys, not DHS or ICE.[16] ICE's enforcement arm for both criminal and civil matters is its Enforcement and Removal Operations (ERO), which "manages all aspects of the immigration enforcement process, including the identification, arrest, detention and removal of aliens who are subject to removal or are unlawfully present in the U.S."[17] ERO has 7282 officers to carry out these criminal and civil functions, with approximately 1295 of those positions vacant.[18] With an enforcement staff of that size, it is implausible that ICE officers and employees are "personally and directly engaged in" an actual criminal investigation into each of the 700,000 names on ICE's reported list, or that any such criminal investigation is "being conducted" in any meaningful sense. 26 U.S.C. § 6103(i)(2)(A), (B)(ii).

Defendants also cannot plausibly contend that the IRS is not disclosing taxpayer information to DHS and ICE when it confirms whether an address provided by DHS reflects the address associated with the taxpayer in the IRS's records. Confirmation of an address would disclose taxpayer information because it would disclose whether the taxpayer has filed a return or other tax information, as well as the taxpayer's current address or the fact that the taxpayer resides

---

[16] IRS, Disclosure Report for Public Inspection Pursuant to Internal Rev. Code Sect. 6103(p)(3)(C) for Calendar Year 2023, JCX-14-24, at 3 (Apr. 25, 2024), https://www.jct.gov/publications/2024/jcx-14-24/.

[17] https://www.ice.gov/about-ice/ero.

[18] 90 Fed. Reg. 13622, 13623 (Mar. 25, 2025).

at a location different from the address provided by DHS or ICE. Indeed, if such a confirmation did not disclose taxpayer information, the IRS could provide the same confirmation to any third party without violating section 6103, which is plainly inconsistent with the basic mandate of section 6103.

The IRS's disclosure of taxpayer information to DHS and ICE would also be arbitrary and capricious. The APA "requires agencies to engage in "reasoned decisionmaking." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). That requires the agency to "articulate a satisfactory explanation for its action," which includes "display[ing] awareness that it *is* changing position" and "that there are good reasons for the new policy." *FCC v. Fox Tele. Stations, Inc.*, 556 U.S. 502, 513, 515 (2009). An agency must provide "a more detailed justification than what would suffice for a new policy created on a blank slate" when "its prior policy has engendered serious reliance interests that must be taken into account." *Id.* at 515; *see also Am. Bar Ass'n v. U.S. Dep't of Educ.*, 370 F. Supp. 3d 1, 33 (D.D.C. 2019).

Here, the IRS's anticipated agreement with DHS abandons the agency's prior views on which immigrant taxpayers have relied. First, in response to previous immigrant fears that the first Trump administration would give immigration authorities access to IRS data, the IRS made clear that it lacked "authorization … to share tax data with ICE. Sacchetti, supra note 12. Second, the IRS has interpreted section 6103(i)(2) not to authorize the disclosure of taxpayer address information, given that section 6103(i)(2) requires the requesting authority to provide address information to the IRS. IRM 11.3.28.5; IRS Publication 4369, at 5-4. The anticipated information-sharing agreement between DHS and the IRS would reverse these policies without any indication that the IRS intends to acknowledge or consider the reliance interests of immigrant taxpayers or

otherwise provide a reasoned explanation for the change. For those reasons as well, the IRS's actions are likely to be unlawful.

In short, section 6103 guarantees the confidentiality of returns and return information, and nothing in section 6103(i)(2) permits the disclosure of taxpayer address information to immigration authorities for purposes of identifying the location of individuals. Plaintiffs are likely to succeed on their claims that the anticipated sharing of taxpayer information between the IRS and DHS violates section 6103 and is arbitrary and capricious.

## II.    Plaintiffs will suffer irreparable harm absent a preliminary injunction.

Emergency relief is needed to prevent irreparable harm to the members of CTU, ISD, and Somos, and to IAC. For nearly 50 years, section 6103 has reassured taxpayers that the Nixon-era abuse of federal tax records was a thing of the past. And during the first Trump administration, the IRS specifically reassured taxpayers not authorized to be present in the U.S. that it lacked statutory authority to share their information with ICE. *See* Sacchetti, supra note 12. Consistent, faithful adherence to section 6103's confidentiality protections has engendered significant reliance interests. As the record shows, organizations such as CTU, ISD, and Somos advise their members that they may file federal tax returns without risking immigration enforcement because tax information is protected by law from disclosure to immigration authorities. S*ee* Guajardo Decl. ¶ 5; Cavazos Decl. ¶ 5; Diaz ¶ 5. These assurances have become widespread, given the IRS's longstanding position on the importance of maintaining the confidentiality of taxpayer data.[19] The

