**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Centro de Trabajadores Unidos, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>Scott Bessent, in his official capacity as Secretary of the Treasury, et al.,<br><br>    Defendants. | Civil Action No. 25-677 (DLF) |

**REPLY IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Kevin L. Herrera
    (Motion for *pro hac vice* forthcoming)
Mark H. Birhanu
    (Motion for *pro hac vice* forthcoming)
Raise the Floor Alliance
1 N. LaSalle Street, Suite 1275
Chicago, Illinois 60602
(312) 795-9115
kherrera@raisethefflooralliance.org

Nandan M. Joshi
    (DC Bar No. 456750)
Michael T. Kirkpatrick
    (DC Bar No. 486293)
Public Citizen Litigation Group
1600 20th Street, NW
Washington, DC 20009
(202) 588-7733
njoshi@citizen.org

Alan B. Morrison
    (DC Bar No. 073114)
George Washington Law School,
2000 H Street, NW
Washington, DC 20052
(202) 994-7120
abmorrison@law.gwu.edu

*Counsel for Plaintiffs*

April 10, 2025

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 2

I.    Plaintiffs are likely to succeed on the merits. ....................................................... 2

    A.    Plaintiffs are likely to prevail on the merits of their claims. ........................... 2

    B.    Plaintiffs have shown a likelihood of standing. ............................................... 4

    C.    Plaintiffs' APA and nonstatutory claims may proceed. .................................. 10

II.   Plaintiffs will suffer irreparable harm absent a preliminary injunction. ............................ 14

III.  The balance of equities and the public interest support grant of a preliminary injunction. ............................................................................................................... 15

IV.   The Court should not limit the preliminary injunction to Plaintiffs and their members. ............................................................................................................... 16

V.    The Court should not require a bond. ................................................................... 18

CONCLUSION ................................................................................................................. 19

# TABLE OF AUTHORITIES

## CASES

*Abbott Laboratories v. Gardner*,
387 U.S. 136 (1967) ............................................................................................. 10

*American Ass'n of Cosmetology School v. Devos*,
258 F. Supp. 3d 50 (D.D.C. 2017) ......................................................................... 4

*Americans for Safe Access v. DEA*,
706 F.3d 438 (D.C. Cir. 2013) ............................................................................... 9

*Animal Legal Defense Fund, Inc. v. Glickman*,
154 F.3d 426 (D.C. Cir. 1998) ............................................................................... 7

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................................................. 10

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ............................................................................................. 13

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ............................................................................................. 16

*Center for Biological Diversity v. EPA*,
56 F.4th 55 (D.C. Cir. 2022) ................................................................................. 4

*Center for Biological Diversity v. Regan*,
734 F. Supp. 3d 1 (D.D.C. 2024) ........................................................................... 4

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979) ............................................................................................. 10

*Citizens for Responsibility & Ethics in Washington v. U.S. Department of Justice*,
846 F.3d 1235 (D.C. Cir. 2017) ...................................................................... 13, 14

*City of Waukesha v. EPA*,
320 F.3d 228 (D.C. Cir. 2003) ............................................................................... 7

*Clapper v. Amnesty International USA*,
568 U.S. 398 (2013) ............................................................................................... 7

*Commonwealth of Puerto Rico v. Franklin California Tax-free Trust*,
579 U.S. 115 (2016) ............................................................................................... 3

*Czyzewski v. Jevic Holding Corp.*,
580 U.S. 451 (2017) ............................................................................................... 8

*District of Columbia v. USDA* ,
    444 F. Supp. 3d 1 (D.D.C. 2020) ............................................................................ 16

*FDA v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024) ................................................................................................ 8

*Garcia v. Vilsack*,
    563 F.3d 519 (D.C. Cir. 2009) ............................................................................... 13

*Iowaska Church of Healing v. Werfel*,
    105 F.4th 402 (D.C. Cir. 2024) ............................................................................... 9

*HIAS v. Trump*,
    985 F.3d 309 (4th Cir. 2021) ................................................................................. 17

*Lepelletier v. FDIC*,
    164 F.3d 37 (D.C. Cir. 1999) ................................................................................. 8

*National Ass'n of Diversity Officers in Higher Education v. Trump*,
    No. 25-333, __ F.Supp.3d __, 2025 WL 573764 (D. Md. Feb. 22, 2025) ...................... 16, 17

*National Environmental Development Associations' Clean Air Project v. EPA*,
    752 F.3d 999 (D.C. Cir. 2014) ............................................................................... 12

*Natural Resources Defense Council v. Morton*,
    337 F. Supp. 167 (D.D.C. 1971) ............................................................................ 18

*Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*,
    400 U.S. 62 (1970) ............................................................................................... 10

*Orangeburg, South Carolina v. FERC*,
    862 F.3d 1071 (D.C. Cir. 2017) ............................................................................. 7

*Radack v. U.S. Department of Justice*,
    402 F. Supp. 2d 99 (D.D.C. 2005) ......................................................................... 14

*Richardson v. Trump*,
    496 F. Supp. 3d 165 (D.D.C. 2020) ....................................................................... 16

*Richmond Tenants Organization v. Kemp*,
    956 F.2d 1300 (4th Cir. 1992) ............................................................................... 16

*Roe v. Department of Defense*,
    947 F.3d 207 (4th Cir. 2020) ................................................................................. 17

*Simms v. District of Columbia*,
    872 F. Supp. 2d 90 (D.D.C. 2012) ......................................................................... 18

*Tanner-Brown v. Haaland*,
   105 F.4th 437 (D.C. Cir. 2024) ........................................................................ 7

