# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| Centro de Trabajadores Unidos, et al., ) | |
| ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 25-677 (DLF) |
| ) | |
| Scott Bessent, in his official capacity as ) | |
| Secretary of Treasury, et al. ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## [PROPOSED] BRIEF OF AMICI CURIAE IRS-FUNDED TAX PREPARATION SITES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Local Rule 7(o), which incorporates the Fed. R. App. P. requirement to include a corporate disclosure statement, *amici curiae* Cambridge Economic Opportunity Committee, Inc., and Center for Economic Development of Southeastern Mass state that they are independent non-profit organizations. They do not have a parent company or issue stock.

**TABLE OF CONTENTS**

**CORPORATE DISCLOSURE STATEMENT**                                         I

**TABLE OF CONTENTS**                                                      II

**TABLE OF AUTHORITIES**                                                   III

**STATEMENT OF INTEREST OF AMICI CURIAE**                                  1

**ARGUMENT**                                                               2

    I.  Absent an injunction, the mou will break decades of promises on which immigrant taxpayers have relied.                                  3

    II. The MOU threatens to undermine the agency's own interests.        11

    III.If this court permits information-sharing, the irs and ice are likely to make errors that subject taxpayers to dire consequences.        12

**CONCLUSION**                                                             16

**CERTIFICATE OF COMPLIANCE**                                              17

**CERTIFICATE OF SERVICE**                                                 21

# TABLE OF AUTHORITIES

## CASES

*Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025)........................................................ 17
*Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 811 F.3d 500 (D.C. Cir. 2016).................. 3

## STATUTES

26 U.S.C. § 6103 ......................................................................................................... 4
    § 6103(i)(2) ................................................................................................ 14, 15, 18
    § 6103(j) ........................................................................................................ 13
    § 6103(*l*) ...................................................................................................... 13
26 U.S.C. § 7803 ........................................................................................................ 12
26 U.S.C. § 7801 ........................................................................................................ 12
42 U.S.C § 2000d ....................................................................................................... 10
8 U.S.C. § 1253 ......................................................................................................... 16
Consol. Approps. Act, Pub. L. No. 114-113, Division Q, Title II, § 203, 129 Stat. 2242 (2015).. 6
Taxpayer First Act, Pub. L. 116–25, title I, § 1401(a), 133 Stat. 981, 993 (2019). ...................... 8

## ADMINISTRATIVE MATERIALS

Gov't Account. Office, Individual Taxpayer Identification Numbers Can Be Improperly
    Obtained and Used, GAO-04-529 18 (March 2004) ............................................................ 6
I.R.M. § 1.1.1.4 (07-29-2019). ........................................................................................ 13
Internal Revenue Serv., Become an IRS partner to help in your community (Apr. 8, 2025),
    https://www.irs.gov/individuals/become-an-irs-partner-to-help-in-your-community (emphasis
    added).................................................................................................................... 8
Internal Revenue Serv., Fact Sheet: Becoming a Certified Acceptance Agent (CAA) for SPEC
    Partners (Oct 2024) ................................................................................................ 9
Internal Revenue Serv., Free tax return preparation for qualifying taxpayers
    https://www.irs.gov/individuals/free-tax-return-preparation-for-qualifying-taxpayers ............ 8
Internal Revenue Serv., Inflation Reduction Act Strategic Operating Plan, Pub. 3744 3 (2023). 12
Internal Revenue Serv., IRS Moves to Protect Victims of Domestic Violence (2001)................ 11
Internal Revenue Serv., Non-English speaking or English as a Second Language (Jan. 10, 2025) 8
Internal Revenue Serv., Privacy, Confidentiality, and Civil Rights, Pub. 4299 (2025) ................ 9
Internal Revenue Serv., Topic No. 857, Individual Taxpayer Identification Number (ITIN) (Nov.
    7, 2024) ................................................................................................................ 5
Taxpayer Identifying Numbers (TIN), 60 Fed. Reg. 30,213 (June 8, 1995) (codified at 26 CFR §
    301.6109–1). .......................................................................................................... 5
Taxpayer Identifying Numbers (TINs), 61 Fed. Reg. 26,789 (May 29, 1996)............................ 5

## OTHER AUTHORITIES

Doha Madani, *U.S. citizen children, including 4-year-old with cancer, taken to Honduras on
    mother's deportation flight, legal advocates say*, NBC News (April 27, 2025)...................... 18
Greg Allen, *ICE Detained The Wrong Peter Brown*, NPR (Dec. 18, 2018) ................................ 16

Gregory F. Jenner, Treasury Responds to Groups' Concern Over Targeting ITIN Users (2004), https://www.taxnotes.com/research/federal/other-documents/treasury-tax-correspondence/treasury-responds-to-groups-concern-over-targeting-itin-users/yqkt ......... 6, 10

Jacob Bogage and Jeff Stein, *IRS nears deal with ICE to share addresses of suspected undocumented immigrants*, Wash. Post (March 22, 2025) ...................................................... 15

Jennifer Sykes, Katrin Križ, Kathryn Edin, and Sarah Halpern-Meekin, *Dignity and Dreams: What the Earned Income Tax Credit (EITC) Means to Low-Income Families*, 80 Am. Soc. Rev. 243 (2014) ................................................................................................................ 11

Jory Heckman, *IRS Layoff Notices to Employees Delayed by 'Glitches'*, Fed. News Network (Apr. 23, 2025) .......................................................................................................................... 14

Makena Kelly, *DOGE Is Planning a Hackathon at the IRS. It Wants Easier Access to Taxpayer Data*, Wired (Apr. 5, 2025) ....................................................................................................... 13

Marco Guzman, *IRS Cooperation with ICE Will Damage Public Trust, Putting Tax Revenues in Jeopardy*, Institute on Taxation and Economic Policy (Apr. 10, 2025) https://itep.org/irs-cooperation-with-ice-will-damage-public-trust-putting-tax-revenues-in-jeopardy/ ................. 14

Maria Sacchetti, *Undocumented and paying taxes, they seek a foothold in the American Dream*, Wash. Post (Mar. 11, 2017). ...................................................................................................... 7

Shayak Sarkar, *Internal Revenue's External Borders*, 112 Cal. L. Rev. 1645, 1667–68 (2024).. 13

The Budget Lab, *The Potential Impact of IRS-ICE Data Sharing on Tax Compliance* (Apr. 8, 2025), https://budgetlab.yale.edu/research/potential-impact-irs-ice-data-sharing-tax-compliance ............................................................................................................................ 14

## STATEMENT OF INTEREST OF AMICI CURIAE[1]

*Amici curiae* are local anti-poverty nonprofit organizations that partner with federal, state, and local governments to promote self-sufficiency. Cambridge Economic Opportunity Committee ("CEOC") was founded as a Community Action Agency in April 1965 as part of the War on Poverty. The Community Economic Development Center of Southeastern Massachusetts, established in 1997 as a community development corporation, is located in New Bedford. These organizations work diligently to serve low wage earners, individuals with limited English proficiency, those with disabilities, those living in subsidized housing, and seniors. *Amici* serve clients with a range of immigration statuses, languages, and national origins. Their staff speak nine languages, partially representing the diversity of their communities.

