**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Centro de Trabajadores Unidos, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 25-677 (DLF) |
| Scott Bessent, in his official capacity as Secretary of the Treasury, et al., | |
| Defendants. | |

**BRIEF OF 105 MEMBERS OF CONGRESS AS *AMICI CURIAE* IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Gerson H. Smoger*
SMOGER & ASSOCIATES, P.C
4228 Hallmark
Dallas, TX
(510) 531-4529
Smogerlaw@gmail.com

* Motion for *pro hac vice* admission forthcoming

Leah M. Nicholls (DC Bar No. 982730)
PUBLIC JUSTICE
1620 L St. NW, Ste. 630
Washington, DC 20036
(202) 797-8600

lnicholls@publicjustice.net

*Counsel for Amici Curiae 105 Members of Congress*

## <u>TABLE OF CONTENTS</u>

INTERESTS OF AMICI CURIAE ................................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...............................................................2

ARGUMENT ..................................................................................................................................4

     I.     BOTH CONGRESS AND THE IRS CONSISTENTLY HAVE VIEWED THE
CONFIDENTIALITY OF TAX INFORMATION AS SACROSANCT ................ 4

     II.     INDIVIDUAL TAX IDENTIFICATION NUMBERS WERE CREATED SO
THAT IMMIGRANTS AND OTHERS COULD PAY TAXES OWED TO THE
GOVERNMENT .................................................................................................... 7

     III.     UNDER § 6103, INFORMATION SHARING WITH ICE HAS NEVER BEEN
AUTHORIZED; CONGRESS HAS ONLY PERMITTED INFORMATION
SHARING EXPRESSLY AUTHORIZED BY A STATUTORY EXCEPTION,
AND CONGRESS CONSIDERED AND REJECTED THE EXPANSION THAT
THE ADMINISTRATION NOW SEEKS ............................................................ 11

CONCLUSION ..............................................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes and Proposed Statutes**

26 U.S.C. § 6103 ................................................................................................1–7, 10–19

26 U.S.C. § 7213(a) .........................................................................................................6

26 U.S.C. § 7216 ..............................................................................................................6

26 U.S.C. § 7701(b) .........................................................................................................2

Bill to Amend the Immigration and Nationality Act, S. 2454, 109th Cong. (2006)................17, 18

Comprehensive Immigration Reform Act of 2006, S. 2611, 109th Cong. § 301 (2006) ...................................................................................................................17

Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, div. Q, 129 Stat. 2242 (2015) ..................................................................................................7, 10

Fostering Undergraduate Talent by Unlocking Resources for Education (FUTURE) Act, Pub. L. No. 116-91, § 3, 133 Stat. 1188 (2019) ..........................................13

Patient Protection and Affordable Care Act, Pub. L. No. 111-148, §1411, 124 Stat. 119 (2010)..............................................................................................13

Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248 (1982) ...........................15

Tax Reform Act, Pub. L. No. 94-455, 90 Stat. 1520 (1976)...................................................2, 4, 6

Victims of Terrorism Tax Relief Act of 2001, Pub. L. No. 107-134, § 201, 115 Stat. 2427 (2001)..............................................................................................12

**Court Rules**

Fed. R. App. P. 29(a)(4)(E)...............................................................................................1

**Other Authorities**

152 Cong. Rec. S4953 (daily ed. May 23, 2006) (statement of Sen. Chuck Grassley) ...........................................................................................................18, 19

Amendment to S. 2454, S. Amdt. 3267 to S. Amdt. 3192, 109th Cong. (2006) (amendment of Sen. Ben Nelson) ................................................................................17, 18

Amendment to S. 2611, S. Amdt. 4177, 109th Cong. (2006) (amendment of Sen. Chuck Grassley) .................................................................................................18

Gordon C. Milbourn, III, U.S. Dept. of Treasury, Treasury Inspector Gen. for Tax Admin., *The Internal Revenue Service's Individual Taxpayer Identification Number Creates Significant Challenges for Tax Administration* (Jan. 8, 2004) ...................13

Internal Revenue Servs., *Internal Revenue Manual* (Aug. 3, 2023) ...................................6, 14, 15

Internal Revenue Serv., Off. of Chief Couns., *Disclosure Litigation Reference Book* (Apr. 2000) ........................................................................................................6

Maria Sacchetti, *Undocumented and paying taxes, they seek a foothold in the American Dream*, Wash. Post (Mar. 11, 2017), https://www.washingtonpost.com/local/social-issues/undocumented-and-paying-taxes-they-seek-a-foothold-in-the-american-dream/2017/03/11/bc6a8760-0436-11e7-ad5b-d22680e18d10_story.html .......................9, 10

Nathan Layne & Kanishka Singh, *Top IRS officials join chief in quitting following immigration data deal,* Reuters (Apr. 9, 2025, 12:06 PM), https://www.reuters.com/world/us/us-irs-chief-quit-over-deal-share-data-with-immigration-officials-report-says-2025-04-08/ ........................................................14

*Report of the S. Comm. On Finance*, S. Rep. No. 94-938 (1976) ..............................................4, 5

*Social Security Number and Individual Taxpayer Identification Number Mismatches and Misuse*: Hearing Before the Subcomm. on Oversight & the Subcomm. on Soc. Sec. of the H. Comm. on Ways & Means, 108th Cong. 12 (Mar. 10, 2004) .......................................................................................................10, 11, 12

Staff of Joint Comm. on Tax'n 109th Cong., *Present Law and Background Relating to Tax Issues Associated with Immigration Reform* (July 17, 2006) ..........2, 3, 13, 14

*Tax Payments by Undocumented Immigrants*, Inst. on Tax'n & Econ. Pol'y (July 30, 2024), https://itep.org/undocumented-immigrants-taxes-2024/ .........................................8

*Taxpayer Bill of Rights 8: The Right to Confidentiality,* Internal Revenue Servs. (Jan. 23, 2025), https://www.irs.gov/newsroom/taxpayer-bill-of-rights-8 .............................7

Taxpayer Identifying Numbers (TINs), 61 Fed. Reg. 26,788 (May 29, 1996) .......................7, 8, 9