---

[19] *See*, *e.g.*, Nat'l Immigration Law Center, FAQ: Individual Taxpayer Identification Number (ITIN): A Powerful Tool for Immigrant Taxpayers ("Is it safe to use an ITIN? Generally, yes. The IRS has strong privacy protections in place to ensure that immigrants who report their income and file their taxes are not at risk of having their information shared."), https://www.nilc.org/resources/itinfaq/; American Immigration Council, The Facts About the Individual Taxpayer Identification Number (ITIN) ("The ITIN is not an immigration-enforcement

IRS has recognized this reliance interest, noting that "[i]f the IRS abused [taxpayers'] reasonable expectation of privacy, the resulting loss of public confidence could seriously impair the tax system."[20] ISD member James Doe filed his 2024 taxes in March 2025 in reliance of the confidentiality protections afforded by the tax code. James Doe Decl. ¶ 8. He now lives with fear for his safety and his family's safety because of the news that the IRS will share taxpayer information with ICE despite its prior assurances. *Id.* ¶ 9.

Moreover, the consistent protection of taxpayer information has engendered reliance interests that go beyond taxpayers' immediate concerns about providing the IRS with sensitive personal information. As the Treasury Inspector General for Tax Administration has recognized, "an ITIN has become widely accepted by third parties outside of the IRS for use as a valid identification number for many nontax purposes," such as obtaining loans and credit cards, opening businesses and bank accounts, getting driver's licenses, and establishing a credit history.[21] The record here confirms that observation. New Mexico relies on ITINs to issue driver's licenses to immigrants, allow them to pay state taxes and receive tax credits, and provide them with higher education benefits. Diaz Decl. ¶¶ 10–12. In Los Angeles, immigrant entrepreneurs use ITINs to obtain business permits, open bank accounts, and obtain mortgages and loans. Espinoza Decl. ¶¶ 4–5. The widespread use of ITINs to enable immigrants to engage with state and local governments and financial institutions—and to participate in society and the economy generally—

---

tool."),    https://www.americanimmigrationcouncil.org/research/facts-about-individual-taxpayer-identification-number-itin.

[20] IRS Pub. 4369, at 1-9.

[21] Treasury Inspector Gen. for Tax Admin., Admin. of the Individual Taxpayer Identification Number Program, Rep. No. 2024-400-012, at 1 (Dec. 19, 2023), https://www.tigta.gov/sites/default/files/reports/2024-11/2024400012fr.pdf.

flows from Congress's decision to create the ITIN program for individuals not eligible for SSNs and to afford ITIN taxpayers the same privacy protections to which all other taxpayers are entitled.

The anticipated information-sharing agreement between the IRS and DHS puts all of that at risk—and irreparably so. "Obviously, once … highly personal information is disclosed …, the revelation cannot be undone." *Nat'l Treasury Emps. Union v. U.S. Dep't of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993); *see also Hospitality Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010) ("This Court has recognized that the disclosure of confidential information can constitute an irreparable harm because such information, once disclosed, loses its confidential nature."). And even before any taxpayer information is shared, the imminent deal between the IRS, DHS, and ICE is forcing Plaintiffs' members to make irreversible decisions about their willingness to risk the loss of personal privacy—and potential immigration enforcement—if they apply for an ITIN or submit a tax return this April. *See* John Doe Decl. ¶ 7 (explaining concern about filing taxes this year).

That concern is reasonable. The IRS understands that "[t]o foster a tax system based on voluntary compliance, the public must maintain a high degree of confidence that the personal and financial information furnished to the [IRS] is protected against unauthorized use, inspection, or disclosure."[22] Permitting the IRS to share taxpayer information with DHS and ICE, and allowing DHS and ICE to inspect and use that data to identify the location of targets for immigration enforcement, would irreparably destroy the confidence that taxpaying immigrant workers, including Plaintiffs' members, have placed in the IRS's prior assurances that their personal

---

[22] IRS Pub. 1075, Tax Info. Sec. Guidelines for Fed., State, and Local Agencies 23 (Rev. Nov. 2021). The IRS webpage for Publication 1075 (https://www.irs.gov/pub/irs-pdf/p1075.pdf) is offline. It is available at this location: https://web.archive.org/web/20250310231947/ https://www.irs.gov/pub/irs-pdf/p1075.pdf.

information would be protected. *See also* Becker & Ward, supra note 8 (noting view of former IRS commissioner under President George W. Bush that disclosure creates a risk of "decline in tax compliance from immigrant communities, and perhaps others who depend on keeping their information filed with the IRS private.").