*Tierney v. Schweiker*,
   718 F.2d 449 (D.C. Cir. 1983) ........................................................................ 15

*Tozzi v. U.S. Department of Health & Human Services*,
   271 F.3d 301 (D.C. Cir. 2001) .......................................................................... 9

*Transohio Savings Bank v. Director, Office of Thrift Supervision*,
   967 F.2d 598 (D.C. Cir. 1992) ........................................................................ 14

*Trump v. International Refugee Assistance Project*,
   582 U.S. 571 (2017) ................................................................................. 16, 17

*U.S. Army Corps of Engineers v. Hawkes Co.*,
   578 U.S. 590 (2016) ........................................................................................ 10

*Venetian Casino Resort, LLC v. EEOC*,
   530 F.3d 925 (D.C. Cir. 2008) ........................................................................ 10

*Winter v. National Resources Defense Council*,
   555 U.S. 7 (2008) ............................................................................................ 16

**STATUTES**

5 U.S.C. § 704 ..................................................................................................... 13

8 U.S.C. § 1253(a)(1) ............................................................................................ 5

26 U.S.C. § 6103 ............................................................................................. 8, 10

26 U.S.C. § 6103(b)(3) .......................................................................................... 6

26 U.S.C. § 6103(b)(6) .......................................................................................... 6

26 U.S.C. § 6103(i)(1)(C)(ii) ................................................................................. 3

26 U.S.C. § 6103(i)(2) ................................................................................. *passim*

26 U.S.C. § 6103(i)(2)(C) ...................................................................................... 6

26 U.S.C. § 6103(i)(5) ....................................................................................... 1, 3

26 U.S.C. § 6103(*l*)(6) ........................................................................................... 3

26 U.S.C. § 6103(m)(2) ......................................................................................... 3

26 U.S.C. § 6103(m)(4) ......................................................................................... 3

26 U.S.C. § 6103(m)(5) ......................................................................................... 3

26 U.S.C. § 6103(m)(6) ......................................................................................... 3

26 U.S.C. § 7431 ................................................................................................. 13

**RULES**

Federal Rule of Civil Procedure 65(c) .................................................................. 18

Local Civil Rule 5.1(h) .......................................................................................... 1

**OTHER**

Rebecca Beitsch, *IRS, DHS reach deal on information sharing on migrants*, The Hill,
     Apr. 8, 2025. ..................................................................................................... 5

Jacob Bogage, *DHS officials ask IRS to use tax data to locate up to 7 million
     immigrants*, Wash. Post, Apr. 5, 2025 ............................................................. 5

Marshall Cohen & Rene Marsh, *IRS reaches data-sharing deal with DHS to help find
     undocumented immigrants for deportation*, CNN, Apr. 8, 2025 ........................ 5

Executive Order 14161, 90 Fed. Reg. 8451 (Jan. 30, 2025).................................... 4

Internal Revenue Manual 11.3.28.2 ...................................................................... 11

Internal Revenue Manual 11.3.28.5 ................................................................... 3, 11

Internal Revenue Manual Exhibit 11.3.28-2 ......................................................... 11

IRS, Disclosure Report for Public Inspection Pursuant to Internal Rev. Code Sect.
     6103(p)(3)(C) for Calendar Year 2023, JCX-14-24 (Apr. 25, 2024) (2024
     Disclosure Report), https://www.jct.gov/publications/2024/jcx-14-24/ ................. 11

IRS, Disclosure Report for Public Inspection Pursuant to Internal Rev. Code Sect.
     6103(p)(3)(C) for Calendar Year 2022, JCX-6-23 (Apr. 18, 2023),
     https://www.jct.gov/publications/2023/jcx-6-23/ ................................................. 11

IRS, Disclosure Report for Public Inspection Pursuant to Internal Rev. Code Sect.
     6103(p)(3)(C) for Calendar Year 2021, JCX-8-22 (May 17, 2022),
     https://www.jct.gov/publications/2022/jcx-8-22/ ................................................. 11

IRS, Disclosure Report for Public Inspection Pursuant to Internal Rev. Code Sect.
     6103(p)(3)(C) for Calendar Year 2020, JCX-17-21 (Apr. 13, 2021),
     https://www.jct.gov/publications/2021/jcx-17-21/ ............................................... 11

IRS, Disclosure Report for Public Inspection Pursuant to Internal Rev. Code Sect.
6103(p)(3)(C) for Calendar Year 2019, JCX-13-20 (Apr. 24, 2020),
https://www.jct.gov/publications/2020/jcx-13-20/ ....................................................... 11

IRS, Disclosure Report for Public Inspection Pursuant to Internal Rev. Code Sect.
6103(p)(3)(C) for Calendar Year 2018, JCX-21-19 (May 14, 2019),
https://www.jct.gov/publications/2019/jcx-21-19/ ....................................................... 11

IRS, Disclosure Report for Public Inspection Pursuant to Internal Rev. Code Sect.
6103(p)(3)(C) for Calendar Year 2017, JCX-29-18 (Apr. 18, 2018),
https://www.jct.gov/publications/2018/jcx-29-18/ ....................................................... 11

IRS Publication 4369, Disclosure & Privacy Law Reference Guide (rev. 2012),
https://www.irs.gov/pub/irs-pdf/p4639.pdf ................................................................. 3

Renee Marsh & Marshall Cohen, *Acting IRS commissioner resigning after agency
reaches data-sharing deal with immigration authorities*, CNN, Apr. 9, 2025 ...................... 12

Benjamin Siegel, *Acting IRS commissioner plans to resign after data-sharing deal
with immigration authorities*, ABC News, Apr. 9, 2025 ........................................... 12