*Amici* provide a comprehensive "bundled services" approach to help people in need access resources and benefits such as housing, food stamps, health insurance. By consolidating services and eliminating barriers to access, participants can gain access to more benefits and support than they would in more siloed organizations.

Tax-filing assistance was a natural fit for these organizations, as they were already serving low-income and economically vulnerable community members. *Amici* began to participate in the Internal Revenue Service's Volunteer Income Tax Assistance ("VITA") program to offer free tax preparation in the 2004 filing season and have continued ever since. Nearly all of *amici's* staff have been certified at the Advanced Level, and some have provided tax-preparation assistance for ten or even twenty years. Their Executive Directors further undertook extensive training to allow their organizations to become Certifying Acceptance Agents, which can assist tax filers without

---

[1] Pursuant to Local Civil Rule 7(o)(5), counsel for amici curiae certify that no counsel for a party authored this brief in whole or in part, and no person other than amici curiae, their members, or their counsel made a monetary contribution to the brief's preparation or submission.

eligibility for a Social Security Numbers to apply for an Individual Taxpayer Identification Number ("ITIN").

Alongside these services, the Executive Director of the CEDC of Southeastern Massachusetts is a Department of Justice Accredited Representative. The DOJ Accredited Representatives are non-attorneys who are trained in immigration law and work for DOJ-recognized non-profit organizations. The Executive Director's accreditation allows her to screen and assist clients in pursuing immigration relief, such as humanitarian visas (U, T, special immigrant juvenile status) and temporary protected status. CEDC works with local law enforcement assisting victims of crime with their immigration cases.

The CEDC of Southeastern Massachusetts devoted particular efforts to build trust with New Bedford's immigrant taxpayers. After a worksite immigration raid in 2007, many immigrants and their families have limited their engagements with government institutions. Because the CEDC spread the word that it was safe and beneficial for families to file their tax returns, the VITA program has taken off.

Now, reports that the IRS and ICE have signed an agreement for the sharing of information about taxpayers have already interfered with the CEDC's ability to serve immigrant taxpayers in their communities. During the 2025 filing season, New Bedford saw the number of filers using ITINs plummet from 221 to 123—a partial measure of the immigrant taxpayers deterred from filing. If the IRS is permitted to disclose information pursuant to the Memorandum of Understanding (MOU), *see* ECF No. 38-1, *amici* fear that this trend will continue.

## ARGUMENT

For more than twenty years, *amici* have helped low-income taxpayers, including immigrant taxpayers, to file their taxes as part of the IRS's VITA program. By providing this service, among the many offered by each organization, the organizations helped these families both to participate

fully in supporting their communities and to receive essential services. Throughout this time, the IRS promised immigrant taxpayers that their personal information would be protected, including from immigration-enforcement agencies. The agency also enlisted *amici* and similar organizations to echo these promises, relying on the trust that the organizations have built with their immigrant clients.

Now, only a few months into a new presidential administration, the Treasury Department has suddenly shifted position, through the MOU and related actions at issue in this lawsuit. *See* ECF No. 38-1. These efforts break from the longstanding, publicly advertised IRS policy to not share taxpayer's data except in very narrow and limited circumstances. If allowed, the Treasury Department's rash decision will destroy the trust in the IRS, and it will send many tax-compliant workers back into the underground economy. The agencies' actions further threaten to undermine the IRS's core revenue-raising and tax-administration functions. What's more, the hastily constructed information-sharing apparatus is likely to lead to substantial errors, particularly for people who have common names, or whose names do not fit neatly within IRS information systems. The other group at high risk are immigrants whose immigration history includes a removal order but whose status has since been regularized, or who are no longer deportable.

For these reasons, described in further detail below, *amici* urge the Court to recognize that a preliminary injunction to preserve the status quo would strongly serve the public interest. *See Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 811 F.3d 500, 511–12 (D.C. Cir. 2016) (recognizing that "the government's interest is the public interest," rather than the articulated interest by a governmental party in preliminary-injunction proceedings).

## I.     ABSENT AN INJUNCTION, THE MOU WILL BREAK DECADES OF PROMISES ON WHICH IMMIGRANT TAXPAYERS HAVE RELIED.

A. *The IRS Has Consistently Encouraged Immigrant Workers To File Tax Returns With Reassurance That Information Would Not Be Shared For Immigration Enforcement.*

Grounded both in the protections of 26 U.S.C. § 6103 and the agency's ethos, the IRS has regularly committed to non-citizen tax filers that their information would be protected— particularly from immigration enforcement agencies. The IRS emphasized that its purpose was to collect revenue and administer the tax code, not to enforce immigration law. Moreover, the IRS has emphasized a commitment to taxpayer privacy, including through years-long efforts by former National Taxpayer Advocate Nina E. Olson. *See* Exhibit A, Declaration of Nina E. Olson (hereinafter, "Olson Decl.") ¶ 7–11.

Many of these representations were made during the development of the ITIN program. Although not all immigrant taxpayers have Social Security Numbers and many ITIN filers are not undocumented immigrants, the program still served as a visible indicator of the agency's approach to immigrant taxpayers.