*The Potential Impact of IRS-ICE Data Sharing on Tax Compliance,* The Budget Lab (Apr. 8, 2025), https://budgetlab.yale.edu/research/potential-impact-irs-ice-data-sharing-tax-compliance ..................................................................................8, 9

U.S. Dep't of the Treasury, Off. of Tax Pol'y, *Report to the Congress on Scope and Use of Taxpayer Confidentiality and Disclosure Provisions, Vol. I: Study of General Provisions* (Oct. 2000) .........................................................................5, 6

*Volunteer Income Tax Assistance (VITA) sites with ITIN services*, Internal
Revenue Servs. (Jan. 16, 2025), https://www.irs.gov/tin/itin/volunteer-
income-tax-assistance-vita-sites-with-itin-services ..................................................................8

## INTERESTS OF *AMICI CURIAE*[1]

Proposed *Amici* are 105 Members of Congress.[2] These Members are well-acquainted with taxpayer confidentiality laws and the establishment of Individual Tax Identification Numbers (ITINs) as an integral aspect of the U.S. tax code, as well as with the statutory privacy and legislative framework Congress has enacted to advance the ability of those without Social Security Numbers (SSNs) to pay taxes. As such, *Amici* have an interest in ensuring that the carefully designed statutory privacy protections that apply to taxpayer information are strictly adhered to and consistent with statutory intent.

Congress has chosen to limit any intrusions regarding the privacy of taxpayer information to tightly defined exceptions for specific purposes, making legislation amending 26 U.S.C. § 6103 the sole means for creating new exceptions. Every person or business with federally taxable income must pay taxes under federal law, yet Congress relies upon voluntary compliance across the tax code and has reasoned that millions of responsible taxpayers would be less likely to provide their most personal data to the Internal Revenue Service (IRS), including their identity or address, if that information would be made available for immigration enforcement. For that reason, despite having expanded exceptions to the privacy law in a number of specific circumstances, and having considered and rejected immigration-related amendments specifically, Congress has repeatedly chosen not to enact such an exception for immigration enforcement but rather to address immigration enforcement with separate policies and steps. This choice by Congress puts an administrative decision to use taxpayer information for immigration enforcement goals beyond the

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), no party's counsel authored this brief, in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than *amici curiae* or their counsel contributed money that was intended to fund preparing or submitting this brief.
[2] A full list of *amici* appears in the Appendix.

purview of the executive.

*Amici* are very concerned that the Administration is seeking to broaden this tightly regulated information-sharing regime, whether by Memorandum of Understanding (MOU) between agencies or otherwise, without seeking Congressional approval first, and that this would both directly contravene Congress's well-considered statutory design of focusing IRS resources on collecting federal tax revenues and constitute an intrusion by the executive branch upon powers reserved by the Constitution for Congress. *Amici* believe the Administration's actions here could profoundly alter expectations of privacy for taxpayers and impact revenue-raising and budgetary projections for the federal government as a whole.

## INTRODUCTION AND SUMMARY OF ARGUMENT

After it became clear to Congress that misuse of the tax system posed a threat under the Nixon Administration, in 1976 Congress enacted the Tax Reform Act. Pub. L. No. 94-455, 90 Stat. 1520 (1976). 26 U.S.C. § 6103 and related provisions, were enacted to make clear that taxpayer information would be, as a rule, kept confidential absent specific statutory exceptions. Pursuant to this statutory framework, the IRS has consistently maintained, including in both testimony to Congress and in representations to the public, that it does not share taxpayer information for immigration enforcement, or for any purpose not specifically authorized by § 6103.

For decades, Congress and the IRS have created regulatory and taxpayer compliance systems, including clinics around the country, to encourage immigrants and those considered "resident or non-resident aliens" under the tax code to pay taxes in accordance with federal law as required by 26 U.S.C. §§ 7701(b)(1)(A), (b)(3). The IRS issues Individual Taxpayer Identification Numbers (ITINs) to individuals who are required to have a taxpayer identification number but who do not have and are not eligible to obtain SSNs. ITINs are issued regardless of immigration status to ensure IRS's receipt of tax revenue from all those who have the responsibility to pay taxes under

the Code. Staff of Joint Comm. on Tax'n 109th Cong., *Present Law and Background Relating to Tax Issues Associated with Immigration Reform* 4 (July 17, 2006) ("Joint Committee Report"). In exchange for voluntary tax compliance, the government has publicly and frequently assured taxpayers that their information would be kept private, including from use for immigration enforcement purposes. Acting in reliance on this understanding, undocumented taxpayers have voluntarily paid billions of dollars in federal, state, and local taxes every year, while contributing to public benefits programs that they are excluded from, such as Social Security.

In seeking to implement a novel and unprecedented MOU between the IRS and U.S. Immigration and Customs Enforcement (ICE), the Administration argues that, despite Congress's carefully constructed statutory framework, its own interpretation of § 6103(i)(2) permits a far broader sharing of taxpayer data, including potentially the sharing of data in large batches, than has ever before occurred or even been contemplated by Congress in enacting § 6103(i)(2) or any other provision of law.

This would be violative of Congress's carefully constructed legislative framework and is incompatible with congressional legislation in three significant ways: 1) exceptions to § 6103's mandated privacy have been specifically delineated by Congress and creating new exceptions is the sole prerogative of Congress as it balances public interests; 2) loosening privacy protections, as the Administration's proposal seeks to do, would be antithetical to the underlying statutory and regulatory purpose of the privacy law, as well as the ITIN program and its conformance to the IRS's mission, which is explicitly and singly to enhance tax collection for our national treasury; and 3) although Congress has amended § 6103 many times with bi-partisan majorities and on a number of occasions Congress has considered amendments that would broaden § 6103's

exceptions in ways that the Administration now seeks, after careful consideration Congress has elected not to pass such legislation.

## ARGUMENT

### I.    BOTH CONGRESS AND THE IRS CONSISTENTLY HAVE VIEWED THE CONFIDENTIALITY OF TAX INFORMATION AS SACROSANCT

Beginning with the Tax Reform Act of 1976, Congress has maintained strict limitations on the disclosure of taxpayer information under 26 U.S.C. § 6103. The law establishes that tax returns and return information "shall be confidential," subject only to limited exceptions specifically authorized by statute, and the legislative history underscores that any exceptions should be read narrowly consistent with this purpose, given the need to protect public trust in the mechanisms for raising revenues on behalf of the government via a system relying on self-compliance. Further, the structure and legislative history of § 6103 make clear that only Congress can create exceptions under the law.