III.    **The balance of equities and the public interest support grant of a preliminary injunction.**

As against the certain and irreparable injury that Plaintiffs' members and IAC would experience if the IRS failed to protect the confidentiality of taxpayer information and unlawfully disclosed that taxpayer information to immigration enforcement authorities, Defendants would suffer no cognizable harm if enjoined to maintain the status quo until this Court has resolved this litigation. The balance of equities and public interest both support the requested relief.

First, the relief that Plaintiffs seek—maintenance of the status quo for a brief period of time—can hardly be a significant harm to the administration's efforts to remove individuals, given that taxpayer address information cannot lawfully be used for that purpose.

Second, "[i]t is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice,'" or, in this case, prevents one from beginning. *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Cmties. Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)). Thus, Plaintiffs' "extremely high likelihood of success on the merits is a strong indicator that [injunctive relief] would serve the public interest." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Moreover, Defendants would suffer no injury from remaining bound by the confidentiality restrictions that the IRS has previously recognized apply, *see* Sacchetti, supra note 12, and that they have operated under since the Tax Reform Act of 1976. And "[t]here is generally no public interest in the perpetuation of an unlawful agency action." *Open Cmties. Alliance*, 286 F. Supp. 3d at 179

(citation omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws." *Id.* (citation omitted).

Indeed, DHS and ICE apparently have some information about the individuals that they seek to pursue, and nothing in the proposed preliminary injunction would prevent them from using that information to enforce the immigration laws. Moreover, the proposed preliminary injunction would not preclude individualized requests under section 6103(i)(2) for taxpayer information relevant to a bona fide criminal investigation, rather than merely to obtain or confirm the location of the taxpayer. In short, the proposed preliminary injunction would simply preserve the status quo until this Court can assess Plaintiffs' claims about the lawfulness of Defendants' unprecedented plan to share taxpayer information on a mass basis to facilitate immigration enforcement. In these circumstances, the balance of equities thus weighs decisively in favor of granting preliminary relief here.

The broader impact further tilts the equities in favor of preliminary relief. Media reports indicate that the fear that Plaintiffs' members experience is widespread among the immigrant community. Tax professionals serving those communities have reported that "even longtime customers have disappeared or said they won't be filing taxes this year" because "they're too scared."[23] Organizations focused on assisting immigrant taxpayers have reported "increasing concerns among workshop members about the safety and confidentiality of their data."[24] These taxpayers are "in a desperate bind: fearful that they could be tracked down and deported if they file their taxes, but also mindful that they could get in trouble for not paying their taxes."

---

[23] Adrian Carrasquillo, *Trump Wants to Use the IRS to Track Down Immigrants. They May Stop Paying Taxes*, The Bulwark, Mar. 5, 2025.

[24] Lauren Lorichhio et al., *Mass Deportation Plans Prompt Unease for ITIN Filers*, TaxNotes, Mar. 7, 2025.

Carrasquillo, supra note 23.  Thus, to the extent that disclosures to DHS actually occur without a court order, as media reports suggest is likely, they would further reduce the willingness of immigrants to file and pay their federal taxes, which constitutes an additional harm to the public interest.

## CONCLUSION

For the foregoing reasons, this Court should enjoin Defendants from disclosing, inspecting, or using tax return information for immigration enforcement purposes except as expressly authorized by 26 U.S.C. § 6103.

Dated: March 31, 2025

Respectfully submitted,

Kevin L. Herrera
   (Motion for *pro hac vice* forthcoming)
Mark H. Birhanu
   (Motion for *pro hac vice* forthcoming)
Raise the Floor Alliance
1 N. LaSalle Street, Suite 1275
Chicago, Illinois 60602
(312) 795-9115
kherrera@raisethefllooralliance.org

/s/ Nandan M. Joshi
Nandan M. Joshi
   (DC Bar No. 456750)
Michael T. Kirkpatrick
   (DC Bar No. 486293)
Public Citizen Litigation Group
1600 20th Street, NW
Washington, DC 20009
(202) 588-7733
njoshi@citizen.org

Alan B. Morrison
   (DC Bar No. 073114)
George Washington Law School,
2000 H Street, NW
Washington, DC 20052
(202) 994-7120
abmorrison@law.gwu.edu

*Counsel for Plaintiffs*