# INTRODUCTION[1]

Defendants have now confirmed what Plaintiffs have alleged: The Internal Revenue Service (IRS) intends to share confidential taxpayer information with the Department of Homeland Security (DHS) and U.S. Immigration and Customs Enforcement (ICE) for the purpose of advancing this administration's immigration-enforcement agenda. Although Defendants seek to defend their action under 26 U.S.C. § 6103(i)(2), Plaintiffs' opening memorandum explained why the (i)(2) exception allowing disclosure for certain criminal investigations and proceedings does not apply. First, information about a taxpayer's location requires a court order obtained by the Department of Justice (DOJ) under 26 U.S.C. § 6103(i)(5), as the IRS has recognized. Second, the (i)(2) exception applies only for *individualized* requests for information relevant to criminal investigations that are actually *being conducted*. Although Defendants have not disclosed many of the key terms of their memorandum of understanding (MOU), the information that Defendants have disclosed, coupled with the logistical impossibility of ICE actively conducting separate, individual criminal investigations into thousands of immigrants with outstanding removal orders, supports Plaintiffs' position that ICE does not seek taxpayer data to aid in prosecution of individuals, but rather to locate and then deport immigrants from the United States.

Defendants do not grapple with Plaintiffs' arguments in their opposition. Rather, Defendants principally argue that their heavily redacted MOU complies with the requirements of section 6103(i)(2). At the outset, the Court should not accept Defendants' assurances about the lawfulness of their MOU based on the redacted version filed with their opposition. Defendants did not file a motion to seal as required by Local Rule 5.1(h) and, therefore, should be compelled to

---

[1] This reply addresses Defendants' opposition to Plaintiffs' motion for a preliminary injunction. Plaintiffs will file a separate, timely response to Defendants' motion to dismiss.

submit an unredacted version of their MOU so that this Court will have a complete record on which to consider whether Plaintiffs are likely to succeed on their claims.[2]

Moreover, the issue presented in this case is not whether the framework established by this particular MOU is lawful; the issue is whether the IRS has the authority to disclose taxpayer information to DHS and ICE on a mass scale for the purpose of identifying the location of individuals for immigration enforcement. If such a disclosure occurs while this case is ongoing, it will be impossible to repair the harm. Defendants do not contend otherwise, but argue that this Court is powerless to prevent the harm until it is too late to stop it. That is incorrect. This Court can and should grant Plaintiffs' proposed preliminary injunction, which would prevent the mass sharing of taxpayer location information without interfering with legitimate criminal law enforcement inquiries submitted under section 6103(i)(2), to preserve the status quo until this Court can fully resolve Plaintiffs' claims.

## ARGUMENT

### I.    Plaintiffs are likely to succeed on the merits.

#### A.    Plaintiffs are likely to prevail on the merits of their claims.

Plaintiffs' opening memorandum explained why Defendants cannot lawfully invoke section 6103(i)(2) to share taxpayer address information on a mass scale. *See* PI Mem. 14–17. Congress created one mechanism for locating individuals in criminal matters: a process that requires the DOJ to obtain a court order pursuant to the showing required under section 6103(i)(5). Defendants' use of section 6103(i)(2) to obtain the location of immigrant taxpayers impermissibly circumvents that process. Moreover, section 6103(i)(2) permits the disclosure of information only

---

[2] Plaintiffs are filing concurrently herewith a motion to compel the filing of an unredacted version of the MOU and the separate implementation agreement between IRS and ICE referred to in section 3 of the MOU.

where relevant to a criminal investigation actually being conducted, making it impossible to request taxpayer information on the mass basis that DHS is reportedly contemplating. And as Plaintiffs have explained, the IRS's decision to share taxpayer information with DHS and ICE reverses its prior position without any reasoned explanation for the change or consideration of the reliance interests of immigrant taxpayers. *See* PI Mem. 17–18.

Defendants have now finalized an MOU that they argue satisfies the requirements of section 6103(i)(2). Defendants, however, do not attempt to respond to Plaintiffs' discussion of the limited scope of section 6103(i)(2), except for a brief footnote in the section of their opposition discussing the public interest factor. *See* Opp. 20 n.5. There, they assert that "[t]here is nothing in Section 6103(i)(2) that prohibits information sharing for [the] purpose [of obtaining or confirming the identity or location of an individual] if all the requirements of the exception are met." *See* Opp. 20 n.5. That assertion, however, ignores the IRS's own prior statements that section 6103(i)(2) does *not* authorize the use of section 6103(i)(2) for that purpose. *See* PI Mem. 7 (quoting IRM 11.3.28.5 and IRS Publication 4369, Disclosure & Privacy Law Reference Guide (rev. 2012), at 5-4, https://www.irs.gov/pub/irs-pdf/p4639.pdf). It also ignores that allowing law enforcement to use section 6103(i)(2) to obtain location information would circumvent the requirement for DOJ to obtain a court order. *See* 26 U.S.C. § 6103(i)(5).

If Congress had wanted to authorize access to taxpayer information under section 6103(i)(2) for the purpose of locating individuals, "it would have said so." *Commonwealth of Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 128 (2016); *see*, *e.g.*, 26 U.S.C. § 6103(i)(1)(C)(ii) (missing child); (*l*)(6) (individuals owing child support); (m)(2), (4), & (5) (individuals owing debt to federal government); (m)(6) (blood donors with AIDS virus). Congress

did not authorize law enforcement to use taxpayer data to locate criminals outside of the section 6103(i)(5) process.

Having virtually no defense on the merits, Defendants focus on threshold arguments. Those arguments should be rejected.