In proposing to create the ITIN, the IRS specifically noted the confidentiality protections that would attach: "The IRS individual taxpayer identification numbers and the information obtained by the IRS as a result of issuing numbers constitute confidential taxpayer information. Section 6103 strictly prohibits the disclosure of this information to other government agencies, private entities, or citizens. Disclosure in violation of the restrictions under section 6103 may lead to civil or criminal penalties."[2]

During notice and comment, the IRS received comments suggesting that ITINs should be issued by immigration-enforcement agencies or the Social Security Administration. The IRS

---

[2] *See* Taxpayer Identifying Numbers (TIN), 60 Fed. Reg. 30,211, 30,213 (June 8, 1995) (codified at 26 CFR § 301.6109–1).

rejected those suggestions: "The IRS is the most appropriate federal agency to assign the ITIN because the number is intended for tax use only. Having the IRS as the sole issuer of ITINs will facilitate the general public's acceptance of the fact that the assignment of an ITIN creates no inference regarding the immigration status of an alien individual or the right of that individual to be legally employed in the United States."[3] The IRS reached this conclusion after substantial *interagency* consultation.[4] It continued its commitment to taxpayer confidentiality in publications promoting the ITIN program, explaining that "[t]he ITIN creates no inference concerning your immigration *status*."[5]

In 2003 and 2004, shortly before *amici* began to serve as VITA sites, there were new discussions about the role of the IRS in immigration enforcement. At that time, the IRS, Department of Homeland Security, Government Accounting Office, and others reaffirmed that "current statutory restrictions on sharing tax data would need to be modified to permit sharing of IRS data with [Department of Homeland Security]."[6] Congress made no such modifications. Around the same time, the Department of Treasury responded to concerns about the privacy of immigrant taxpayers' information, noting "Neither the IRS nor TIGTA has a program or project to investigate unauthorized workers in an effort to have them deported. The core missions of IRS

---

[3] Taxpayer Identifying Numbers (TINs), 61 Fed. Reg. 26,788, 26,789 (May 29, 1996) (regarding proposed amendment to 26 CFR § 301.6109–1(d)(3)(iii)).
[4] *Id.*
[5] Internal Revenue Serv., Topic No. 857, Individual Taxpayer Identification Number (ITIN) (Nov. 7, 2024).
[6] *See* Gov't Account. Office, Individual Taxpayer Identification Numbers Can Be Improperly Obtained and Used, GAO-04-529 18 (March 2004). Amid the GAO investigation, the IRS imposed stricter requirements to obtain an ITIN, *id.* at 11, and Congress later codified these and other strictures, Consol. Approps. Act, Pub. L. No. 114-113, Division Q, Title II, § 203, 129 Stat. 2242, 3078–81 (2015).

and TIGTA are, and must remain, focused on our tax system."[7] *Amici* moved to develop their VITA programs, relying in part on IRS representations about the security of taxpayers' information.

More recently, during the prior Trump administration, there was renewed anxiety in immigrant communities about the security of tax information. Yet again, the IRS reassured taxpayers, "The IRS has strong processes in place to protect the confidentiality of taxpayer information, and this includes information related to tax returns filed using ITINs . . . There is no authorization under this provision to share tax data with ICE."[8]

The current efforts to share information with ICE are fundamentally inconsistent with these years of representations.

B.   *The IRS Enlisted Trusted Community Organizations To Echo Its Confidentiality Promises And Encourage Tax Filing Among Immigrant Communities.*

The IRS's efforts to build trust with immigrant taxpayers went beyond pronouncements from government officials.  Rather, the agency has enlisted community-based organizations like *amici* to encourage tax compliance, including through tax-filing assistance through the VITA program. The message from the IRS has been an open invitation to join it as a partner in its work to service more taxpayers, including by becoming a VITA site and providing further support to ITIN tax filers. In recruiting and training organizations to provide VITA and other services, the IRS repeatedly emphasized the importance of taxpayer privacy.

---

[7] Gregory F. Jenner, Treasury Responds to Groups' Concern Over Targeting ITIN Users (2004), https://www.taxnotes.com/research/federal/other-documents/treasury-tax-correspondence/treasury-responds-to-groups-concern-over-targeting-itin-users/yqkt.

[8] Maria Sacchetti, *Undocumented and paying taxes, they seek a foothold in the American Dream*, Wash. Post (Mar. 11, 2017).

VITA is powered by volunteers certified by the IRS. The program encourages participation in the tax system among low- and moderate-income households, persons with disabilities, the elderly, and "limited English speakers," including immigrants.[9] First started in 1969, the VITA program has proven so successful that Congress permanently authorized it in in 2019.[10]

The IRS has specifically sought VITA program partners who would be trusted by underrepresented communities, including those with limited English proficiency and immigrants:

> **Become an IRS partner to help in your community**
> Make a difference in your community by partnering with IRS and thousands of nationwide organizations to meet individual taxpayers' needs for tax education and assistance. In these tough economic times, tax benefits can offer stronger financial stability for people and the communities in which they live. They can also serve as the starting point in realizing dreams.[11]
>
> **Who do you serve?**
> If your organization serves neighborhoods where <u>English is not spoken as the primary language, you most likely have developed strong ties to your constituents and are a trusted resource for them</u>. The link you provide between these individuals and community services can include tax preparation, tax education and assistance.[12]

This type of partnership creates a win-win situation for the agency that knows its community members, the community that receives trustworthy services, and the IRS that increases compliance and efficiency thanks to knowledgeable tax-preparers and electronic filing of tax returns. For *amici*, until now, this work showed the government at its best.

---

[9] See Internal Revenue Serv., Free tax return preparation for qualifying taxpayers https://www.irs.gov/individuals/free-tax-return-preparation-for-qualifying-taxpayers.

[10] Taxpayer First Act, Pub. L. 116–25, title I, § 1401(a), 133 Stat. 981, 993 (2019).

[11] Internal Revenue Serv., Become an IRS partner to help in your community (Apr. 8, 2025), https://www.irs.gov/individuals/become-an-irs-partner-to-help-in-your-community    (emphasis added).

[12] Internal Revenue Serv., Non-English speaking or English as a Second Language (Jan. 10, 2025), https://www.irs.gov/individuals/non-english-speaking-or-english-as-a-second-language (emphasis added).

The IRS also specifically sought to deepen its VITA partnerships to provide support for taxpayers who would need to use an ITIN. To obtain an ITIN, taxpayers must either mail their passports or other identity documents to the IRS or present them to a Certifying Acceptance Agent, who is trained and screened to provide certified copies of the documents to the IRS. As recently as last October, the IRS made a deliberate effort to expand its CAA services:

> The goal is to increase the individual Tax Identification Number (ITIN) Services throughout the nation and within individual communities, particularly communities with high ITIN usage.[13]

*Amici* both heeded this call to become CAAs for their communities.