In passing the Act, concerns about balancing privacy with tax compliance were carefully considered. In the Report of the Senate Committee on Finance, the Committee noted:

> Questions have been raised and substantial controversy created as to whether the present extent of actual and potential disclosure of return and return information to other Federal and State agencies for nontax purposes breaches a reasonable expectation of privacy on the part of the American citizen with respect to such information. This, in turn, has raised the question of whether the public's reaction to this possible abuse of privacy would seriously impair the effectiveness of our country's very successful voluntary assessment system which is the mainstay of the Federal tax system. In a more general sense, questions have been raised with respect to whether tax returns and tax information should be used for any purposes other than tax administration.

S. Rep. No. 94-938, at 317 (1976).[3] Congress's conclusion regarding this "substantial controversy" was to prioritize taxpayer privacy: "The committee decided that the information that the American

---

[3] Available here: https://www.finance.senate.gov/imo/media/doc/tax6.pdf.

citizen is compelled by our tax laws to disclose to the Internal Revenue Service was entitled to essentially the same degree of privacy as those private papers maintained in his home." *Id.* at 328.

Any disclosure exceptions to confidentiality were required to be carefully delineated and specifically authorized by statute, and, critically, not created by the Executive branch.

> Although present law describes income tax returns as "public records", open to inspections under regulations approved by the President, or under Presidential order, the committee felt that returns and return information should generally be treated as confidential and not subject to disclosure except in those limited situations delineated in the newly amended section 6103 where the committee decided that disclosure was warranted.

*Id.* at 318. Congress's reasoning for this is stated clearly:

> The committee has reviewed each of the areas in which returns and return information are now subject to disclosure. With respect to each of these areas, the committee has tried to balance the particular office or agency's need for the information involved with the citizen's right to privacy and the related impact of the disclosure upon the continuation of compliance with our country's voluntary assessment system.

*Id.*

The approach in the 1976 Act was subsequently summarized as "eliminat[ing] Executive discretion" over privacy determinations and disclosure categories in a Report to Congress by the Office of Tax Policy Department of the Treasury in 2000:

> By the mid-1970's, there was increased Congressional and public concern about the widespread use of tax information by government agencies for purposes unrelated to tax administration. This concern culminated with a total revision of section 6103 in the Tax Reform Act of 1976. There, Congress *eliminated Executive discretion* regarding what information could be disclosed to which Federal and state agencies and established a new statutory scheme under which tax information was confidential and not subject to disclosure *except to the extent explicitly provided by the Code.* Although there have been many amendments to the law since that time, the basic statutory scheme established in 1976 remains in place today.

U.S. Dep't of the Treasury, Off. of Tax Pol'y, *Report to the Congress on Scope and Use of Taxpayer Confidentiality and Disclosure Provisions, Vol. I: Study of General Provisions* 3 (Oct.

2000) (emphasis added); *see also* Internal Revenue Serv., Off. of Chief Couns., *Disclosure Litigation Reference Book* 1-11 (Apr. 2000) (describing the legislative debate over the Tax Reform Act and concluding that "[i]n short, Congress undertook direct responsibility for determining the types and manner of permissible disclosures.").

Consistent with this framework, Congress has sought to prevent unauthorized disclosures of tax information, including by passing numerous statutes that include criminal penalties for disclosure. S*ee, e.g.,* 26 U.S.C. § 7213(a)(1) (U.S. officer or employee or contractor); 26 U.S.C. § 7213(a)(2) (state employees); 26 U.S.C. § 7213(a)(3) (for publication); 26 U.S.C. § 7213(a)(4) (unlawful solicitation of tax returns); and 26 U.S.C. § 7216 (return preparers).

The highly restricted nature of taxpayer information has been repeatedly reenforced by the IRS in instructions to its employees concerning their personal liability for unauthorized disclosure. For example, the manual provides that "Every IRS employee, contractor and stakeholder who has access to Federal Tax Information (FTI) . . . is responsible to protect it from unauthorized access, use or disclosure." Internal Revenue Servs., *Internal Revenue Manual*, § 11.3.1.1.1 (Aug. 3, 2023) ("IRS Manual"). The Manual continues:

> IRC 6103(a) prohibits the disclosure of returns and return information unless authorized by Title 26. Although a disclosure may be authorized by statute, the person making the disclosure must also have the authority and follow the proper procedures, or the disclosure is not authorized. IRS employees are required, under IRC 6103, to ensure that returns and return information are protected from unauthorized disclosure and access. The IRS employee making the disclosure is responsible for ensuring the authority of the recipient to receive it. . . . IRS employees are personally responsible for verifying the identity and authority of the recipient to receive tax data prior to making any disclosure – failure to establish the recipient's authority may be negligent.

*Id.* at § 11.3.1.4 (Aug. 13, 2018).

This promise of confidentiality, and protection it provides against the weaponization of taxpayer information, has also been repeatedly reiterated by the IRS to the public. The IRS

Taxpayer Bill of Rights, codified by the Protecting Americans from Tax Hikes Act of 2015 (PATH Act) § 401, as part of the Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, div. Q, 129 Stat. 2242, 3117 (2015), makes a specific promise to taxpayers of the right to confidentiality. That promise is repeated numerous times on IRS webpages and outreach materials: "Taxpayers have the right to expect that any information they provide to the IRS will not be disclosed unless authorized by the taxpayer or by law. . . . In general, the IRS may not disclose your tax information to third parties unless you give us permission." *Taxpayer Bill of Rights 8: The Right to Confidentiality,* Internal Revenue Servs. (Jan. 23, 2025), https://www.irs.gov/newsroom/taxpayer-bill-of-rights-8.

Thus, assurances of confidentiality are embedded in Congress's legal and statutory framework, such as § 6103 and OMB guidelines, the IRS's internal training and operational documents, and in repeated representations the IRS makes to the public.