### B.    Plaintiffs have shown a likelihood of standing.

A membership organization may assert associational standing if "'(1) at least one member of the association has standing to sue in her own right (based on a showing of harm, causation, and redressability), (2) the interests the association seeks to protect by suing on its members' behalf are germane to its purpose, and (3) neither the asserted claim nor the relief requested requires individual members to participate in the litigation.'" *Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1, 32 (D.D.C. 2024) (quoting *Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 66 (D.C. Cir. 2022)); *see Am. Ass'n of Cosmetology Sch. v. Devos*, 258 F. Supp. 3d 50, 67 (D.D.C. 2017) (stating that, when "an association seeks prospective relief on behalf of its members, actual participation by individual members is generally not required."). Here, Defendants contest Plaintiffs' showing only as to the first element of the associational standing test. *See* Opp. 8–9. Their arguments lack merit.

*First*, Defendants argue that Plaintiffs lack standing because they have not identified a member under criminal investigation by DHS or ICE. *See id*. But although Defendants characterize their MOU as designed solely to obtain taxpayer information for purposes of a criminal investigation, the very first paragraph of the MOU invokes the authority of Executive Order 14161, 90 Fed. Reg. 8451 (Jan. 30, 2025). As the MOU explains, Executive Order 14161 directs DHS (and other agencies) "to take immediate steps to identify, exclude, or remove aliens illegally present in the United States." MOU § 1.a. And according to DHS, the MOU is designed to "solve" the problem of "millions of illegal aliens" that have been "lost … due to incompetence and

4

improper processing," and "is essential to identify who is in our country, including violent criminals, determine what public safety and terror threats may exist so we can neutralize them, scrub these individuals from voter rolls, as well as identify what public benefits these aliens are using at taxpayer expense."[3] DHS's statement that the MOU will aid in locating millions of "lost" individuals is consistent with reporting that "[f]ederal immigration officials are seeking to locate up to *7 million people* suspected of being in the United States unlawfully by accessing confidential tax data at the Internal Revenue Service."[4] Putting aside whether DHS's blanket accusations about immigrant behavior have a basis in reality, the MOU directly affects the interests of all immigrant taxpayers, including Plaintiffs' members Jane Doe, John Doe, and James Doe, who, like most holders of individual taxpayer identification numbers (ITINs), are not accused of having committed a crime.

Moreover, Plaintiffs' members do not need to have "committed a crime" to be "under criminal investigation" for purposes of the MOU. Opp. 9. Being "under criminal investigation" is a designation that DHS, under the MOU, can confer on any individual. For instance, the MOU's recitals assert that DHS "has identified numerous aliens illegally present in the United States whom [it has] represented are under final orders" of removal, and DHS "has represented that each of the above-referenced individuals is under criminal investigation for violations of one or more specifically designated Federal criminal statutes," including 8 U.S.C. § 1253(a)(1), which makes it unlawful for an individual willfully to remain in the country 90 days after a final order of

---

[3] Rebecca Beitsch, *IRS, DHS reach deal on information sharing on migrants*, The Hill, Apr. 8, 2025.

[4] Jacob Bogage, *DHS officials ask IRS to use tax data to locate up to 7 million immigrants*, Wash. Post, Apr. 5, 2025 (emphasis added); *see* Marshall Cohen & Rene Marsh, *IRS reaches data-sharing deal with DHS to help find undocumented immigrants for deportation*, CNN, Apr. 8, 2025 ("In a recent video call, DHS officials told IRS officials they needed access to their data to help them locate up to 7 million suspected undocumented immigrants.").

removal. Although much of the MOU is redacted, it appears that the IRS will allow DHS's representations alone to trigger the transfer of confidential taxpayer information. The MOU applies to criminal investigations under any other "specifically designated Federal criminal statute" as well. MOU § 1.e. And because DHS reportedly seeks to use this process to obtain or confirm current taxpayer address information, *see* PI Mem. 14–15, the only substantive limitation in the redacted MOU on DHS's ability to obtain IRS data is the requirement that it provide the IRS the "name and address of the taxpayer" that DHS has in its files. MOU § 6.C.1.[5] The MOU thus opens the door for DHS to obtain taxpayer address information on any immigrant it can identify, by declaring an individual to be under criminal investigation.

*Second*, Defendants assert that the MOU does not cause harm to Plaintiffs' members because, Defendants contend, the risk of removal for any individual immigrant is speculative. *See* Opp. 10. But Plaintiffs' members who are not authorized to be present in the United States, although may be subject to removal, nonetheless are entitled by law to the protection of section 6103, including that the personal information that they submit to the IRS will not be accessed to facilitate their removal. The IRS's failure to adhere to those assurances effectively deprives Plaintiffs' members who comply with their duty to file federal tax returns of the statutory protection that bars sharing their personal information with immigration authorities. The "causation requirement for constitutional standing" is therefore met, because "the challenged agency action authorizes the conduct that allegedly caused the [P]laintiff[s'] injuries," and that

---

[5] Defendants note that section 6103(i)(2) does not authorize the IRS to disclose taxpayer return information, which generally includes information that the IRS obtains from the taxpayer. *See* Opp. 5; 26 U.S.C. § 6103(b)(3). Under section 6103(i)(2)(C), however, a "taxpayer's identity" is not treated as taxpayer return information. Section 6103(b)(6) defines "taxpayer identity" to include a taxpayer's mailing address. Defendants have not denied that the MOU covers taxpayer address information or that they consider the statutory definition of "taxpayer identity" to apply to the term "taxpayer's identity" in section 6103(i)(2)(C).

conduct allegedly "illegal otherwise." *Orangeburg, S.C. v. FERC*, 862 F.3d 1071, 1080 (D.C. Cir. 2017) (quoting *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 440 (D.C. Cir. 1998) (en banc)). This case is thus not like *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), cited by Defendants (Opp. 10), which found that the plaintiffs lacked standing to challenge a surveillance program that required a court order before the plaintiffs' own communications could be surveilled. *See id.* at 414 (declining "to endorse standing theories that rest on speculation about the decisions of independent actors," namely, the Foreign Intelligence Surveillance Court). Here, the harm to Plaintiffs' members does not turn on the actions of independent actors or decisions made by a court, but on Treasury Defendants' own unauthorized actions in allowing the use of confidential taxpayer information to identify the location of individuals for immigration enforcement.