In recruiting assistance from community organizations like *amici*, the IRS repeatedly emphasized the importance of data privacy and inclusive provision of services.[14] IRS personnel conducted annual trainings and were available to offer guidance and to provide oversight of the VITA sites. It is not unusual for the IRS to conduct audits of VITA sites and to even pose as taxpayers to test the privacy safeguards in any given site. VITA sites, for example, must have their own separate internet connection for e-filing and may not keep any of the taxpayer's documents upon completion of the tax return. *Amici* were also reminded of their obligation, as recipients of federal funding, to comply with Title VI requirements to not deny services to anyone on the grounds of national origin.[15]

*Amici* took the IRS's instructions and their trusted role within their communities seriously. Conscious that individuals rely on them for accurate information, they have invested considerable time and resources educating themselves about privacy laws and controls for taxpayers'

---

[13] Internal Revenue Serv., Fact Sheet: Becoming a Certified Acceptance Agent (CAA) for SPEC Partners (Oct 2024).
[14] Internal Revenue Serv., Privacy, Confidentiality, and Civil Rights, Pub. 4299 9–13 (2025).
[15] 42 U.S.C § 2000d.

information. The active efforts by the IRS to provide tax preparation services for immigrant families, combined with the reassurance that immigration status was irrelevant and that information collected would be kept private except for extreme and limited exceptions, led *amici* to feel that they were providing a service of value.

The IRS benefited from *amici*'s credibility among immigrant and other vulnerable communities. *Amici* repeated countless times that the IRS had strict guidelines for protecting information and that there was a "firewall" between the IRS and other agencies. *Amici* were frank about one prior incident of a rogue Treasury employee's disclosure of immigrant taxpayers' records. They explained, however, that this was the only case that they had ever heard about and that the incident itself had prompted the IRS to be even more watchful over the data it received.[16] These reassurances encouraged hundreds of taxpayers in *amici*'s small communities—and millions more across the country—to trust that they could file taxes without fear.

This has been true until this year. Initial reports of the IRS's willingness to pass information to immigration-enforcement agencies culminated in the Memorandum of Understanding which is now before the Court. *Amici* and other trusted community organizations no longer know what to tell immigrant taxpayers.

        *C.*  *Taxpayers have relied on these privacy promises.*

*Amici* have heard firsthand from immigrant and other taxpayers how important they find the IRS's privacy protections. Immigrants and refugees, many new to the country, who had often fled dangerous situations in their homeland came to CEDC to learn about the US tax system to ensure that they were following U.S. laws. These immigrants wanted to work toward becoming

---

[16] Gregory F. Jenner, *Treasury Responds to Groups' Concern*, *supra* n. 7.

citizens and bring over the family that they left behind. Because of their experiences in their home country, many were worried about giving their information to the government.

Likewise, survivors of domestic violence would ask if their abusers could access their or their children's information to which they were assured that there are mechanisms within the IRS to code and protect their information.[17] The IRS also provides victims of identity thefts and scams personal protection identification numbers to protect them.

Reassured by *amici* and similar organizations' efforts, immigrant community members have filed taxes for many reasons. In a 2014 study of local families, taxpayers reported a sense of civic participation and dignity when filing tax returns. [18] Many are also aware that filing a return is proof of good moral character for future efforts to regularize their status. These reasons held true, even as many do not qualify for the most valuable tax credits such as the earned income tax credit.

Now, immigrant taxpayers have learned that the IRS has adopted a new non-tax priority to pursue immigrants, even if it means betraying the trust they placed in the IRS. Even those taxpayers who are not at risk of deportation would have reason to fear being mistaken or questioned just by virtue of being immigrant taxpayers. *See infra* at 14-18. *Amici* are already seeing these taxpayers shy away from the tax system. Just this filing season, many regular taxpayers chose to not file and ITIN filings were cut almost in half. The IRS's willingness to share data may force immigrant families back into the underground economy.

---

[17] Internal Revenue Serv., IRS Moves to Protect Victims of Domestic Violence (2001), *avail. at* https://www.taxnotes.com/research/federal/other-documents/irs-news-releases/irs-moves-to-protect-victims-of-domestic-violence/10d8p.

[18] Jennifer Sykes, Katrin Križ, Kathryn Edin, and Sarah Halpern-Meekin, *Dignity and Dreams: What the Earned Income Tax Credit (EITC) Means to Low-Income Families*, 80 Am. Soc. Rev. 243 (2014).

## II.    THE MOU THREATENS TO UNDERMINE THE AGENCY'S OWN INTERESTS.

Beyond the broken promises to immigrant taxpayers and weakened credibility of community organizations like *amici*, the use of IRS resources to subsidize immigration-enforcement agencies would undermine the IRS's core mission of tax administration and revenue collection.

Until recently, it would not seem necessary to assert the tautology that the IRS exists to collect taxes and enforce the tax laws. *See* 26 U.S.C. §§ 7801, 7803(a)(2)(A) (defining the core duties of the Commissioner of Internal Revenue as to "administer, manage, conduct, direct, and supervise the execution and application of the internal revenue laws or related statutes and tax conventions").[19] The agency's mission statement, as adopted in 2018, under the prior Trump administration, is to "[p]rovide America's taxpayers top-quality service by helping them understand and meet their tax responsibilities and enforce the law with integrity and fairness to all."[20] Through at least December 24, 2024, the Internal Revenue Manual reaffirmed this mission and articulated values including honesty and integrity, respect, and inclusion.[21] While neither the mission nor values remain in the publicly available Internal Revenue Manual, they reflect longstanding commitments by the agency.

The information-sharing at issue in this litigation reflects a distraction from these core purposes. While Section 6103 imposes a mandatory duty to disclose information in support of specific federal criminal investigations, the MOU and public reporting reflect instead a bulk

---

[19] Shayak Sarkar, *Internal Revenue's External Borders*, 112 Cal. L. Rev. 1645, 1667–68 (2024) (describing the agency's revenue-collection purpose and hazards of "mission creep").
[20] Internal Revenue Serv., *Inflation Reduction Act Strategic Operating Plan,* Pub. 3744 3 (2023).
[21] I.R.M. § 1.1.1.4 (07-29-2019).

information-sharing apparatus.[22] No such bulk information-sharing is contemplated by the statute.[23] More importantly, these efforts will require substantial agency resources, at the same time as the agency reduces its personnel by 40%.[24] There is no indication that the agency has properly considered the effect of this redirection of resources on its ability to fulfill its mission.

Apart from the diversion of resources, distrust generated by the IRS's broken privacy promises threatens the agency's ability to collect revenue. The declines in tax filing that *amici* have already begun to see in New Bedford would directly impair the public fisc—reducing federal revenue by billions of dollars each year.[25]

While some damage has already been done to immigrant taxpayers' trust in the IRS, this Court can help to restore that trust through clear protection of taxpayer data.