## II.    INDIVIDUAL TAX IDENTIFICATION NUMBERS WERE CREATED SO THAT IMMIGRANTS AND OTHERS COULD PAY TAXES OWED TO THE GOVERNMENT

In July 1996, the IRS (under existing authority in the tax code) launched the ITIN program administratively. The IRS created ITINs (9-digit numbers provided to people who needed a method to file U.S. taxes) solely for tax administration purposes. It decided on this mechanism because it would enable the Service to identify and track the reporting and payment of tax obligations by individuals who otherwise lacked Taxpayer Identification Numbers (TINs) or SSNs.

The final rule, Taxpayer Identifying Numbers (TINs), 61 Fed. Reg. 26,788 (May 29, 1996) ("TINs Regulation"), explained that the ITIN was designed to help those who "need a TIN but cannot qualify for a social security number," thereby creating a mechanism for those individuals to comply with tax laws without fearing deportation. Thus, by design, the IRS created ITINs to include undocumented immigrants, availing them of a method to pay taxes alongside a specific

and public promise that "no inference" with regard to immigration status would result from this use. *Id*.

Federal funding has also for decades supported outreach and tax clinics for ITIN filers, as well as payment portals, to help them and others holding ITINs pay their taxes. *Volunteer Income Tax Assistance (VITA) sites with ITIN services*, Internal Revenue Servs. (Jan. 16, 2025), https://www.irs.gov/tin/itin/volunteer-income-tax-assistance-vita-sites-with-itin-services.

The choice made by Congress to maintain the mission and purpose of the IRS has resulted in substantial income for the U.S. Treasury, totaling billions of dollars annually. *See Tax Payments by Undocumented Immigrants*, Inst. on Tax'n & Econ. Pol'y (July 30, 2024), https://itep.org/undocumented-immigrants-taxes-2024/. For 2022, some of those key data points include that:

> More than a third of the tax dollars paid by undocumented immigrants go toward payroll taxes dedicated to funding programs that these workers are barred from accessing. Undocumented immigrants paid $25.7 billion in Social Security taxes, $6.4 billion in Medicare taxes, and $1.8 billion in unemployment insurance taxes in 2022.

*Id*. Another data point is that "undocumented immigrants paid $19.5 billion in federal income taxes alone in 2022, and $96.7 billion total in U.S. taxes including $59.4 billion in payments to the federal government and $37.3 billion in payments to states and localities." *Id*.

The Yale "Budget Lab" recently estimated the costs of effects on compliance with tax obligations for just undocumented workers, finding that "unauthorized immigrants paid $66 billion in federal income & payroll taxes in 2023, about 2/3 of which was payroll taxes." *The Potential Impact of IRS-ICE Data Sharing on Tax Compliance,* The Budget Lab (Apr. 8, 2025), https://budgetlab.yale.edu/research/potential-impact-irs-ice-data-sharing-tax-compliance ("Budget Lab"). In the event of an IRS-ICE agreement, there could be a "0.5% loss in federal

income and payroll tax revenue on average, or $25 billion in 2026 (central range of $12-39 billion) and $313 billion ($147-479 billion) over 2026-35." [4] *Id*.

In creating the ITIN program, the IRS had "extensive discussions" with both the Immigration and Naturalization Service (INS) (the predecessor to ICE) and the Social Security Administration, ultimately concluding that the IRS itself would issue ITINs (rather than INS) to ensure the number was used solely for tax administration. TINs Regulation (noting that the Social Security Administration, INS, and State Department "concur that the IRS is the appropriate initiator of a numbering system dedicated solely for tax purposes").

The agency assured Congress and the public that its focus was collecting revenue rather than policing immigration: "Having the IRS as the sole issuer of ITINs will facilitate the general public's acceptance of the fact that the assignment of an ITIN creates no inference regarding the immigration status of an alien individual or the right of that individual to be legally employed in the United States." *Id*. In 2017, during the first Trump Administration, following changes discussed below to related provisions under the PATH Act, IRS officials noted publicly that: "'The IRS has strong processes in place to protect the confidentiality of taxpayer information, and this includes information related to tax returns filed using ITINs. . . . There is no authorization under this provision [of the PATH Act] to share tax data with ICE.'" Maria Sacchetti, *Undocumented and paying taxes, they seek a foothold in the American Dream*, Wash. Post (Mar. 11, 2017), https://www.washingtonpost.com/local/social-issues/undocumented-and-paying-taxes-they-seek-

---

[4] The researchers note that "there is considerable uncertainty around this estimate as it is hard to gauge how taxpayer behavior will adjust and the extent to which adjustment will be feasible." Budget Lab.

a-foothold-in-the-american-dream/2017/03/11/bc6a8760-0436-11e7-ad5b-d22680e18d10_story.html.

In 2015, Congress directly addressed ITINs as part of its PATH Act. ITIN-related provisions included: (1) expiration and renewal of ITINs, meaning that ITINs not used on a tax return for 3 consecutive years would expire and all ITINs issued before 2013 would also expire on a staggered schedule, requiring taxpayers to renew them; and 2) documentation rules were codified, which is something the IRS had already administratively imposed in 2012. Pub. L. No. 114-113, div. Q, 129 Stat. 2242, 3078 (2015). Most notably, what the law did not do was enable immigration enforcement by way of ITIN disclosure in any fashion.

This was not by accident. In response to Congressional debate over whether to alter the tax system to aid the INS and immigration enforcement, in 2004 Commissioner Mark Everson, who was appointed by President George W. Bush and had previously served as deputy commissioner of the Immigration and Naturalization Service, warned about a "chilling effect" if such disclosure was allowed. *See Social Security Number and Individual Taxpayer Identification Number Mismatches and Misuse*: *Hearing Before the Subcomm. on Oversight & the Subcomm. on Soc. Sec. of the H. Comm. on Ways & Means*, 108th Cong. 12 (Mar. 10, 2004) ("SSN and ITIN Hearing"):

> We must also weigh the potential benefits of any changes to the ITIN program against the cost of those changes to the tax system, including both direct economic costs and the indirect costs that arise from discouraging participation in the tax system. As an example, the Service believes at this time that any sharing of confidential taxpayer information, directly or indirectly, with immigration authorities would have a chilling effect on efforts to bring ITIN holders, and potential ITIN holders, into the U.S. tax system. Such an initiative would deprive the Federal Government of tax revenue by discouraging illegal workers in the U.S. from participating in the tax system, when the Code requires them to pay tax on their U.S. earnings.