*Third*, Defendants contend that Plaintiffs' members cannot suffer harm because the disclosure of their tax information would be lawful. *See* Opp. 8. In conducting the standing inquiry, however, the Court "must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *Tanner-Brown v. Haaland*, 105 F.4th 437, 444 (D.C. Cir. 2024) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) (per curiam)). Indeed, Defendants' opposition does not meaningfully respond to Plaintiffs' merits arguments; it simply asserts that disclosures made under its MOU would be lawful. Accordingly, in evaluating Plaintiffs' standing, the Court should assume that IRS intends to share taxpayer information with ICE in violation of the confidentiality requirement of section 6103.

*Fourth*, Defendants challenge the standing of Plaintiff Inclusive Action for the City (IAC). *See* Opp. 10. Much of Defendants' argument against IAC's standing assumes that sharing of

taxpayer information under the MOU is permitted by section 6103(i)(2). *Id.* at 11–12. As explained above, for purposes of evaluating standing, the Court should assume that the MOU violates section 6103.

Defendants also contend that IAC has failed to show a likelihood of standing because the Supreme Court has rejected the idea that "standing exists when 'an organization diverts its resources in response to a defendant's actions.'" Opp. 12 (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (*AHM*)). *AHM* holds that an organization's diversion of resources for the purpose of "opposing those policies" that it seeks to challenge is not a sufficient basis for standing. 602 U.S. at 395. Thus, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 395. IAC, however, does not argue that it has suffered harm because it has expended money for those purposes. Rather, IAC asserts that Defendants' actions will directly harm IAC's business because a large percentage of its prospective clients rely on the confidentiality protections in section 6103 to obtain ITINs to file their tax returns and obtain business licenses. *See* PI Mem. 12. Defendants' failure to adhere to those protections will have the natural effect of shrinking IAC's prospective client base and increasing IAC's cost in evaluating the creditworthiness of immigrant entrepreneurs. This loss of "business opportunity satisfies the injury requirement." *Lepelletier v. FDIC*, 164 F.3d 37, 42 (D.C. Cir. 1999); *see also Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").

Defendants alternatively argue that these economic injuries are not traceable to Defendants' actions because they are caused by the independent actions of IAC's clients or prospective clients, not by Defendants' unlawful sharing of those clients' tax information. Opp.

8

13. An injury is traceable to agency action, however, where "the agency action is at least a substantial factor motivating the third parties' actions." *Tozzi v. U.S. Dep't of Health & Hum. Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001) (internal quotation marks omitted); *see Americans for Safe Access v. DEA*, 706 F.3d 438, 447–49 (D.C. Cir. 2013). Here, the *sole* motivating factor that would cause IAC's client base to forgo participation in the tax system, and in the broader economy, *see* PI Mem. 12, is the IRS's decision to renege on its commitment not to share taxpayer information with ICE. *See id.* at 13. Indeed, the IRS itself has recognized that immigrants—and all taxpayers—rely on the assurance of confidentiality when participating in the tax system. *Id.* at 19 (citing IRS Pub. 4369, at 1-9). Defendants have no basis for suggesting that their change in policy does not cause IAC's injuries.

Defendants' reliance on *Iowaska Church of Healing v. Werfel*, 105 F.4th 402 (D.C. Cir. 2024), is misplaced. There, the D.C. Circuit permitted a church to challenge denial of its tax-exempt status but held that the church lacked standing to raise a separate claim under the Religious Freedom Restoration Act (RFRA) relating to its use of a hallucinogenic tea in its religious ceremonies. Solely with respect to the RFRA claim, the D.C. Circuit held that the church's loss of income from membership donations was not traceable to the IRS but depended on the "independent decisions of third-party donors." *Id.* at 413 (internal quotation marks omitted). In that case, the IRS lacked authority to grant the church a religious exemption from the Controlled Substances Act, which is the law that made the church's use of its tea unlawful. *Id.* at 406, 411. Here, Defendants have the authority to abstain from sharing taxpayer information for immigration enforcement and to comply with section 6103. The financial harm that IAC will suffer is directly traceable to Defendants' failure to do so.

### C.    Plaintiffs' APA and nonstatutory claims may proceed.

**1.** The APA authorizes judicial review of "final agency action." 5 U.S.C. § 704. Courts have held that an agency's decision to disclose information to others is final agency action subject to judicial review. *Chrysler Corp. v. Brown*, 441 U.S. 281, 318 19 (1979) (holding that a "decision to disclose [reports under the Freedom of Information Act] is reviewable agency action" under the APA); *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) ("Adopting a policy of permitting employees to disclose confidential information without notice" is final agency action). Agency action is final when it "mark[s] the 'consummation' of the agency's decisionmaking process," that is, it is not "of a merely tentative or interlocutory nature," and the action is one "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). Courts take a "pragmatic" approach in applying these factors. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

Defendants argue that the MOU does not reflect final agency action because it "parrot[s] the IRS's preexisting statutory obligations under Section 6103." Opp. 16. Key provisions of the MOU, however, remain hidden from public view. In particular, Defendants have redacted key provisions in sections 5.A., 5.C., and 5.D. that specify the IRS's obligations upon receiving a request for information from ICE. Several provisions of section 6, setting forth ICE's duties and responsibilities, are also redacted, as are all of the substantive terms of section 7, concerning a description of the records sought. Without full disclosure of the terms of the MOU, and the terms of the separate implementing agreement, there is no basis for accepting Defendants' assertion that the MOU merely implements, but does not violate, section 6103 or that the MOU does not bind the IRS to "a particular legal position" on the disclosure of taxpayer information to DHS. Opp. 17.