## III.  IF THIS COURT PERMITS INFORMATION-SHARING, THE IRS AND ICE ARE LIKELY TO MAKE ERRORS THAT SUBJECT TAXPAYERS TO DIRE CONSEQUENCES.

Consistent with news reports of ICE's ambitious plans for this information sharing, the MOU creates a framework for ICE to make requests for information on large numbers of taxpayers. Such a bulk approach would be a radical shift from existing practice under the (i)(2) exception and introduces substantial risk of errors. *See* Olson Decl. ¶¶ 23–30. There is particular risk for people

---

[22] ECF 38-1; Makena Kelly, *DOGE Is Planning a Hackathon at the IRS. It Wants Easier Access to Taxpayer Data*, Wired (Apr. 5, 2025).

[23] 26 U.S.C. § 6103(j), (*l*) (authorizing bulk data sharing with the Census Bureau and Social Security Administration).

[24] Jory Heckman, *IRS Layoff Notices to Employees Delayed by 'Glitches'*, Fed. News Network (Apr. 23, 2025).

[25] The Budget Lab, The Potential Impact of IRS-ICE Data Sharing on Tax Compliance (Apr. 8, 2025), https://budgetlab.yale.edu/research/potential-impact-irs-ice-data-sharing-tax-compliance (estimating between 5.7 and 18.4 billion dollars in the first year); Marco Guzman, IRS Cooperation with ICE Will Damage Public Trust, Putting Tax Revenues in Jeopardy, Institute on Taxation and Economic Policy (Apr. 10, 2025) https://itep.org/irs-cooperation-with-ice-will-damage-public-trust-putting-tax-revenues-in-jeopardy/ (estimating between 8.6 and 51.8 billion dollars per year).

whose surnames do not meet a narrow set of "standard" forms or those with complicated immigration histories. In the context of immigration enforcement, such errors can have grave consequences, especially where ICE believes that a final removal order is in place.

Public reporting has indicated that ICE intends to seek information on hundreds of thousands, or even millions, of taxpayers through this MOU.[26] That is orders of magnitude larger than the number of requests IRS has historically processed each year under (i)(2). Olson Decl. ¶¶ 23–29. Amid such a radical ramp-up, it would be essential to ensure strong safeguards against identification errors. Yet nothing in the publicly available MOU illustrates such safeguards.

A.   *The MOU Will Likely Lead To Errors Based On Name Misidentification.*

Misidentification errors are more likely among communities that speak languages other than English and their descendants. For example, Spanish and Portuguese naming conventions often provide for two surnames; government databases may be inconsistent with respect to which surname is identified. Olson Decl. ¶ 41. Similarly, names that originate in other writing systems, such as Arabic, Cyrillic, or Chinese may be transliterated inconsistently in various locations. At an extreme, the same Chinese name is often pronounced entirely differently in Mandarin and Cantonese, leading to inconsistent transliterated records for people who speak both languages. The IRS has historically recognized these naming challenges, as reflected in the detailed instructions for name entry to *amici* and other VITA sites. Olson Decl. ¶ 42.

---

[26] Jacob Bogage and Jeff Stein, *IRS nears deal with ICE to share addresses of suspected undocumented immigrants*, Wash. Post (March 22, 2025) ("The move toward information-sharing comes as President Donald Trump pushes his administration to use every resource to conduct what he hopes will be the largest mass deportation of immigrants in U.S. history.").

People with more common names, particularly names that are common in immigrant communities, are also at risk.[27] For example, there may be multiple people named Jose Garcia, Anoop Singh, or Ming Li, even in one neighborhood. This could lead ICE to obtain information on the wrong individual.

  B.  *The MOU Will Likely Lead To Errors Based On Incomplete Immigration History.*

Immigration law is not solely concerned with the enforcement and removal of non-citizens; it also includes the responsibility to recognize legal benefits and ensure respect for the country's obligations under international humanitarian law. For a decade, the CEDC has employed DOJ Accredited Representatives to provide assistance on immigration-law issues. Working with many immigrant taxpayers, *amici* are well aware of the complexity of our immigration system and are concerned that immigrants who may have legal status or potentially available immigration relief will be swept up, wrongfully detained and deported without due process.

The MOU introduction begins by referencing the administration's goal to "take immediate steps to identify, exclude, or remove aliens illegally present in the United States." Olson Decl. ¶ 22. The act of being present without currently valid status is not in itself a crime; immigration removal proceedings and detention are civil in nature. The MOU cites the section of immigration law which imposes criminal penalties for those who remain in the country after a final order of removal. 8 U.S.C. § 1253. However, a removal order does not prevent USCIS from granting a status that can prevent the execution of the removal order, or even lead the removal case to be reopened. For example, certain immigrants with removal orders may still be entitled to lawfully remain in the U.S. because of Temporary Protected Status, Withholding of Removal, or protection

---

[27] Such mistakes occurred even before the current pressure to rapidly detain and remove people. *See* Greg Allen, *ICE Detained the Wrong Peter Brown*, Nat'l Pub. Radio (Dec. 18, 2018).

under the Convention Against Torture. Some people with final removal orders reopen their proceedings and apply for asylum. Others may be granted administrative relief and subsequently reopen proceedings to obtain a U-visa (for qualifying individuals who are cooperating with law enforcement in criminal investigations), Special Immigrant Juvenile Status, VAWA relief (under the Violence Against Women Act, for certain victims of domestic violence), or a T-visa (for victims of human trafficking).

Individuals may have been ordered removed *in absentia* but still qualify for relief upon showing compelling reasons to reopen their proceedings. An immigrant with a removal order may have subsequently married a U.S. citizen and could apply to reopen their case.

Already, in the past few months, immigration enforcement has moved quickly and made mistakes. The risks of a misdirected investigation are particularly egregious where ICE is pursuing people who have final orders of removal. The case of Kilmar Abrego-Garcia illustrates perfectly the high risk. Mr. Abrego-Garcia had an order of removal but who was also granted Withholding of Removal which prohibits the government from executing the removal order because he would "more likely than not" face persecution upon repatriation. 8 U.S.C. § 1231(b)(3). To this day, this immigrant father remains incarcerated in a Salvadoran prison after an admitted "administrative error."[28] More recently, several American citizen children, including a toddler with cancer, have been removed without clear indications of parental wishes.[29] In the absence of any procedural steps that ICE must take before it can place the immigrant on an airplane to their country of origin, these mistakes are bound to happen. Despite the requirement that information disclosed under subsection (i)(2) be used only for the investigation of and preparation for federal

---

[28] *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025).
[29] Doha Madani, *U.S. citizen children, including 4-year-old with cancer, taken to Honduras on mother's deportation flight, legal advocates say*, NBC News (April 27, 2025).

criminal proceedings, it would be difficult to catch a mistake or misuse of the information before it is too late.