*Id*. at 12.

Thus, it has long been Congress's conclusion that if these taxpayers were to fear that their personal information would be used for immigration enforcement, many would stop filing taxes and this would result in billions of dollars in lost revenue, not to mention reducing funding for Social Security and Medicare. As Everson states, the use of taxpayer information for immigration enforcement has been excluded by both Congress and IRS officials, while privacy for ITIN holders has been viewed by Congress as a way to ensure that IRS resources are focused on tax revenues. *Id*.

III.    **UNDER § 6103, INFORMATION SHARING WITH ICE HAS NEVER BEEN AUTHORIZED; CONGRESS HAS ONLY PERMITTED INFORMATION SHARING EXPRESSLY AUTHORIZED BY A STATUTORY EXCEPTION, AND CONGRESS CONSIDERED AND REJECTED THE EXPANSION THAT THE ADMINISTRATION NOW SEEKS**

Under 26 U.S.C. § 6103, all "returns and return information" are confidential and cannot be disclosed by the IRS except in narrowly defined circumstances. Congress has built into the statute a number of very specific exceptions, including, for example, sharing with state tax agencies, child support enforcement, or, later, for healthcare eligibility checks. Each of these exceptions are included with specificity in the body of the statute but notably there is no general exception allowing disclosure for immigration enforcement, whether civil or criminal.

Absent a statutory exception, § 6103 does not permit the sharing of information with ICE. The need for a specific congressionally authorized exception is paramount. Unless a law explicitly overrides § 6103 by name, even a statute with a "notwithstanding any other law" clause does not override the tax code's confidentiality rules. In his 2004 testimony, Commissioner Everson reiterated this in explaining the longstanding purpose of the statutory scheme:

> First, there are undoubtedly points of conflict and points of tension between our tax laws and our immigration laws. What may be beneficial from the perspective of immigration law or policy, may not be beneficial from the perspective of tax law and tax administration. Second, our tax laws make no distinction, either in the tax payment and reporting obligations of taxpayers or the tax collection and tax

11

administration obligations of the IRS, between immigrants who are legally employed in this country, and those who are not. The Service must necessarily continue to fulfill its obligations to administer the tax laws to taxpayers who are not legally employed in our country, but who owe taxes because they, in fact, earned income here. Third, the Service must, and will continue to solicit the participation of such taxpayers in our system, as it does with other taxpayer groups. …The IRS desires to facilitate these individuals' entry and continuing participation in our tax system, and to lessening impediments to their participation. Fourth, the Service continues to be bound and guided in its sharing of taxpayer information by the provisions of Internal Revenue Code section 6103. The provisions of section 6103 protect the confidentiality of taxpayer information, and broadly restrict the sharing of taxpayer information by the IRS with employers or with other government agencies, except under narrow circumstances. I would urge Congress to carefully balance the competing public interest at stake before deciding to make any changes to this provision of the tax law.

SSN and ITIN Hearing at 10.

To be sure, Congress has amended § 6103 when it felt that circumstances necessitated tightly bound disclosures. In the wake of 9/11, Congress passed the Victims of Terrorism Tax Relief Act of 2001, Pub. L. No. 107-134, § 201, 115 Stat. 2427, 2443 (2001), amending the tax code's confidentiality rules to aid law enforcement against terrorism by adding § 6103(b)(11) and defining "terrorist incident, threat, or activity." This allowed the IRS to share relevant tax information with federal law enforcement for terrorism cases.

Another specific exception was later added in response to the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, §1411, 124 Stat. 119, 225 (2010). This exception to tax confidentiality appears in 26 U.S.C. § 6103(l)(21), authorizing the IRS to disclose certain batched tax return information to the Department of Health and Human Services for determining eligibility for health insurance affordability programs (*e.g.*, income verification for premium tax credits). Similar amendments for the batch sharing of information to facilitate access to benefits were made by Congress in the Fostering Undergraduate Talent by Unlocking Resources for Education (FUTURE) Act, Pub. L. No. 116-91, § 3, 133 Stat. 1188, 1189 (2019), which modified § 6103,

creating § 6103(l)(13) in order to permit the IRS to disclose tax return information directly to authorized Education Department officials determining eligibility and the amount of federal student financial aid.

However, even when another enactment by Congress would facially require information collection or sharing, the presumption is that a specific exception must be enacted by Congress to § 6103 in order to override its prerogatives to prevent data sharing, including names, address, and information on immigration status. This has even been held to be true when "required" by a law under a specific statutory requirement:

> Consistent with tenets of statutory construction, it has been a long-standing interpretation of the IRS that, unless a provision of law outside the Code explicitly overrides section 6103 by specifically identifying it, a statute of general application (*i.e.,* "notwithstanding any other law") does not override the restrictions of section 6103 on the disclosure of returns and return information. The Illegal Immigration Reform and Immigration Responsibility Act of 1996 requires the Commissioner of Social Security to report to the Attorney General the names and addresses of aliens who are not eligible for employment but who had Social Security earnings. The provision does not specifically override section 6103. . . . The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 also provides that information concerning illegal alien status should be provided to the Immigration and Naturalization Service notwithstanding any other law. The Treasury Inspector General for Tax Administration has noted that the IRS is not providing information about a taxpayer's illegal alien status that the IRS may have obtained as a result of an application [for] ITIN or otherwise because the provisions does not [sic] specifically override section 6103.

Joint Committee Report at 11–12 (internal citations omitted).

Simply put, Congress has never passed a specific statutory exception for the IRS to share data related to immigration enforcement. The lack of such an exception has severely constricted the IRS from sharing information regarding ITIN immigrant taxpayers. As IRS officials wrote in response to the Treasury Inspector General's Office's annual report to Congress in 2003:

> The Service has no legal authority with respect to the enforcement of immigration and social security administration laws. Moreover, the Service is broadly restricted under Section 6103 of the Internal Revenue Code from sharing taxpayer

information, including the possibility that the applicant is not working legally in the United States, with third parties, including other executive agencies, except in very limited circumstances.