Defendants have also not explained why a new MOU was needed if its sole purpose was to implement section 6103(i)(2). The IRS has established procedures for processing individualized requests for taxpayer information under that section. *See* IRM 11.3.28.2, .5 & Ex. 11.3.28-2. In 2023, the IRS used those procedures to process over 30,000 requests from U.S. Attorneys.[6] To be sure, DHS reportedly seeks access to information about far more taxpayers, whether the 700,000 as initially reported or 7 million as more recently reported. But the potential volume makes it more likely—not less—that DHS will use taxpayer information for purposes other than conducting an active criminal investigation, thereby violating the requirements of section 6103(i)(2). PI Mem. 16. And any sharing of taxpayer information with ICE represents a change in IRS policy and its abandonment of its previous position that it lacked authority to share tax data with ICE. *See* PI Mem. 13. Indeed, going back to the first Trump administration, IRS has never shared any taxpayer information with DHS or ICE under section 6103(i)(2).[7] And while Defendants assert that the

---

[6] IRS, Disclosure Report for Public Inspection Pursuant to Internal Rev. Code Sect. 6103(p)(3)(C) for Calendar Year 2023, JCX-14-24, at 3 (Apr. 25, 2024) (2024 Disclosure Report), https://www.jct.gov/publications/2024/jcx-14-24/.

[7] 2024 Disclosure Report, at 3; IRS, Disclosure Report for Public Inspection Pursuant to Internal Rev. Code Sect. 6103(p)(3)(C) for Calendar Year 2022, JCX-6-23, at 3 (Apr. 18, 2023), https://www.jct.gov/publications/2023/jcx-6-23/; IRS, Disclosure Report for Public Inspection Pursuant to Internal Rev. Code Sect. 6103(p)(3)(C) for Calendar Year 2021, JCX-8-22, at 3 (May 17, 2022), https://www.jct.gov/publications/2022/jcx-8-22/; IRS, Disclosure Report for Public Inspection Pursuant to Internal Rev. Code Sect. 6103(p)(3)(C) for Calendar Year 2020, JCX-17-21, at 3 (Apr. 13, 2021), https://www.jct.gov/publications/2021/jcx-17-21/; IRS, Disclosure Report for Public Inspection Pursuant to Internal Rev. Code Sect. 6103(p)(3)(C) for Calendar Year 2019, JCX-13-20, at 3 (Apr. 24, 2020), https://www.jct.gov/publications/2020/jcx-13-20/; IRS, Disclosure Report for Public Inspection Pursuant to Internal Rev. Code Sect. 6103(p)(3)(C) for Calendar Year 2018, JCX-21-19, at 3 (May 14, 2019), https://www.jct.gov/publications/2019/jcx-21-19/; IRS, Disclosure Report for Public Inspection Pursuant to Internal Rev. Code Sect. 6103(p)(3)(C) for Calendar Year 2017, JCX-29-18, at 3 (Apr. 18, 2018), https://www.jct.gov/publications/2018/jcx-29-18/.

MOU simply parrots section 6103(i)(2), Acting Commissioner Melanie Krause has reportedly resigned her post in part because she disagrees with the terms of this deal.[8]

Here, the MOU marks the consummation of the agency's decisionmaking process about whether IRS will share taxpayer information with immigration authorities. And the MOU affects rights and obligations. The MOU imposes "duties and responsibilities" on both the IRS and ICE with respect to the processing of information sharing requests. MOU §§ 5, 6; *see Nat'l Env't Dev. Ass'n' Clean Air Project v. EPA*, 752 F.3d 999, 1007 (D.C. Cir. 2014) (finding action to be final where it provided "firm guidance to enforcement officials about how to handle permitting decisions."). The fact that significant portions of those duties are redacted confirms that the MOU does not simply restate section 6103(i)(2), but rather contains substantive provisions that do not appear in the statutory text. And Defendants do not contend that the IRS would have shared taxpayer information—particularly address information—with DHS or ICE in the absence of the MOU. Furthermore, under Defendants' understanding of final agency action, *see* Opp. 16, an agency would have free rein to produce irreparable harm with no accountability, so long as it does not acknowledge its decision in advance, because a plaintiff harmed by the action would not be able to sue until it is too late to obtain effective relief. By focusing on the consummation of the decisonmaking process and the determination of rights and obligations, rather than the occurrence of irreparable harm, the two-pronged test for final agency action ensures that affected parties, such as Plaintiffs here, can bring suit under the APA before any irreversible damage is done.

---

[8] Renee Marsh & Marshall Cohen, *Acting IRS commissioner resigning after agency reaches data-sharing deal with immigration authorities*, CNN, Apr. 9, 2025. Ms. Krause is expected to depart her post around May 15. Benjamin Siegel, *Acting IRS commissioner plans to resign after data-sharing deal with immigration authorities*, ABC News, Apr. 9, 2025.