## CONCLUSION

Sharing IRS data with immigration-enforcement agencies comes at much too high a cost. The loss of trust will hurt everyone, not just the group whose data it once promised to protect. Immigrant taxpayers will make a reasonable choice to stay away, undermining tax collection and administration. The choice between filing a tax return and a risk of deportation for oneself or family member is not very hard choice. Although information-sharing has not yet occurred, the news reporting that the IRS would no longer safeguard information has harmed *amici's* reputation of credibility and trust. *Amici* strongly urge this Court to stop the IRS from making this mistake.

Dated: April 29, 2025

Respectfully submitted,

/s/ Joshua A. Rosenthal

Joshua A. Rosenthal (D.C. Bar No. 198162)
ASIAN LAW CAUCUS
55 Columbus Ave.
San Francisco, CA 94111
Telephone: (628) 345-5628
joshr@asianlawcaucus.org

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with Local Rule 5.1(d) and Local Rule 7(o)(4)

and is prepared in a double-spaced format using 12-point Times New Roman font.

/s/ Joshua A. Rosenthal
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2025, I electronically filed the above document, including its attachments, with the Clerk of Court via the Court's CM/ECF electronic filing system, which will send a notice of electronic filing to all counsel of record identified on the docket.

/s/ Joshua A. Rosenthal
*Counsel for Amici Curiae*

EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| Centro de Trabajadores Unidos, et al., ) | |
| ) | |
|      Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 25-677 (DLF) |
| ) | |
| Scott Bessent, in his official capacity as ) | |
| Secretary of Treasury, et al. ) | |
| ) | |
|      Defendants. ) | |
| _____ ) | |

**DECLARATION OF NINA E. OLSON**

I, Nina E. Olson, declare the following under penalty of perjury:

1.  I am over the age of 18 years old and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.  I served as the National Taxpayer Advocate from March 2001 through July 2019. The National Taxpayer Advocate is a statutorily mandated position, with the purpose to "assist taxpayers in resolving problems with the Internal Revenue Service" ("IRS"); "identify areas in which taxpayers have problems in dealings with the [IRS]"; "to the extent possible, propose changes in the administrative practices of the Internal Revenue Service to mitigate [such] problems"; and "identify potential legislative changes." 26 U.S.C. § 7803(c)(2)(A). The National Taxpayer Advocate reports directly to the Commissioner of Internal Revenue. 26 U.S.C. § 7803(c)(1)(B)(ii).

3.   I was appointed by Treasury Secretary Lawrence Summers under the Clinton Administration and reported to service under Treasury Secretary Paul O'Neill in the George W. Bush Administration. During my tenure I served under three Presidents, at least six Secretaries of the Treasury, as well as five Commissioners and numerous acting Commissioners.

4.   As National Taxpayer Advocate, I led and directed the Taxpayer Advocate Service (TAS)—an independent organization within the IRS with the statutorily-mandated mission of helping taxpayers resolve their problems with the IRS. During my tenure as National Taxpayer Advocate, TAS had about 1,700 employees in 75 offices nation-wide and assisted more than four million taxpayers. I also submitted 37 additional reports to Congress and testified at more than sixty congressional hearings on topics including taxpayer rights, IRS operations, and the confidentiality of tax information.

5.   Before I became National Taxpayer Advocate, I was the founder and Executive Director of the Community Tax Law Project, the first independent 501(c)(3) low-income taxpayer clinic in the United States. Prior to founding that organization, I owned a tax planning and preparation firm in Chapel Hill, North Carolina from 1975 to 1991.

6.   Since my service as National Taxpayer Advocate, I have continued to advocate for the rights of taxpayers and for fairness and reduced complexity in the tax system as founder and Executive Director of the Center for Taxpayer Rights. I have also taught and written extensively on tax-law matters.

7.   As National Taxpayer Advocate, confidentiality was a substantial and recurring area of concern.

8.   In my 2003 Annual Report to Congress, I submitted a legislative recommendation to Congress about the confidentiality and disclosure of returns and return information. Noting that

"[t]he importance of confidentiality to the fair and effective administration of the tax system cannot be overstated," I recommended that "disclosure of returns and return information be limited to those rare instances in which an agency has demonstrated a compelling need for that information which cannot be reasonably obtained from another source." Internal Revenue Serv., National Taxpayer Advocate 2003 Annual Report to Congress, Pub. 2104, at 232–255 (Dec. 2003).

9.   As National Taxpayer Advocate, I authored and championed the Taxpayer Bill of Rights ("TBOR"). I first recommended that Congress enact a Taxpayer Bill of Rights in my 2007 Annual Report to Congress and identified its absence as a Most Serious Problem for Taxpayers in my 2013 Annual Report to Congress. This led the IRS to administratively adopt the TBOR in the summer of 2014. In my 2014 Annual Report to Congress, I again recommended that Congress codify the TBOR, which it did in 2015. *See* Protecting Americans from Tax Hikes Act of 2015 (PATH Act), Pub. L. No. 114-113 § 401, 129 Stat. 3117 (2015) (codified at 26 U.S.C. § 7803).

10. The TBOR's sixth enumerated right is the "Right to Confidentiality," now found at 26 U.S.C. § 7803(a)(3)(D), which provides that taxpayers have the right to expect that "any information they provide to the IRS will not be disclosed unless authorized by the taxpayer or by law." That right reflects nearly fifty years of congressional intent, beginning with the 1976 Tax Reform Act, to limit disclosure of tax data to narrow, carefully delineated exceptions in 26 U.S.C. § 6103.

11. These confidentiality protections serve not only taxpayers' interests; they also strengthen the system of tax administration, which necessarily relies on voluntary compliance. There are not, and will never be, sufficient enforcement resources to audit every taxpayer or to track down all taxpayers who fail to file returns and remit payment. By safeguarding taxpayers' privacy, the IRS encourages taxpayers to share wide-ranging information about their lives, sometimes including

sensitive matters of family life, health status, and even behavior that may be contrary to other laws. All of this information is necessary to comprehensive and successful tax administration. As IRS Commissioner Mark Everson (a former IRS Commissioner) testified to Congress in 2004: "We are broadly restricted under Section 6103 of the Code from sharing taxpayer information with third parties, including other government agencies, except in very limited circumstances."