Gordon C. Milbourn, III, U.S. Dept. of Treasury, Treasury Inspector Gen. for Tax Admin., *The Internal Revenue Service's Individual Taxpayer Identification Number Creates Significant Challenges for Tax Administration*, App'x X (Jan. 8, 2004).

Despite this, the Administration now seeks to interpret Congressionally-passed legislation in § 6103(i)(2)—providing limited authority for certain types of tax information to be made available under tightly controlled circumstances for non-tax criminal investigations—as permitting broad data-sharing within the Administration. The Administration's reading of § 6103(i)(2) is incorrect. Section 6103(i)(2) does not permit the access to taxpayer information that the Administration now seeks. Leaving aside the notable and sudden departures of a raft of knowledgeable IRS officials in protest of the Administration's interpretation, there are at least three fundamental flaws in the Administration's analysis. *See* Nathan Layne & Kanishka Singh, *Top IRS officials join chief in quitting following immigration data deal,* Reuters (Apr. 9, 2025, 12:06 PM), https://www.reuters.com/world/us/us-irs-chief-quit-over-deal-share-data-with-immigration-officials-report-says-2025-04-08/.

*First*, as discussed above, any exception to § 6103 must be clear and explicitly stated within the body of the statute. More specifically as to § 6103(i)(2), it does not authorize disclosure or inspection of taxpayer information for the purposes of providing a taxpayer's address, which is precisely what the MOU seeks. Section 6103(i)(2) requires an address to make a request, a point enforced by the IRS Manual § 11.3.28.4(5), which makes clear that "[r]equests for addresses only are invalid because IRC 6103(i)(2) requires that the requester provide an address." IRS Manual § 11.3.28.4(5) (Apr. 17, 2025). This is because the statutory requirement would be meaningless if

*any* address will suffice rather than the address and name that together would allow the IRS to match the request with internal records. Indeed, this requirement has existed ever since the current version of § 6103(i)(2) was passed into law more than forty years ago in 1982, and it is significant that until now it has never even been argued that it could be applied in the manner that the MOU suggests. *See* Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, § 356 (1982).

By contrast, when Congress has sought to specifically authorize disclosure of an address, it has done so, such as in § 6103(i)(5), which expressly authorizes access to location information contained in tax records when the individual at issue is a fugitive from justice and a court specifically authorizes the disclosure. Similarly, multiple provisions under § 6103(m) duly authorize sharing address information with other federal agencies, or even with the media, for specified reasons. These include §§ 6103: (m)(1) (release to media for notifications of tax refunds owed by IRS); (2)(A) (address disclosure to a federal agency to collect federal claims); (3) (mailing address disclosure to agency to inform individuals of occupational exposures); (4)(A) (mailing address disclosure to Department of Education regarding student loan defaulters); (5)(A) (address disclosure to Department of Health and Human Services regarding student loan defaulters); (6)(A) (address disclosure to blood donor service to locate individuals of health risks); and (7) (address disclosure to the Social Security Administration to mail statements). Notably, there is no similar authorization in § 6103(i)(2).

In conclusion, Congress has never authorized any textual exception to § 6103 that is remotely close to the use being contemplated in the Memorandum of Understanding. There is no question that Congress knows how to craft legal exceptions, including for batch data sharing, as it has done so for student loans and health benefits by the IRS. However, it has not done so here. Indeed, the number of files requested (whether 700,000 or 7 million) raises the specter of an end-

run or pretextual approach to the statutory requirements, particularly given the history of clear statements of law and policy that immigration enforcement is not a permissible purpose under § 6103. Simply put, while § 6103 includes exceptions to the privacy of tax return information in certain circumstances, none come close to permitting batch sharing or the sharing of location information in these circumstances, nor specifically for the purpose of immigration enforcement.

*Second*, to accept the government's position, one must conclude that Congress intended to abrogate the underlying purpose for establishing the ITIN program in the first place, which was to create the ability for all those subject to federal tax laws to comply with their tax obligations under the law while being told that their information would not be shared by the IRS in ways that could impact their immigration status. Thus, to support the Administration's position, the court must assume that Congress and the IRS intentionally misrepresented the state of the law to millions of taxpayers for decades in order to collect their revenues while secretly knowing that there was a hidden mechanism through which DHS could collect their tax data without informing them of that possibility.

*Third*, the legislative record of attempts to amend § 6103 to permit information-sharing with DHS makes clear that the consistent choice of Congress has been to allow the IRS to fulfill its mission to collect taxes by explicitly choosing taxpayer privacy over the exigencies of immigration enforcement goals. Indeed, the record, as discussed below, shows that Congress repeatedly considered possible amendments to allow information-sharing for immigration enforcement under limited circumstances but rejected them. Such tensions among federal policy goals have been extensively debated, yet Congress to this day has chosen not to authorize the sharing of confidential taxpayer information with immigration authorities. Instead, the legislature considered ways that immigration enforcement would be funded and pursued by other means

available to the federal government, while the IRS was specifically empowered to ensure that everyone with federally taxable income could pay taxes without fear.

Certainly, this Administration was not the first to consider the prospect currently before the Court of easing tax privacy in order to aid immigration enforcement. Bills to allow the IRS to share information about undocumented taxpayers with DHS or ICE have on several occasions died in committee hearings or as draft amendments. For instance, The Comprehensive Immigration Reform Act of 2006 included several tax-related provisions. Comprehensive Immigration Reform Act of 2006, S. 2611, 109th Cong. § 301 (2006) ("S. 2611"). It proposed to amend 26 U.S.C. § 6103 to allow limited information sharing with the Department of Homeland Security. *Id*. The Joint Committee on Taxation questioned "whether the potential benefits to Department of Homeland Security workplace enforcement outweigh the adverse effects on taxpayer compliance and privacy that would result from the disclosures of return information." Joint Committee Report at 1. While S.2611 passed the Senate, it failed in the House.