**2.** The APA provides that "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C.A. § 704. To determine "whether an alternative remedy is 'adequate' and therefore preclusive of APA review, [courts] look for 'clear and convincing evidence' of 'legislative intent' to create a special, alternative remedy and thereby bar APA review." *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 846 F.3d 1235, 1244 (D.C. Cir. 2017) (*CREW*) (quoting *Garcia v. Vilsack*, 563 F.3d 519, 523 (D.C. Cir. 2009)). While "[a]n alternative that provides for de novo district-court review of the challenged agency action offers ... evidence of Congress' will" to displace an APA remedy, *id.* at 1245, the potency of this evidence is fatally diminished where there is a significant "gap between the relief [the alternative] provides and the relief ... [sought] under the APA," *id.* at 1246 (emphasis added). For example, the availability of "a naked money judgment against the United States" under an alternative statutory scheme is not "an adequate substitute for prospective relief" under the APA where a plaintiff seeks "entry of declaratory or injunctive relief that requires the [government] to modify future practices." *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988); *cf. Garcia*, 563 F.3d at 525 (holding that an alternative remedial scheme was adequate where a successful plaintiff could "obtain declaratory and injunctive relief against [an] agency itself, in addition to money damages, and such remedies would presumably deter [the agency] to the same extent as a successful APA claim").

Contrary to Defendants' suggestion, *see* Opp. 17, 26 U.S.C. § 7431, which provides a damages remedy for knowing or negligent disclosure or inspection of tax return or return information in violation of section 6103, does not provide the relief that Plaintiffs seek: declaratory and injunctive relief to prevent IRS from unlawfully sharing taxpayer information for purposes of locating individuals for immigration enforcement. *Cf. Bowen*, 487 U.S. at 903 (noting that

Congress withheld APA remedies when an adequate alternative remedy already existed so as not to "duplicate existing procedures for review of agency action"); *Radack v. U.S. Dep't of Justice*, 402 F. Supp. 2d 99, 104 (D.D.C. 2005) ("Because Radack seeks declaratory and injunctive relief in addition to damages, the Privacy Act does not provide an 'adequate remedy.'" (citing *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 608 (D.C. Cir. 1992)). Defendants' argument that "the statutory text [of section 7431]" does not indicate "that Congress intended to permit any other remedy," Opp. 17, is therefore misplaced. Because Congress did not expressly foreclose an APA remedy in section 7431, the relevant question is whether section 7431 alone represents "'clear and convincing evidence' of 'legislative intent'" to bar APA review." *CREW*, 846 F.3d at 1244. For the reasons explained above, the answer to that question is "no."[9]

## II. Plaintiffs will suffer irreparable harm absent a preliminary injunction.

Defendants do not seriously dispute Plaintiffs' demonstration of irreparable harm. *See* PI Mem. 18–21. Rather, Defendants argue that Plaintiffs will not suffer irreparable harm because Defendants will adhere to section 6103's requirements when sharing taxpayer information between the IRS and immigration authorities. *See* Opp. 19. Plaintiffs have made clear, however, that they do not seek to enjoin information disclosures that are lawful under section 6103. Thus, Plaintiffs' proposed preliminary injunction would not extend to "information furnished and obtained through court order; or where the request contains the name of an individual taxpayer and an address that the requesting agency or individual has a good faith belief is an actual address for that taxpayer, the information is not requested for the purpose of obtaining or confirming the identity or location of an individual, and the request otherwise satisfies the requirements of 26 U.S.C. § 6103(i)(2)."

---

[9] For similar reasons, nothing in section 7431 forecloses Plaintiffs' claim for equitable relief under nonstatutory review. *See* Opp. 24.

ECF 28-13. Mass requests of information on hundreds of thousands or millions of immigrant taxpayers for the purposes of obtaining or confirming address information, however, is not permissible under section 6103(i)(2), and Defendants do not argue otherwise. And with respect to that activity, Defendants' unsupported assurances that they will follow the law is insufficient to foreclose a finding of irreparable harm if they do not.

Finally, the possibility of money damages under section 7431 does not foreclose a finding of irreparable harm justifying grant of a TRO. *See* Opp. 19. Even putting aside that damages cannot remedy the harm that unlawful disclosure would cause in this case, section 7431 does not preclude a court from issuing declaratory relief to plaintiffs faced with "uncertainty and insecurity" about the lawfulness of a disclosure under section 6103. *See Tierney v. Schweiker*, 718 F.2d 449, 456 (D.C. Cir. 1983). Whether or not declaratory relief at the end of this litigation would obviate the need for a permanent injunction, *see id.*, a preliminary injunction is necessary to prevent the IRS from disclosing return information for immigration purposes while this litigation is ongoing and to ensure that this Court can reach a final decision on the merits of Plaintiffs' claims before any unlawful and irreversible disclosure occurs.

## III.    The balance of equities and the public interest support grant of a preliminary injunction.

Defendants' arguments with respect to the equities and the public interest rest on the flawed assumption that Plaintiffs' proposed preliminary injunction would wholly foreclose DHS's use of section 6103(i)(2). Even if that assumption were true, the harm to the government would be slight, given that DHS has no recent history of pursuing taxpayer information to assist it in enforcing the immigration laws. *See supra* nn.6–7. But as explained above, the proposed preliminary injunction would not "instruct the IRS to violate the law as the proposed injunctions would prevent the IRS from complying with its statutory obligations under Section 6103." Opp. 20. It would bar the IRS

only from engaging in the mass—and irreversible—disclosure of location information to DHS and ICE for purposes of obtaining or confirming the location of individuals for immigration enforcement—an activity that is not authorized by section 6103(i)(2). Although Defendants call Plaintiffs' reading of section 6103(i)(2) "flawed," Opp. 20, they do not rebut Plaintiffs' arguments on that point. The equities and the public interest support granting the proposed preliminary injunction.