12. An essential feature of § 6103's exceptions is that information may be disclosed only for a designated purpose and pursuant to the exact procedures provided for each exception.

13. I have reviewed the Memorandum of Understanding between the Department of Treasury and Department of Homeland Security, as filed at ECF 38-1, ("MOU") which purports to facilitate disclosures pursuant to § 6103(i)(2). I understand that the agencies have also entered into an implementation agreement, as referenced in the MOU, but I have not been able to review that agreement, as it has not been made available to the public, even in redacted form.

14. Based on my fifty years of practice and scholarship in federal tax administration, inside and outside the IRS, I see grave legal deficiencies in the MOU. These defects run flagrantly afoul of 26 U.S.C. § 6103 and undermine the TBOR's Right to Confidentiality. The MOU threatens substantial and irreparable harm to the voluntary compliance foundation of the U.S. tax system.

15. I am also concerned about the ways that this MOU represents an abrupt shift in IRS approach to immigrant taxpayers, contrary to years of representations to those taxpayers about the privacy of their information vis-à-vis immigration enforcement agencies.

16. The IRS has consistently adopted a posture of neutrality as to immigration violations.

17. During my time as National Taxpayer Advocate, there were occasional discussions of the prospect of using IRS information for the purposes of civil immigration enforcement. Alongside the rest of agency leadership, including under the George W. Bush and first Trump administrations,

Olson Decl.                                                                                                4

it was commonly understood that any such information-sharing could occur only with legislation to amend § 6103.

18. Moreover, there were occasional incidents in which an employee of a parallel federal agency sought to enforce immigration law based on a taxpayer's engagement with the IRS. In the wake of each of these incidents, I worked diligently with agency leadership to ensure that agency staff, our federal partners, and community members understood the IRS's commitment to neutrality and interest in the voluntary tax compliance of immigrant taxpayers.

19. Because it is difficult, if not impossible, to fully separate ICE's enforcement of criminal laws associated with immigration from its efforts to detain and remove noncitizens, the IRS has consistently avoided sharing of information with ICE under subsection (i)(2).

20. Moreover, based on my understanding of the IRS's systems and processes, I foresee that any bulk information-sharing, as contemplated by the MOU, will contain frequent errors, particularly among communities of immigrants.

**The MOU Fails to Meet the Requirements of Subsection (i)(2).**

21. The MOU purports to facilitate information-sharing pursuant to subsection (i)(2), which allows for disclosure of return information, other than taxpayer return information (but allowing for disclosure of the taxpayer's identity), without a judicial order. Such disclosure is permitted only in support of the investigation or preparation for judicial proceedings to enforce a federal non-tax criminal law, and may be disclosed, maintained, and used only in connection with such investigation or preparation.

22. From the beginning, the MOU's own text suggests an impermissible purpose. The document's opening paragraphs directly reference a goal of *civil* immigration enforcement. Paragraph 1(a) cites "Executive Order (EO) No. 14161, Protecting the United States from Foreign

Olson Decl.                                                                                    5

Terrorists and Other National Security and Public Safety Threats" and states that "the President directed the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to take immediate steps to identify, exclude, or remove aliens illegally present in the United States." The exclusion and removal of non-citizens is a matter of civil immigration law, not federal criminal law.

23. Another substantial flaw is the open-ended, standing pipeline for mass disclosures established by the MOU. This runs contrary to § 6103(i)(2)(A)'s explicit requirement for individualized, documented requests. The statute mandates that each discrete written request: (1) name a specific taxpayer, (2) specify taxable periods, (3) cite the criminal statute at issue, and (4) explain relevance to that specific investigation. This case-by-case procedure was not accidental—it was Congress's deliberate choice. The Senate Report to the 1976 Act warned against a "databank mentality" that would undermine taxpayer privacy. S. Rep. No. 94-938, at 328 (1976). This case-by-case approach is adopted in the Internal Revenue Manual – the agency's instructions to staff – at I.R.M. Exhibit 11.3.41-6, *IRC 6103(i)(2) Case Processing Checklist* (accessed Apr. 28, 2025).

24. The MOU's planned "batch" processing system under a future "implementation agreement" (¶ 6(A)) would transform what Congress designed as a limited, case-specific disclosure mechanism into a wholesale data extraction tool.

25. To illustrate the extent that the MOU's approach is inconsistent with longstanding agency practice, I reviewed reports prepared for the Congressional Joint Committee on Taxation, which annually reports on disclosures pursuant to each exception to § 6103.[1] These public disclosure

---

[1] Joint Committee on Taxation, *Disclosure Report for Public Inspection Pursuant to Internal Revenue Code Section 6103(p)(3)(C)* for Calendar Years 2024 (JCX 17-25) at 3; 2023 (JCX14-24) at 3; 2022 (JCX-6-23), at 3; 2021 (JCX-8-22), at 3; 2020 (JCX-17-21), at 3; 2019 (JCX-13-20), at 3; 2018 (JCX-21-19), at 3; 2017(JCX-29-18), at 3.

reports confirmed my understanding that § 6103(i)(2) has historically been used for only a small number of discrete disclosures and no "Bulk Master File" disclosures.

26. As shown in the following table, the JCT reports show the number of disclosures under § 6103(i)(2) range from a low of 343 in calendar year 2018 to a high of 42,301 in calendar year 2021.

27. These statistics also reflect the historically limited use of subsection (i)(2) for information disclosures.

28. If the Administration's statements are to be taken at face value, the requests for 700,000 taxpayer records would be an unprecedented request and blow a hole in the protection of taxpayer return information that was not contemplated by Congress.

| Calendar Year | Bulk Master File Data Disclosures to US Attorneys under IRC § 6103(i)(2) | Other Disclosures to US Attorneys under IRC § 6103(i)(2) | Total Other Disclosures | 6103(i)(2) % of Total Other Disclosures |
|---|---|---|---|---|
| 2024 | -0- | 24,415 | 1,160,842 | 2.1032% |
| 2023 | -0- | 30,538 | 25,248,806,641 (large disclosure to Treas. Office of Tax Analysis) | .0001% |
| 2022 | -0- | 14,640 | 665,533,414 | .0022% |
| 2021 | -0- | 42,301 | 3,537,551,919 (large disclosure to GAO) | .0012% |
| 2020 | -0- | 13,791 | 388,625,027 | .0035% |
| 2019 | -0- | 796 | 295,652,223 | .0003% |
| 2018 | -0- | 343 | 283,293,814 | .0001% |
| 2017 | -0- | 349 | 236,263,101 | .0001% |

29. I am aware of no historical precedent under § 6103(i)(2) for a standing mechanism for mass disclosures of the kind envisioned by the MOU, nor can I see how such a mechanism would be consistent with the statute.