An amendment to the proposed Bill to Amend the Immigration and Nationality Act to Provide for Comprehensive Reform and for Other Purposes, S. 2454, 109th Cong. (2006) proposed by Sen. Ben Nelson sought to amend § 6103(i) by adding the following paragraph:

> (9) Disclosure of information relating to violations of federal immigration law: (A) Upon receipt by the Secretary of the Treasury of a written request, by the Secretary of Homeland Security or Commissioner of Social Security, the Secretary of the Treasury shall disclose return information to officers and employees of the Department of Homeland Security and the Social Security Administration who are personally and directly engaged in: (i) preparation for any judicial or administrative civil or criminal enforcement proceeding against an alien under the Immigration and Nationality Act (8 U.S.C. 1101 *et seq*.), other than the adjudication of any application for a change in immigration status or other benefit by such alien, or (ii) preparation for a civil or criminal enforcement proceeding against a citizen or national of the United States under section 274, 274A, or 274C of the Immigration and Nationality Act (8 U.S.C. 1324, 1324a, or 1324c), or (iii) any investigation which may result in the proceedings enumerated in clauses (i) and (ii) above.

Amendment to S. 2454, S. Amdt. 3267 to S. Amdt. 3192, 109th Cong. (2006) (amendment of Sen.

Ben Nelson). No action was taken on that amendment.

As part of the debate over S. 2611, an amendment proposed by Sen. Chuck Grassley took

a narrower approach and passed the Senate on May 23, 2006. Amendment to S. 2611, S. Amdt.

4177, 109th Cong. (2006) (amendment of Sen. Chuck Grassley). Specifically, it proposed to amend

§ 6103(l) to allow DHS to obtain certain information from the SSA, upon written request, namely:

> (i) Disclosure of employer no-match notices—Taxpayer identity information of
> each person who has filed an information return required by reason of section 6051
> during calendar year 2006, 2007, or 2008 which contains: (I) more than 100 names
> and taxpayer identifying numbers of employees (within the meaning of such
> section) that did not match the records maintained by the Commissioner of Social
> Security, or (II) more than 10 names of employees (within the meaning of such
> section) with the same taxpayer identifying number.

*Id*. In remarks on the Senate floor, Senator Grassley explained the considerations that informed

his proposed amendment:

> With respect to information sharing, the amendment contains important language
> regarding the use of tax return information. The protection of taxpayer information
> is a cornerstone of our voluntary tax system. These protections are found in section
> 6103 of the tax code and are designed to strike the balance between taxpayer
> privacy and legitimate law enforcement. . . . [W]e have taken a more focused
> approach. We identified the specific information that would be needed to identify
> potentially illegal workers and crafted an amendment to 6103 that permits such use
> while maintaining all of the privacy protections afforded by 6103. Specifically, we
> allow the Social Security Administration to share taxpayer identity information
> with DHS for the next 3 years. The information that can be shared would be for
> those employers who had more than 100 employees with names and numbers that
> do not match, and employers who used the same social security number for more
> than 10 employees. In addition, DHS would be able to request that SSA provide
> information to identify employers who are not participating in the system, and
> employers who are not verifying all of their new employees. This information
> sharing would sunset after 3 years unless Congress extends this authority. We will
> closely monitor the use of this authority to determine if it should be extended.

152 Cong. Rec. S4953 (daily ed. May 23, 2006) (statement of Sen. Chuck Grassley).

This amendment also failed to pass the House and become law. However, these failures demonstrate that Congress understands the data-sharing limitations placed upon information-sharing by § 6103, including (i)(2). Congress's failed attempts to pass these exceptions show that Congress is aware that in order to alter this data-sharing limitation, it is Congress that needs to pass appropriate legislation to do so. Yet, as of today, no such legislation explicitly mandating IRS-ICE data sharing has ever been passed. The bottom line is that the Administration can neither usurp Congress's role nor twist, beyond recognition, statutory language to do what Congress has not.

Furthermore, *Amici* fear that if the Administration is permitted to usurp the role of Congress in this fashion, all taxpayers with SSNs may become vulnerable to data-sharing under this or future MOUs, exposing all taxpayers to a profound incursion on their privacy based only on rough categorizations of individuals through batch inquiries that may or may not yield criminal charges. The application before this court and such other potential applications to follow are inconsistent with the intent of Congress, the specificity of Congress's studied and limited exceptions to § 6103, and would chill tax compliance even beyond the millions of taxpayers in the ITIN program, endangering federal revenues more generally. Meanwhile, the costs over time of greatly diminished public faith in the confidentiality of tax filings and the post-hoc changes in Administration policies that may substantially impact the privacy and private lives of taxpayers will likely also prove intolerably high.

Whatever these costs, they certainly were not ones sanctioned by Congress.

## **<u>CONCLUSION</u>**

This Court should grant Plaintiffs' motion for a preliminary injunction.

April 29, 2025

Respectfully submitted,

*/s/ Leah M. Nicholls*
Leah M. Nicholls (DC Bar No. 982730)
PUBLIC JUSTICE
1620 L St. NW, Ste. 630
Washington, DC 20036
(202) 797-8600
lnicholls@publicjustice.net

Gerson H. Smoger*
SMOGER & ASSOCIATES, P.C
4228 Hallmark
Dallas, TX
(510) 531-4529
Smogerlaw@gmail.com

* Motion for *pro hac vice* admission forthcoming

*Counsel for Amici Curiae Members of Congress*

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2025, I caused a copy of the foregoing Notice of Appearance to be sent via the Court's CM/ECF system to counsel of record who have entered an appearance in this case.

*/s/ Leah M. Nicholls*
Leah M. Nicholls

*Counsel for Amici Curiae*
*Members of Congress*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with all the applicable requirements of LCvR 7(o), including all formatting requirements set forth in this rule. Specifically, the undersigned certifies that the brief complies with the applicable page limit set forth in LCvR 7(o) as it contains 19 pages.

I acknowledge that my brief may be stricken if it fails to comply with any of the applicable requirements.