## IV.    The Court should not limit the preliminary injunction to Plaintiffs and their members.

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017) (citing *Winter v. National Res. Def. Council*, 555 U.S. 7, 20, 24 (2008)). A federal district court has wide discretion to fashion appropriate injunctive relief." *Richardson v. Trump*, 496 F. Supp. 3d 165, 189 (D.D.C. 2020) (quoting *Richmond Tenants Org. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992)). The general rule is that "injunctive relief should be no more burdensome to the defendant than is necessary to provide complete relief to the plaintiffs." *Dist. of Columbia v. USDA*, 444 F. Supp. 3d 1, 49 (D.D.C. 2020) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

As recently noted in *National Association of Diversity Officers in Higher Education v. Trump*, No. 25-333, __ F.Supp.3d __, 2025 WL 573764 (D. Md. Feb. 22, 2025), the "relevant question" when defining the scope of a preliminary injunction "is whether, in light of the claims and Plaintiffs' showing of likelihood of success on the merits, including similarly situated non-parties within the scope of an injunction would be appropriate." *Id.* at *29. An injunction that extends to non-parties may be "particularly appropriate" where "the government relies on a 'categorical policy,' and when the facts would not require different relief for others similarly

situated to the plaintiffs." *Id.* (quoting *HIAS v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (quoting *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020))). Thus, for example, in *International Refugee Assistance Project*, the Supreme Court affirmed the extension of an injunction against the Administration's Muslim travel ban to include "parties similarly situated to" the named plaintiffs, who had a connection to the United States, 582 U.S. at 582, while finding that the balance of interests weighed differently for non-parties who lacked those ties, *id*. And in *HIAS*, three resettlement agencies challenged an executive order that "altered the system by which the federal government resettles refugees across the United States" and a Department of State notice implementing that order. 985 F.3d at 315. After determining that the plaintiffs were likely to succeed on their claim that the executive order and notice violated a federal statute, the Fourth Circuit affirmed an injunction prohibiting enforcement of the order and notice in their entirety, not only as to the three plaintiffs. As the court explained, the scope of the injunction was appropriate because "[t]he refugee resettlement program by its nature impacts refugees assigned to all nine resettlement agencies, which place refugees throughout the country." *Id.* at 326–27.

Here, although Defendants argue that a preliminary injunction should be limited to Plaintiffs and their members, they have identified no feasible means for providing complete relief to Plaintiffs and their members absent an injunction that bars Defendants from engaging in the mass sharing of taxpayer information. Defendants contend that Centro de Trabajadores Unidos, Immigrant Solidarity DuPage, and Somos Un Pueblo Unido maintain member lists, but any such lists would not be available to Defendants. Defendants, therefore, would have no means of excluding Plaintiffs' members from any mass sharing of taxpayer information between the IRS and immigration authorities. And other than to regurgitate their challenge to IAC's standing,

Defendants offer no explanation of how IAC could be afforded complete relief absent grant of a preliminary injunction that forecloses all mass disclosures of information.

Defendants contend that "[b]roader relief than necessary would impinge on the government's proper role in investigating and prosecuting crimes, including immigration crimes." Opp. 21. As explained above, however, Plaintiffs' proposed injunction is narrowly tailored to permit the IRS to share evidence relevant to an active criminal investigation pursuant to section 6103(i)(2), while protecting against the improper use of that provision to obtain location information about individual taxpayers. Defendants do not explain how Plaintiffs' proposal interferes with their interests in investigating and prosecuting crimes.

## V.    The Court should not require a bond.

Defendants suggest that, if the Court issues a preliminary injunction, it should require Plaintiffs to post security under Federal Rule of Civil Procedure 65(c), but Defendants have not even hinted at what kind of costs they would incur from not complying with DHS's request for information required to be kept confidential under section 6103. "Courts in this Circuit have found [that] the Rule 'vests broad discretion in the district court to determine the appropriate amount of an injunction bond,' including the discretion to require no bond at all." *Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (cleaned up). Given that Plaintiffs' claims do not concern the expenditure of money or monetary damages, and given that Defendants do not even attempt to grapple with the merits of Plaintiffs' claims, a bond would not be appropriate in this case. *See also NRDC v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (imposing nominal bond where substantial security "would have the effect of denying the plaintiffs their right to judicial review of administrative action").

## CONCLUSION

For the foregoing reasons, this Court should enjoin Defendants from disclosing, inspecting, or using tax return information for immigration enforcement purposes except as expressly authorized by 26 U.S.C. § 6103.

Dated: April 10, 2025                                    Respectfully submitted,

Kevin L. Herrera                                         /s/ Nandan M. Joshi
  (Motion for *pro hac vice* forthcoming)                Nandan M. Joshi
Mark H. Birhanu                                            (DC Bar No. 456750)
  (Motion for *pro hac vice* forthcoming)                Michael T. Kirkpatrick
Raise the Floor Alliance                                   (DC Bar No. 486293)
1 N. LaSalle Street, Suite 1275                          Public Citizen Litigation Group
Chicago, Illinois 60602                                  1600 20th Street, NW
 (312) 795-9115                                          Washington, DC 20009
kherrera@raisetheflooralliance.org                       (202) 588-7733
                                                         njoshi@citizen.org

                                                         Alan B. Morrison
                                                           (DC Bar No. 073114)
                                                         George Washington Law School,
                                                         2000 H Street, NW
                                                         Washington, DC 20052
                                                         (202) 994-7120
                                                         abmorrison@law.gwu.edu

                    *Counsel for Plaintiffs*

19