Olson Decl.                                                                                         7

30. Finally, section 9 of the MOU refers repeatedly to ICE possession of "tax returns." ECF 38-1 at 11–13. There is no basis under subsection (i)(2) for disclosure of tax returns; tax returns are only available under § 6103(i)(1) pursuant to an ex parte order from a federal district court judge or magistrate.

**There are Serious Questions Regarding the Redacted Portions of the MOU and the Implementation Agreement.**

31. Because significant provisions of the MOU have been redacted and the implementation agreement is not available, it is not entirely clear what information ICE intends to seek under the MOU or how it will be shared. Nonetheless, based on the deficiencies identified above, I have serious concerns about how the agencies will address these details.

32. As a preliminary matter, it is important to recognize that "taxpayer return information" is a term of art that the IRS has consistently interpreted to reach far beyond tax returns to include any information that is provided by or on behalf of a taxpayer.

33. Before any information may be disclosed under §6103(i)(2), the IRS must determine whether the information requested is (1) return information or (2) taxpayer return information. Thus, the IRS must examine how the IRS received or obtained the return information requested before it can make a disclosure. If the information was provided by or on behalf of the taxpayer, the IRS cannot grant the disclosure under subsection(i)(2), with one narrow exception for a "taxpayer's identity." Congress deliberately crafted this narrow language to ensure the most sensitive items remain protected absent an *ex parte* court order under § 6103(i)(1).

34. Accordingly, ICE cannot lawfully obtain a copy of any Form W-2s, Wage and Income Statements, filed with the IRS by an employer, because that wage return was filed on behalf of the taxpayer so the taxpayer and the IRS can compute the taxpayer's liability. While National Taxpayer Advocate, I helped to develop comprehensive guidance to explain the application of these

Olson Decl.                                                                                    8

definitions in the complex scenario of identity theft. *See* Memorandum from Drita Tonuzi to Joanne B. Minsky, Internal Revenue Serv. Off. of Chief Counsel, *Identity Theft – Disclosure Issues Under 26 U.S.C. §6103* (July 8, 2016), *released as* PMTA 2017-004 (Aug. 25, 2017) at 12 (reflecting a longstanding interpretation of W-2 forms as "taxpayer return information").

35. Throughout my tenure as NTA, the IRS consistently rejected agency requests on precisely this ground. The legislative history of § 6103, every published IRS policy document, and decades of unbroken practice all confirm this understanding.

36. I have serious concerns that ICE seeks to use the MOU to obtain information other than these narrow categories of information.

37. Moreover, even assuming that a taxpayer's address would fall within the exception for a "taxpayer's identity," subsection (i)(2), the use of this provision to gather taxpayer addresses would similarly fall outside the exception.

38. Longstanding agency practice has prevented the IRS from disclosing only taxpayer's addresses under subsection (i)(2). These practices were memorialized in the Internal Revenue Manual.

39. In preparing this declaration, I reviewed the current Internal Revenue Manual and noted that the provisions on information-sharing pursuant to (i)(2) were updated this month, on April 17, 2025. The current version of the Internal Revenue Manual reaffirms that "Requests for addresses only are invalid because IRC 6103(i)(2) requires that the requester provide an address." I.R.M. 11.3.28.5.4(5), *Disclosure of Return Information Other Than Taxpayer Return Information* (last edited July 23, 2018).

40. In light of these restrictions, it is difficult to discern what information ICE is lawfully seeking from IRS.

**IRS Databases Contain Errors, Which Risk Inaccurate Disclosures to ICE Under the MOU**

41. Government databases often fail to properly or consistently record the names of individuals whose names do not follow Anglo naming conventions. For example, many Spanish and Portuguese speaking individuals have two surnames. Likewise, individuals who speak languages that use writing systems other than the Latin alphabet, such as Chinese, Hindi, Cyrillic, or Arabic scripts, may have their names transliterated inconsistently.

42. The training guide for volunteers in the IRS Volunteer Income Tax Assistance (VITA) and Tax Counseling for the Elderly programs dedicates two entire pages to entering Spanish, Indo-Chinese, and other hyphenated or dual/triple surnames. See Internal Revenue Serv., Pub. 4012, *2024 Returns: VITA/TCE Volunteer Resource Guide: Entering Last Name Correctly* B19–B20 (rev. Oct. 2024). The guide notes that the name and taxpayer identifying number must match exactly or the e-filed return will be rejected, demonstrating the inflexibility of the IRS name controls.

43. This mismatch creates a high probability of either false positives (matching the wrong taxpayer) or false negatives (failing to match a taxpayer) in a mass data-sharing context. The consequences of these false positive for a taxpayer could be dire: not merely exposing them to criminal penalties but that the wrong person may be apprehended and subjected to deportation.

**Conclusion**

44. Finally, I must sound a note of concern, not only for the taxpayers who may be affected negatively by this MOU, but also for the staff at the IRS. As National Taxpayer Advocate, I encountered thousands of dedicated IRS employees, who seek only to serve the public to the best of their abilities.

45. The protections of § 6103 are enforced in part by imposing civil and criminal penalties on employees who disclose or inspect information in violation of the statute. While such penalties are

not adequate remedies for a taxpayer whose information is wrongly disclosed under the statute, they could nonetheless wreak havoc on the life of a civil servant. I am profoundly concerned that agency leadership's reckless decision to enter into this MOU and begin transferring information in a manner that is fundamentally inconsistent with § 6103 will thus place civil servants in an impossible bind: to lose their livelihood or risk criminal prosecution.

46. We have already seen many in IRS leadership make the choice to leave the agency, rather than support these unlawful efforts.

47. For all of these reasons stated, I believe that the IRS-ICE MOU flagrantly violates 26 U.S.C. § 6103, contravenes the Taxpayer Bill of Rights, endangers both taxpayers and IRS employees, and represents an unprecedented and unlawful repurposing of the tax system for immigration enforcement. Unless enjoined, it will undermine voluntary compliance, devastate federal revenues, and fundamentally damage the integrity of the federal tax system.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of April 2025, in Washington, D.C.

Nina E. Olson