*/s/ Leah M. Nicholls*
Leah M. Nicholls

*Counsel for Amici Curiae*
*Members of Congress*

## APPENDIX: LIST OF *AMICI CURIAE*

1. **Gabe Amo**
   Representative of Rhode Island

2. **Yassamin Ansari**
   Representative of Arizona

3. **Becca Balint**
   Representative of Vermont

4. **Nanette Barragán**
   Representative of California

5. **Joyce Beatty**
   Representative of Ohio

6. **Ami Bera**
   Representative of California

7. **Suzanne Bonamici**
   Representative of Oregon

8. **Julia Brownley**
   Representative of California

9. **Salud O. Carbajal**
   Representative of California

10. **Troy Carter**
    Representative of Louisiana

11. **Greg Casar**
    Representative of Texas

12. **Kathy Castor**
    Representative of Florida

13. **Joaquin Castro**
    Representative of Texas

14. **Sheila Cherfilus-McCormick**
    Representative of Florida

15. **Judy Chu**
    Representative of California

16. **Gilbert R. Cisneros, Jr.**
    Representative of California

17. **Yvette Clarke**
    Representative of New York

18. **Emanuel Cleaver, II**
    Representative of Missouri

19. **J. Luis Correa**
    Representative of California

20. **Jim Costa**
    Representative of California

21. **Joe Courtney**
    Representative of Connecticut

22. **Jasmine Crockett**
    Representative of Texas

23. **Danny K. Davis**
    Representative of Illinois

24. **Madeleine Dean**
    Representative of Pennsylvania

25. **Maxine Dexter**
Representative of Oregon

26. **Lloyd Doggett**
Representative of Texas

27. **Sarah Elfreth**
Representative of Maryland

28. **Veronica Escobar**
Representative of Texas

29. **Adriano Espaillat**
Representative of New York

30. **Cleo Fields**
Representative of Louisiana

31. **Lizzie Fletcher**
Representative of Texas

32. **Bill Foster**
Representative of Illinois

33. **Laura Friedman**
Representative of California

34. **Maxwell Alejandro Frost**
Representative of Florida

35. **John Garamendi**
Representative of California

36. **Jesús G. "Chuy" García**
Representative of Illinois

37. **Robert Garcia**
Representative of California

38. **Sylvia Garcia**
Representative of Texas

39. **Jimmy Gomez**
Representative of California

40. **Maggie Goodlander**
Representative of New Hampshire

41. **Al Green**
Representative of Texas

42. **Pablo Jose Hernandez**
Representative of Puerto Rico

43. **Steven Horsford**
Representative of Nevada

44. **Jared Huffman**
Representative of California

45. **Glenn F. Ivey**
Representative of Maryland

46. **Sara Jacobs**
Representative of California

47. **Pramila Jayapal**
Representative of Washington

48. **Henry C. ("Hank") Johnson, Jr.**
Representative of Georgia

49. **Sydney Kamlager-Dove**
Representative of California

50. **Robin L. Kelly**
Representative of Illinois

51. **Ro Khanna**
Representative of California

52. **Teresa Leger Fernandez**
Representative of New Mexico

53. **Mike Levin**
Representative of California

54. **Sam Liccardo**
Representative of California

55. **Ted W. Lieu**
Representative of California

56. **Lucy McBath**
Representative of Georgia

57. **Jennifer L. McClellan**
Representative of Virginia

58. **Betty McCollum**
Representative of Minnesota

59. **James P. McGovern**
Representative of Massachusetts

60. **LaMonica McIver**
Representative of New Jersey

61. **Gregory W. Meeks**
Representative of New York

62. **Robert Menendez**
Representative of New Jersey

63. **Dave Min**
Representative of California

64. **Kevin Mullin**
Representative of California

65. **Jerrold Nadler**
Representative of New York

66. **Eleanor Holmes Norton**
Representative of the District of
Columbia

67. **Alexandria Ocasio-Cortez**
Representative of New York

68. **Ilhan Omar**
Representative of Minnesota

69. **Scott H. Peters**
Representative of California

70. **Chellie Pingree**
Representative of Maine

71. **Nellie Pou**
Representative of New Jersey

72. **Mike Quigley**
Representative of Illinois

73. **Delia C. Ramirez**
Representative of Illinois

74. **Emily Randall**
Representative of Washington

75. **Jamie Raskin**
Representative of Maryland

76. **Luz M. Rivas**
Representative of California

77. **Deborah K. Ross**
Representative of North Carolina

78. **Raul Ruiz**
Representative of California

79. **Andrea Salinas**
Representative of Oregon

80. **Linda T. Sánchez**
Representative of California

81. **Mary Gay Scanlon**
Representative of Pennsylvania

82. **Jan Schakowsky**
Representative of Illinois

83. **Lateefah Simon**
Representative of California

84. **Adam Smith**
Representative of Washington

85. **Darren Soto**
Representative of Florida

86. **Melanie A. Stansbury**
Representative of New Mexico

87. **Greg Stanton**
Representative of Arizona

88. **Mark Takano**
Representative of California

89. **Shri Thanedar**
Representative of Michigan

90. **Bennie G. Thompson**
Representative of Mississippi

91. **Dina Titus**
Representative of Nevada

92. **Rashida Tlaib**
Representative of Michigan

93. **Jill Tokuda**
Representative of Hawaii

94. **Paul Tonko**
Representative of New York

95. **Norma J. Torres**
Representative of California

96. **Ritchie Torres**
Representative of New York

97. **Lori Trahan**
Representative of Massachusetts

98. **Derek T. Tran**
Representative of California

99. **Juan Vargas**
Representative of California

100. **Gabe Vasquez**
Representative of New Mexico

101. **Nydia M. Velázquez**
Representative of New York

102. **Debbie Wasserman Schultz**
Representative of Florida

103. **Maxine Waters**
Representative of California

104. **Bonnie Watson Coleman**
Representative of New Jersey

105. **Frederica S. Wilson**
Representative of Florida

# Exhibit B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Centro de Trabajadores Unidos, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 25-677 (DLF) |
| Scott Bessent, in his official capacity as Secretary of the Treasury, et al., | |
| Defendants. | |

**[PROPOSED] ORDER**

On consideration of the Motion by 105 Members of Congress for leave to file an *amicus curiae* brief in support of Plaintiffs' motion for a preliminary injunction and the entire record herein, it is hereby:

**ORDERED** that the motion is GRANTED. The Clerk of Court is directed to file 105 Members of Congress's *Amicus Curiae* Brief in Support of Plaintiffs' Motion for a Preliminary Injunction, attached as Exhibit 1, onto the electronic case docket in the above-captioned matter.

**SO ORDERED.**

This _____ day of _____, 2025.

**BY THE COURT:**

_____
The Honorable Judge Dabney L. Friedrich
United States District Court Judge